# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **AMANI REED** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.** |
| | ) | **JURY DEMAND** |
| **UNIVERSITY SCHOOL OF NASHVILLE,** | ) | |
| **Defendant.** | ) | |

## <u>COMPLAINT</u>

Plaintiff Amani Reed ("Plaintiff" or "Mr. Reed"), by and through his undersigned counsel, as and for his Complaint in this action against Defendant University School of Nashville, Inc. ("Defendant" or "USN"), hereby alleges as follows:

## TABLE OF CONTENTS

NATURE OF THE CLAIMS ................................................................................................3

JURISDICTION & VENUE ...............................................................................................3

PARTIES ...........................................................................................................................3

CASE SUMMARY ............................................................................................................4

EXHIBITS ..........................................................................................................................6

   Exhibit A: The Barnes & Thornburg Independent Investigation Report .................6

   Exhibit B: Expert Memorandum from Law Professor Eric F. Amarante ................8

   Exhibit C: Mr. Reed's Employment Agreement ......................................................9

   Exhibit D: USN's Termination Letter ....................................................................10

   Exhibit E: USN Conflict of Interest Policy ...........................................................10

FACTS ..............................................................................................................................11

   Relevant Background History of Mr. Reed & USN ...............................................11

   2021 - 2022: USN's Prior Sexual Misconduct Investigation & PR Crisis............15

   Oct. 21, 2021: Hires Mr. Reed after National Search ...........................................16

   Dec. 2021: USN Breaches Mr. Reed's Contract Before He Arrives .....................20

   July 1, 2021: Mr. Reed Begins as Director, USN Continues Breaching his Contract ...........................24

May 2 - June 20, 2024: Mr. Reed Oversees the Masullo Investigation ...................................................27

June 20, 2024 - Board Recognizes & Rewards Mr. Reed for Another "Great" Year ............................36

June 20 - July 3, 2025: Masullo Investigation Ends, Mr. Reed Terminates Dr. Masullo ....................38

July 10, 2025: Mr. Reed & Alumnus Meet a 3rd Time, Attorney Appears Unannounced ...................40

August 8 - 22, 2024: Alumnus Requests Board Meeting, Board Refuses, Crisis Results ....................42

Aug. 22, 2025: Trustees Receive Letter Defaming Mr. Reed, Leak it to the Public ............................43

Aug. - Dec. 2025: USN Responds to 2024 PR Crisis with B&T Investigation .....................................51

Oct. 27, 2024: Mr. Reed Reports Racial Discrimination to the Board, Board Ignores Him.................55

Dec. 18, 2024: B&T Report Criticizes the Board, Reveals Conflicts of Interest...................................61

Dec. 18, 2024: B&T Report Provides Notice to Sims Funk of Conflict of Interest..............................67

Dec. 18, 2024: B&T Report Reveals Board Breached SAIS Accreditation Standards..........................68

Dec. 19, 2024: Mr. Reed Reads Report, Objects to Inaccuracies ..........................................................71

Dec. 24, 2024: USN Notifies Mr. Reed on Christmas Eve He Faces Termination ...............................74

Dec. 24, 2024 - Jan. 6, 2025: Committee Calls Special Meeting, Violates Bylaws .............................76

Dec. 26, 2024 - Jan. 3, 2025: USN Ignores Notice of Resignation......................................................77

Jan. 5, 2025: Mr. Reed Writes Letter Notifying Board of EEOC Charge & Objections .......................80

Jan. 6, 2025: The Board Votes to Fire Mr. Reed, Violates Law ...........................................................83

Post-Jan. 7, 2025: USN Engages in More Deceptive & Punitive Actions ............................................90

Feb. 22, 2025: Poll Shows Board Continues to Lack Credibility .........................................................94

Sept. 11, 2025: Law Professor & Governance Expert Opines in Support of Mr. Reed........................98

Damages: USN's Unlawful Actions Caused Mr. Reed Catastrophic Harm & Damages ....................101

FIRST CAUSE OF ACTION ...............................................................................................................104

Racial Discrimination pursuant to Section 1981 ...............................................................................104

SECOND CAUSE OF ACTION ..........................................................................................................109

Retaliation pursuant to Section 1981................................................................................................109

Prayers for Relief................................................................................................................................114

## NATURE OF THE CLAIMS

1.     This is an action for monetary damages to redress Defendants' unlawful employment practices against Plaintiff, including its discriminatory treatment of Amani Reed due to his race and its unlawful retaliation against him after he twice complained about unlawful discrimination and harassment in the workplace in violation of the Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

## JURISDICTION & VENUE

2.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and 28 U.S.C. § 1332.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

4.     Plaintiff Amani Reed ("Mr. Reed") is a resident and citizen of Fulton County, Georgia. He is an African American man.  Mr. Reed was employed as Director of Defendant University School of Nashville, Inc. from July 1, 2022 until terminated on January 7, 2025.

5.     Defendant University School of Nashville, Inc. is a kindergarten through 12th grade private independent school and a Tennessee nonprofit corporation with a principal address 2000 Edgehill Road, Nashville, Tennessee 37212.

# CASE SUMMARY

6.      Defendant USN employed Amani Reed as its Director or "chief administrative officer" from July 1, 2022 – January 7, 2025.  He is in a protected class because he is African American and was the first minority of any type to serve as a non-interim Director in USN's 110-year history. On January 6, 2025, USN's Board of Trustees[1] voted to terminate Mr. Reed "for Cause"[2] as defined in his employment agreement,[3] which constitutes the material adverse employment action for purposes of his legal claims herein.  Evidence of discrimination and discriminatory intent lies in the Board's consistently treating Mr. Reed during his employment and through his termination far less favorably than USN's Boards treated the ten Directors who proceeded him, all of whom were  white/Caucasian men. This includes his predecessor who, in 2021, led USN through a public relations crisis analogous to a public relations crisis Mr. Reed led USN through in 2024.  It is Mr. Reed's handling of this 2024 crisis which, USN generally claims, warranted his termination. But if the Board had acted consistently with how it treated his predecessor and not discriminated against Mr. Reed, it would not have fired Mr. Reed – nor even criticized him. The Board's and Trustees' history of less favorable treatment of Mr. Reed also included: willfully and materially breaching his Employment Agreement no less than six times over three years; denying him due process and his contractual right to know and respond to factual bases upon which the Board planned to vote on his termination; denying him due process and his contractual right to appear before the Board prior to its planned vote on his termination; acting intentionally, maliciously, and in breach of fiduciary duty to turn the opinions of USN's

---

[1] Hereinafter collectively the "Board" or individually "Trustee"
[2] Hereinafter "Cause" refers to Cause as defined in Mr. Reed's employment agreement
[3] Hereinafter referred as the "Employment Agreement" described below as <u>Exhibit C</u>

Stakeholders[4] against him; lying to and deceiving him during his employment; breaching USN's Conflict of Interest Policy to facilitate his termination; violating the accreditation standards of the Southern Association of Independent Schools to facilitate his termination; and acting maliciously and punitively towards him during the termination process and thereafter. Individually and collectively, these Board actions against a Director were unprecedented in the history of USN. Regarding his retaliation claims, Mr. Reed reported concerns to the Board President and Vice-President on October 27, 2024[5] that he was being subjected to racial harassment and discrimination based upon disturbing emails he received from USN parents – including an attack against Mr. Reed for implementing USN's "anti-racism polices," which the Board President agreed was "frankly offensive" in an email to other Trustees.  Also, on January 5, 2025, Mr. Reed reported to the Board that he had filed with the Equal Employment Opportunity Commission (EEOC) racial discrimination charges against the Trustees who had recommended his termination without abiding by the terms of his Employment Agreement.[6] With both the October 27th Report and January 5th Report, the Board acknowledged receipt of them but, in violation of EEOC guidance and rules, otherwise ignored them.  All Board and Trustee actions outlined above regarding discrimination that occurred after the October 27th Report are also evidence of retaliation. Moreover, after making the October 27th Report, the Board President's demeanor and attitude became negative towards Mr. Reed. Before the October 27th Report, the Board President had been supportive, convivial, and prompt in his communications with Mr. Reed. As recently as June 20, 2024, when notifying Mr. Reed that the Board had approved his maximum 10% discretionary bonus for the year, the Board President

---

[4] As used in this Complaint, "USN Stakeholders" or "Stakeholders" is a collective term defined as a combination in whole or part USN's students, parents, faculty, donors, and/or alumni.
[5] Hereinafter the "October 27th Report"
[6] Hereinafter the "January 5th Report"

wrote, "You had a great year." After the October 27th Report, the Board President became distant and removed from Mr. Reed, ignoring Mr. Reed's communications or responding abruptly and angrily.  USN's wrongful termination caused severe financial and emotional harm to Mr. Reed for which he seeks both compensatory, punitive damages due to the malice or reckless indifference of the Board, and reimbursement of his reasonable attorneys' fees and expenses.

**EXHIBITS**

**Exhibit A:  The Barnes & Thornburg Independent Investigation Report**

7.    <u>Exhibit A</u>, attached hereto, is a true and correct copy of the "The Barnes & Thornburg Independent Investigation Report"[7] dated December 18, 2024. This document is relevant to and supports Mr. Reed's claims because:

a.   Its authors were USN's attorneys at Barnes & Thornburg LLP[8] and USN waived attorney-client privilege by publishing it on its website on January 7, 2025.

b.   USN has cited the Report as containing the factual justifications for the Board's terminating Mr. Reed's employment for Cause despite (a) containing no such factual bases, (b) the Board's refusing to identify the specific bases, and (c) USN's attorney stating in a January 3, 2025 email that he was not aware of disparaging comments regarding Mr. Reed contained in the Report.

c.   The B&T Report reviewed the actions of USN administrators and Trustees since May 2, 2024 to determine if any violations of law, USN policies or best practices occurred.

---

[7] Hereinafter the "B&T Report" or the "Report"
[8] Hereinafter "B&T"

d.   The Report specifically found that Mr. Reed was required by USN's bylaws[9] to follow USN policies and had followed USN's policies during the period reviewed.  Moreover, it contained no factual finding that he violated any law or fiduciary duty.

e.   Regarding the Board and Trustees, it found:  USN's Trustees "do not appreciate their fiduciary duties or have failed to uphold them" (Ex. A at p. 54), violated their "Conflict of Interest Policy" (Ex. A at p. 53-54), violated their "Code of Business Conduct and Ethics Policy" (Ex. A at p. 53-54), breached their fiduciary duty of confidentiality which "eroded" the Board's credibility and ability to manage a crisis (Ex. A at p. 54), failed "to accept and publicly support board decisions" (Ex. A at p. 53), failed to maintain adequate bylaws after a revision effort "proved to be too labor intensive," which undermined its ability to respond to a crisis (Ex. A at p. 52), failed to create and adopt the type of "crisis response and communications plan" that "[w]ell-run institutions" have (Ex. A at p. 57), failed to adopt "any set policy" for faculty misconduct investigations (Ex. A at p. 46), failed to consult "ample resources that offer guidance to independent schools and identify best practices" (Ex. A at p. 50), had become "complacent" under USN's prior Director (Ex. A at p. 52), failed to create a leadership "succession plan for [Mr. Reed] or the School as it navigated this critical transition period" (Ex. A at p. 54), failed to support Mr. Reed in developing "relational capital within the USN community" (Ex. A at p. 51), lacked "economic diversity" (Ex. A at p. 52), and created a perception among USN Stakeholders of being "clubby" and a "glorified PTA" and lacking credibility (Ex. A at p. 52 & 54).

f.   These facts provide a factual basis that USN's Trustees violated their fiduciary duties owed to the Board and were ultimately responsible for causing harm to USN, which provides a legal basis for USN to hold them personally, legally liable for damages.  Because of this

---

[9] Hereinafter the "Bylaws"

potential legal liability, the B&T Report disclosed that each Trustee had, at least, a potential conflict of interest that should have precluded each Trustee from voting to terminate Mr. Reed.

**Exhibit B: Expert Memorandum from Law Professor Eric F. Amarante**

8.    Exhibit B, attached hereto, is a true and correct copy of a memorandum dated September 11, 2025 from Professor Eric Franklin Amarante of the University of Tennessee Knoxville, Winston College of Law.[11]  As explained in detail below, this document is relevant to and supports Mr. Reed's claims because:

a.    Prof. Amarante is s tenured law professor and an expert in nonprofit law and corporate governance.  Mr. Reed has retained Prof. Amarante as an expert witness in nonprofit law and corporate governance to testify regarding matters related to the B&T Report.

b.    In the Memorandum, Prof. Amarante addresses the issue of "whether the [B&T] Report provides a factual basis to conclude that, within the contexts of the Tennessee Nonprofit Corporation Act and my understanding of the conventional, established roles and responsibilities of governing boards and executive employees of nonprofit corporations, Mr. Amani Reed and/or the Board of Trustees (the "Board") of the University School of Nashville (the "School") and its members failed to perform their respective roles or fulfill their duties."  Ex. B at p. 1.

c.    He concludes: "As to Mr. Reed, it is my conclusion that the Report provides no factual basis to conclude that he failed to perform his role or his duty as school director. The Report discloses no illegal or inappropriate behavior by Mr. Reed within the context of the conventional role of a nonprofit officer or executive, and the Report provides no basis to conclude that Mr. Reed failed to fulfill his responsibilities. With respect to the Board, however,

---

[11] Hereinafter the "Amarante Memorandum" or the "Memorandum"

the Report highlights several actions or omissions that qualify as violations of fundamental nonprofit board responsibilities." Ex. B at p. 1.

### Exhibit C:  Mr. Reed's Employment Agreement

9.     Exhibit C, attached hereto, is a copy of Mr. Reed's Employment Agreement dated October 21, 2021.  As explained in detail below, this document is relevant to and supports Mr. Reed's claims because:

a.   With one exception, it is a true and correct copy of the legally binding and enforceable contract between USN and Mr. Reed that governed the terms of his employment as Director. The document attached hereto as Exhibit C is the signed version of the Employment Agreement provided by USN after his termination, but it is not the complete Employment Agreement Mr. Reed recalls signing on October 21, 2021 because it is missing the severance language that the parties agreed to and he recalls was in the document he signed.  It is clearly a defective document because its Section 6(a) refers to "Section 7(e)" to find compensation to which Mr. Reed would be entitled if USN terminated him "without Cause" or if he terminates "for Good Reason."  There is, however, no Section 7(e) and there is no other section that further describes any type of severance compensation.  Other than the missing severance language, the document reflects the true and correct terms and conditions USN and Mr. Reed agreed to on October 21, 2021.

b.   The Board engaged in a three-year-long series of bad faith breaches of the Employment Agreement that started approximately six months before Mr. Reed took office as USN's Director, was entirely unprecedented at USN, and evinced far less favorable treatment compared to how it treated the Directors who preceded Mr. Reed during its 110 year history – all of whom were white/Caucasian men.  USN's breaches of contract included not performing the

no-cost housing benefit, not negotiating in good faith to execute a deferred compensation agreement, ignoring and refusing to follow the requirements for addressing disputes related to the Employment Agreement, ignoring and denying his "termination for Good Reason" rights, violating the non-disparagement clause, and terminating Mr. Reed's employment without Cause as defined by the Employment Agreement.

### Exhibit D:  USN's Termination Letter

10.    Exhibit D, attached hereto, is USN's letter to Mr. Reed dated January 7, 2025 notifying him of his termination.  As explained in detail below, this document is relevant to this lawsuit because it provides no factual basis to Mr. Reed regarding the Board's determination that he engaged in acts or omissions that constitute "Cause" as defined by his Employment Agreement. It is the only document USN has provided to Mr. Reed related to the basis for his termination.

### Exhibit E: USN Conflict of Interest Policy

11.    Exhibit E, attached hereto, is USN's Conflict of Interest Policy.  As explained in detail below, this document is relevant to this lawsuit because, as found by the B&T Report, the Trustees violated the policy when it leaked defamatory information about Mr. Reed from Board meetings and when Trustees failed to comply by making annual disclosures.  More importantly, by concluding that the Board caused a public relations crisis that led to Mr. Reed's termination and the Trustees' leak violated their fiduciary duties in a manner that "eroded" USN's ability to manage the crisis, the B&T Report provided a factual basis for USN to hold the Trustees personally liable for the harm they caused USN.  This potential liability meant the Trustees, under Tennessee law, faced paying damages to USN that therefore created a personal and financial interest at odds with USN's interests.  Therefore, under the terms of the Conflict of Interest Policy, the Board should have analyzed the potential conflicts before taking any further

action, particularly as it related to whether Mr. Reed's acts and omissions related to the crisis caused by the Trustees warranted his termination for Cause.

**FACTS**

**Relevant Background History of Mr. Reed & USN**

12. USN is an elite kindergarten through 12th grade private independent academic institution. It is incorporated under the Tennessee Nonprofit Corporation Act (TNCA), Tenn. Code Ann. § 48-51-101 et seq., and tax-exempt pursuant to §501(c)(3) of the Internal Revenue Service Code. In 1975, it succeeded the Peabody Demonstration School (PDS), which was founded in 1915. Thus, the combined USN/PDS history at the time of filing this Complaint is 110 years old.

13. USN describes itself:

*University School of Nashville is unlike any other independent school. Among the best in the country, USN stands out for its commitment to academic excellence, social justice, expression, and community care.*

14. In its 2026 rankings, Niche.com recognized USN as the best K-12 private school in Nashville and the second best K-12 private school in Tennessee. Niche.com awarded it a grade of "A+" for its "Academics."

15. USN is accredited by the Southern Association of Independent Schools (SAIS).

16. SAIS's accreditation standards for schools includes a corporate governance standard that the officers and trustees/directors who lead the school understand the fiduciary duties they owe to the school.

17. SAIS's accreditation standards for schools includes a corporate governance standard that the officers and trustees/directors who lead the school fulfill the fiduciary duties they owe to the school.

18.    According to USN's most recent Form 990 tax report filed May 12, 2025, USN has approximately $82,000,000 in total assets with an endowment of $43,316,000.

19.    According to USN's Form 990 tax report for fiscal years 2023 and 2024, USN had a written conflict of interest policy, "required trustees to disclose annually interests that could give rise to conflicts," and "regularly and consistently monitor and enforce compliance with the policy."  It explains how it enforces its policy and manages conflicts of interest as follows:

*THE CODE OF BUSINESS CONDUCT AND ETHICS, ADOPTED BY THE BOARD OF TRUSTEES APPLICABLE TO ITS TRUSTEES, OFFICERS, HEAD OF SCHOOL, SENIOR MANAGEMENT, BOARD COMMITTEE MEMBERS, FACULTY AND STAFF (EACH, A ""COVERED INDIVIDUAL""). IT IS THE SCHOOL'S INTENTION TO TAKE ALL MEASURES NECESSARY TO PROMOTE AND ENSURE HONEST AND ETHICAL CONDUCT, INCLUDING THE ETHICAL HANDLING OF CONFLICTS OF INTEREST; FULL, FAIR, ACCURATE, TIMELY, AND UNDERSTANDABLE DISCLOSURE IN ALL FINANCIAL REPORTS PREPARED OR DISTRIBUTED BY THE SCHOOL; AND COMPLIANCE WITH APPLICABLE LAWS AND GOVERNMENTAL REGULATIONS. THIS CODE ALSO IS INTENDED TO PROVIDE THE SCHOOL'S DIRECTIVES AND PROCEDURES THAT: (1) PROTECT THE SCHOOL'S LEGALLY PROTECTABLE INTERESTS, INCLUDING ANY BUSINESS-RELATED OPPORTUNITIES, ASSETS, AND/OR CONFIDENTIAL INFORMATION OF THE SCHOOL; (2) PROTECT THE SCHOOL FROM INCURRING UNAUTHORIZED OR UNNECESSARY CONTRACTUAL OR OTHER LIABILITY; (3) DETER ANY COVERED INDIVIDUAL FROM THE COMMISSION OF ANY WRONGFUL ACT ASSOCIATED IN ANY WAY WITH THE*

*SCHOOL; AND (4) PROVIDE A MECHANISM FOR PROMPT AND CONSISTENT ENFORCEMENT OF THE PROVISIONS OF THIS CODE. ALL COVERED INDIVIDUALS ARE EXPECTED TO BE FAMILIAR WITH THIS CODE AND TO ADHERE TO THE PRINCIPLES AND PROCEDURES SET FORTH IN THIS CODE THAT APPLY TO SUCH.*

20.     As an institution, USN includes "anti-racism" lessons in its curriculum to combat racial prejudice, systemic racism, and the oppression of racial minorities.

21.     As an institution, USN has included "anti-racism" training for its faculty and staff to combat racial prejudice, systemic racism, and the oppression of racial minorities, including attending the "White Privilege Conference", the "People of Color Conference", "Courageous Conversations", the "Diversity Leadership Institute", the "Culturally Responsive Teaching" conference, and "Equity Design Lab: Grading for Equity."

22.     Upon information and belief, USN has never included, provided, nor required any training for its Trustees regarding how, in their positions, to combat racial prejudice, systemic racism, or the oppression of racial minorities.

23.     The Board of Trustees is USN's highest level of leadership and at all times relevant to this Complaint, the Board was USN's highest level of leadership.

24.     The position of "Director" at USN is the "chief administrative officer" and reports directly to the Board.  At all times relevant to this Complaint, as "Director" Mr. Reed was the "chief administrative officer" and reported directly to the Board.

25.     At all times relevant to this Complaint, under USN's Bylaws the Board was responsible for setting "all policy concerning the governance, operation and financial viability of the School"

and the Director was "responsible to the Board for the implementation of the policies adopted by the Board."

26.　　Mr. Reed is fifty-years-old at the time of filing this Complaint.

27.　　Mr. Reed is African American and therefore a member of a protected class under Section 1981.

28.　　Mr. Reed was the first USN Director who was not a white/Caucasian male.  USN recently hired a white/Caucasian man as Mr. Reed's permanent replacement as Director. Therefore, Mr. Reed is the only minority to ever serve as a non-interim Director of USN or PDS in their combined 110 year history.

29.　　For approximately the last thirty-years, Mr. Reed's profession has been an educator and administrator in private independent primary and secondary schools.

30.　　Mr. Reed has served on several prestigious governance boards of organizations serving private independent schools.

31.　　From 2012 – 2022, Mr. Reed served as the Head of School at The School at Columbia ("Columbia") in New York, New York.

32.　　At Columbia, Mr. Reed had a successful tenure and expanded the school's student enrollment to 530, recruited and supported teachers, led curricular change and innovation, managed the renovation of facilities, and stewarded its relationship with Columbia University.

33.　　Columbia never disciplined nor counselled Mr. Reed for any job performance issues at Columbia.  In fact, prior to USN, no school ever disciplined, counselled, terminated or suspended Mr. Reed for a job performance issue.

## 2021 - 2022: USN's Prior Sexual Misconduct Investigation & PR Crisis

34.     The year before Mr. Reed arrived, his immediate predecessor, Dr. Vince Durnan, oversaw a sexual misconduct investigation at USN involving allegations by female students against three senior male students.

35.     Based upon information and belief, instead of obtaining independent external investigators to conduct the investigation, USN attempted an internal investigation.

36.     Based upon information and belief, this decision led to USN stakeholders' voicing protests and criticisms regarding the integrity of the investigation. A public relations crisis resulted.[12]

37.     Based upon information and belief, one source of criticism was the fact that one of the male senior students investigated was the son of a senior administrator at USN, which raised concerns of a cover-up.

38.     In response to the 2021 PR Crisis, USN eventually retained Fisher & Phillips LLP[13] law firm to conduct an independent investigation into the allegations of sexual misconduct.

39.     Fisher Phillips attorneys were experienced and qualified at investigating matters like the one at USN that caused the 2021 PR Crisis.

40.     Jackson Spalding public relations firm was retained to provide crisis public relations ("PR") advice. Jackson Spalding is a mid-sized PR firm with four offices.

41.     Based upon the results of the investigation, USN expelled the three senior male students.

42.     One of the expelled students sued USN. The lawsuit did not resolve until after Mr. Reed started serving as Director in 2022.

---

[12] Hereinafter the "2021 PR Crisis"
[13] Hereinafter "Fisher Phillips"

43.     The Board never criticized Dr. Durnan nor took any corrective action, warned, counseled, disciplined, or punished for his actions as Director during the 2021 PR Crisis or for the resulting lawsuit against USN.

44.     Dr. Durnan, like all USN Directors who preceded Mr. Reed and the current Director who succeeded him, is a white/Caucasian man.

45.     The Board's treating Dr. Durnan far more favorably than Mr. Reed when they held the same position and acted under very similar circumstances is evidence that the Board possessed racially discriminatory intent and acted in a racially discriminatory manner against Mr. Reed when it fired him.

**Oct. 21, 2021: Hires Mr. Reed after National Search**

46.     In 2020, because Dr. Durnan was resigning in June 2022, USN hired a professional recruiting firm to conduct a national search for a new Director for USN.

47.     The recruiting firm contacted Mr. Reed due to his excellent reputation and career record. The recruiting firm invited him to apply for the position.

48.     "Director" at USN is the position equivalent of "Head of School" at Columbia.

49.     Mr. Reed applied for the position at USN even though it would be a lateral move because he and his family were eager to move away from Manhattan after the stress of the COVID pandemic.

50.     After Mr. Reed applied and interviewed for the USN position, USN offered him the position because the national search determined he was the best and most qualified candidate for the position.

51.     USN and Mr. Reed began negotiating employment terms in 2021. The then-Board President, Ivanetta Davis-Samuels and Trustee Bret Sweet, negotiated on behalf of USN.

52.     USN offered and Mr. Reed accepted a compensation package that included salary, retirement benefits, health insurance, a no-cost housing benefit at a home owned by USN, up to $500,00 for renovations to the home, and an annual discretionary bonus of 10% of his salary.

53.     Per USN's compensation policy[14] USN paid its Director within the 75th percentile of its peer institutions.

54.     USN based the value of the compensation package offered to Mr. Reed upon its Compensation Policy.  Mr. Sweet explained to Mr. Reed that the Compensation Policy was the basis for the overall value of the compensation package USN offered him.

55.     USN offered and Mr. Reed accepted a contractual term that USN would pay Mr. Reed eighteen months' severance if he were terminated without Cause or resigned for "Good Reason," as defined by the contract.

56.     Thus, Mr. Reed and USN agreed that USN could only avoid paying severance benefits if USN terminated him for Cause.

57.     The parties agreed to eighteen months as the appropriate severance because both USN and Mr. Reed understood and recognized that eighteen months was the standard, typical minimum length of time required for a candidate to apply for a head of school position at a private independent school in the United States.  This is still true today.

58.     USN offered and Mr. Reed accepted a contractual term that USN would provide Mr. Reed with deferred compensation and work in "good faith" to execute a Deferred Compensation Agreement under IRS Code 457(b).

---

[14] Hereinafter the "Compensation Policy"

59.     USN offered and Mr. Reed accepted a contractual term that USN would not make nor induce or encourage others to make any disparaging comment about Mr. Reed during or after his employment.

60.     USN offered and Mr. Reed accepted a contractual term that "The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement."  This included providing "written notice of any dispute not resolved in the normal course of business" and "Within ten (10) days after the effective date of such notice, Mr. Reed (or his designee) and a designated representative of USN shall meet at a mutually acceptable time and place within the Nashville, Tennessee metropolitan area, and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute."

61.     On October 21, 2021, USN and Mr. Reed executed the Employment Agreement (Exhibit C) for Mr. Reed to serve as USN's Director effective July 1, 2022.

62.     Upon information and belief, the Employment Agreement had been approved by the Board.

63.     The Employment Agreement was a legally binding and enforceable contract that required Mr. Reed to provide services as an employee in exchange for compensation in the form of salary and benefits.

64.     Like all contracts to which Tennessee law applies, the implied covenant of good faith and fair dealing applied to the Employment Agreement.

65.     Exhibit C is obviously a defective document in one respect:  Section 6(a) refers to "Section 7(e)" to find compensation to which Mr. Reed would be entitled if USN terminated him

"without Cause" or if he resigned "for Good Reason."[15]  There is, however, no Section 7(e) and there is no other section that further describes any severance type of compensation.

66.     The Employment Agreement provides that, as Director, Mr. Reed was the "chief administrative officer" and reported directly to the Board.

67.     The Employment Agreement required Mr. Reed to "carry out his duties at all times in accordance with law and the directives, regulations and policies of the Board of Trustees, the By-laws and policies of USN."

68.     The Employment Agreement provides that, as Director, Mr. Reed was a corporate officer of USN and an *ex officio* member of its Board.

69.     As an *ex officio* member of the USN Board, the Bylaws provided him all rights and privileges of a Board member, including the right to attend and speak at meetings, *except* he did not have a right to vote on matters before the Board.

70.     As both a Trustee and a corporate officer, Mr. Reed owed USN the same fiduciary duties that other Trustees and officers owed.  Under Tennessee law, these fiduciary duties are the duty of good faith, duty of loyalty, and duty of care.

71.     If Mr. Reed knowingly breached the Employment Agreement's explicit requirements that he carry out his duties "in accordance with law and the directives, regulations and policies of the Board of Trustees, the By-laws and policies of USN," he would be in breach of contract and breach of his fiduciary duties owed to USN.

72.     If Mr. Reed knowingly breached the Bylaws' explicit requirement that he was responsible for "the implementation of the policies adopted by the Board," he would be in breach of contract and breach of his fiduciary duties owed to USN.

---

[15] Hereinafter "Good Reason" refers to Good Reason as defined in the Employment Agreement

**Dec. 2021: USN Breaches Mr. Reed's Contract Before He Arrives**

73.     In December 2021, Mr. Reed visited Nashville and toured for the first time the house owned by USN in which he and his family were to live pursuant to the no-cost housing benefit[16] in the Employment Agreement.

74.     USN's Director, Dr. Durnan, had lived in the house for years and was still residing there. Therefore, USN had actual knowledge of the house's condition.

75.     After Mr. Reed toured the house with USN representatives, USN determined that the house was not in acceptable condition and would require approximately $1 million to renovate the home to acceptable condition.

76.     Based upon the condition of the house and cost of renovating, USN advised Mr. Reed that it would not provide him with the Housing Benefit per the Employment Agreement.

77.     Mr. Reed would not have executed the Employment Agreement on October 21, 2021 had USN not promised the Housing Benefit because, as part of his compensation package, it was a major value and benefit to Mr. Reed.

78.     Mr. Reed's accepting the USN position resulted in his annual monetary compensation dropping by $300,000.

79.     During negotiations, USN's representatives specifically emphasized the Housing Benefit and represented that it was the compensation element that would make up for the $300,000 decrease in annual monetary compensation.

80.     Mr. Reed relied upon this representation when he decided to execute the Employment Agreement.

---

[16] Hereinafter the "Housing Benefit"

81. When USN eliminated the Housing Benefit, Mr. Reed's total compensation package fell below the Compensation Policy's requirement of compensating its Directors within the 75th percentile of its peer institutions.

82. The elimination of the Housing Benefit constituted a breach of contract by USN of the Housing Benefit requirement of the Employment Agreement because it was an enforceable contractual term and USN refused to perform.

83. USN's elimination of the Housing Benefit constituted a breach of the implied covenant of good faith and fair dealing and a bad faith breach of the Employment Agreement because it was an enforceable contractual term, USN knew the condition of the house when it agreed to the term, USN refused to perform knowing that it constituted a breach of contract, knowing that it could inflict duress on Mr. Reed to accept a less expensive alternative, and that the breach would result in significant financial harm and damages to Mr. Reed.

84. Under duress, Mr. Reed accepted an alternative housing arrangement with USN that was at least $1 million less valuable than the Housing Benefit contained in the Employment Agreement because it required Mr. Reed to obtain a mortgage of that amount to finance the purchase of a home.

85. Mr. Reed also had to liquidate an investment property he owned to purchase a home in Nashville.

86. Under the original terms of the Housing Benefit, Mr. Reed was to live in a USN-owned house located at 3600 Woodmont Blvd. in Nashville, Tennessee. It was 4,377 square feet with five bedroom and six bathrooms, and on an approximately one acre lot. According to Zillow.com, its market value on January 1, 2022 was $1.7 million.

87.     As part of the Housing Benefit, USN's staff would provide all maintenance and upkeep of the house, yard, and landscaping.  Moreover, USN would cover all costs of utilities, taxes, and insurance.

88.     Under the alternative housing arrangement, Mr. Reed was able to buy a 3,012 square foot, 4 bedroom, 4 bathroom home on a $1/20^{th}$ acre lot.  He paid all costs for obtaining his mortgage and for maintenance and upkeep of the house, yard, and landscaping and for all utilities, insurance, and taxes.

89.     Also, under the alternative housing arrangement, Mr. Reed incurred a tax liability of approximately nine percent (9%) of his salary each year, which further reduced the value of his overall compensation package.

90.     Due to the factors outlined above, the house Mr. Reed purchased under the alternative housing arrangement was less valuable, smaller, had fewer amenities and more costs than the Woodmont house agreed to in the Employment Agreement.

91.     Mr. Reed accepted the alternative housing arrangement under duress because, as USN knew, he had provided notice of resignation to Columbia in October 2021 and, if he had not agreed to it, he would have had no plans for employment or housing effective July 1, 2022.

92.     The Board President promised Mr. Reed that USN would increase his salary to (a) compensate for the decreased value of his total compensation package and (b) regain compliance with USN's Compensation Policy.

93.     Mr. Reed accepted the alternative housing arrangement based upon the Board President's promising him that that his salary would be increased to compensate for the lost value and to comply with the Compensation Policy.

94.     Throughout his employment at USN, the Board President and her successor continued to promise Mr. Reed that USN would increase his salary to compensate for the lost value and to comply with the Compensation Policy.  He relied upon these assurances and accordingly did not initiate any type of legal action to recover the lost compensation.  This forbearance constituted legal consideration, and USN's promises to increase his salary constituted a legally enforceable contract.

95.     Despite these assurances, USN never adjusted Mr. Reed's salary to compensate for the decrease in value of his compensation package.

96.     USN's failure to increase his salary constituted a violation of USN's Compensation Policy because his compensation no longer fell within the 75th percentile of peer institutions.

97.     USN's failure to increase his salary constituted a breach of contract of an enforceable contractual term because USN refused to perform.

98.     USN's failure to increase his salary constitutes a breach of the implied the covenant of good faith and fair dealing and a bad faith breach of the Employment Agreement because it made the promises with no intent to perform, made them to induce Mr. Reed into accepting an alternative housing arrangement, made them to keep Mr. Reed from asserting a legal claim for breach of contract, and knowingly breached its own Compensation Policy in doing so.

99.     USN's breach of contract regarding the Housing Benefit and regarding its increasing Mr. Reed's salary to compensate for the loss in value to his compensation package directly caused significant economic damages to Mr. Reed in the form of lost compensation, costs and expenses related to obtaining a mortgage, costs and expenses related to renovating and maintaining a home, and utility costs.

100. Upon information and belief, USN had never before breached a Director's employment agreement.

101. Upon information and belief, USN had never before engaged in bad faith nor violated the implied covenant of good faith and fair dealing with regards to a Director's employment agreement.

102. Upon information and belief, USN had never before failed to comply with its Compensation Policy with regards to a Director's compensation.

103. These unprecedented Board actions are evidence that the Board possessed racially discriminatory intent and acted in a racially discriminatory manner against Mr. Reed.

**July 1, 2021: Mr. Reed Begins as Director, USN Continues Breaching his Contract**

104. Mr. Reed began his employment as USN's Director on July 1, 2022.

105. In the United States, it is an established best practice for nonprofit boards to set strategic goals and review them annually.

106. In the United States, it is an established best practice for nonprofit boards to adopt a "strategic plan" to set strategic goals and measure the nonprofit's success in achieving those goals.

107. At a large, complex nonprofit like USN, adopting and following a strategic plan is not only a best practice, but also essential to success.

108. SAIS Accreditation Standard 2.7 for corporate governance states:

*The school engages in formal and regular strategic thinking and planning aligned with its vision, mission, and beliefs and provides for the continuity of mission. Evidence of visioning and planning must be made clear, and a current strategic plan must exist and be available for review.*

109.    By not adopting and following a strategic plan, USN was in violation of established

nonprofit best practices for nonprofits of USN's size and complexity.

110.    By not adopting and following a strategic plan, USN did not meet SAIS's accreditation

standards for corporate governance.

111.    Because USN had no strategic plan, during the two-and-a-half years of Mr. Reed's

employment the Board's focus was on developing a strategic plan.

112.    As the B&T Report would later conclude, USN's Bylaws were "not adequate" and a

Board committee formed to revise them in 2020 had abandoned the effort because the "task

proved to be too labor intensive."  Ex. A at p. 52.

113.    During Mr. Reed's first year of employment at USN, the new Board President did not

reliably keep scheduled meetings with him and appeared to lack the experience, knowledge and

support to lead the USN Board.

114.    In the summer of 2023, USN Trustees voted to remove and replace the Board President

with Trustee Eric Kopstain.

115.    Mr. Reed heard Trustees and other members of the USN community refer to the Board

President's removal as a "coup," which indicated internal division within the Board.

116.    To help the Board improve its performance, Mr. Reed also recommended that the Board

retain a consultant.

117.    To help the USN Board improve its performance, Mr. Reed took Board President

Kopstain to a NAIS conference to attend a seminar that taught lessons of good governance

practices by examining case studies where nonprofit boards failed and adopt professional

development practices on good governance for private independent schools.

118.    Mr. Reed suggested to Board President Kopstain that the two of them meet each week to discuss USN's most pressing issues.  Board President Kopstain agreed, and they set a regular day and time.

119.    Board President Kopstain's attendance at the weekly meetings, however, was sporadic and he often missed or cancelled.

120.    After Mr. Reed began his employment as Director, the Board continued to breach his Employment Agreement.

121.    Section 3(e) of the Employment Agreement required USN to "work in good faith" with Mr. Reed "to execute a Deferred Compensation Agreement, through which USN will contribute annually to a 457(b) plan on behalf of Mr. Reed (up to the normal IRS limit)."

122.    Mr. Reed repeatedly asked the successive Board Presidents to meet about the Deferred Compensation Agreement.  Despite assuring him they would, they never did.

123.    USN and Mr. Reed never executed a Deferred Compensation Agreement because USN would never meet to create or execute one.

124.    When USN refused to meet and execute a Deferred Compensation Agreement, Mr. Reed's total compensation package fell below the Compensation Policy's requirement of compensating its Directors within the 75th percentile of its peer institutions.

125.    USN's refusal to meet with Mr. Reed and to work in good faith to execute a Deferred Compensation Agreement constituted a breach of contract by USN because it was an enforceable contractual term and USN refused to perform.

126.    USN's refusal to meet with Mr. Reed and to work in good faith to execute a Deferred Compensation Agreement constitutes a breach of the implied covenant of good faith and fair dealing and a bad faith breach of the Employment Agreement because it was an enforceable

contractual term and USN refused to perform knowingly aware that it constituted a breach of contract and that it would result in significant financial harm and damages to Mr. Reed.

127.    Upon information and belief, USN had never before breached terms of a Director's Employment Agreement.

128.    Upon information and belief, USN had never before engaged in bad faith nor breached the implied covenant of good faith and fair dealing with regards to a Director's employment agreement

129.    Upon information and belief, USN had never failed to comply with its Compensation Policy with regards to a Director's compensation.

130.    These unprecedented Board actions are evidence that the Board possessed racially discriminatory intent and acted in a racially discriminatory manner against Mr. Reed.

**May 2 - June 20, 2024: Mr. Reed Oversees the Masullo Investigation**

131.    On May 2nd, 2024, approximately two weeks before graduating, a then-student/now-alumnus[17] disclosed to USN faculty members that she believed she had been subjected to inappropriate behavior by faculty member Dean Masullo, who taught her senior study program.[18]

132.    Based on the Alumnus' Disclosure, Mr. Reed initiated an investigation[19] that same day.

133.    At the time of the Alumnus' Disclosure, the Board had numerous standing committees but had not prepared for the risk of faculty misconduct by creating a standing committee on student safety.

134.    At the time of the Alumnus' Disclosure, the Board had not prepared for the risk of faculty misconduct by adopting a specific policy related to investigating such allegations.

---

[17] Hereinafter the "Alumnus"
[18] Hereinafter the "Disclosure"
[19] Hereinafter the "Masullo Investigation"

135. At the time of the Alumnus' Disclosure, the Board had not prepared for the risk of faculty misconduct by adopting an applicable crisis communications policy.

136. The Bylaws and the Employment Agreement required Mr. Reed to ensure that he and USN followed existing policies in relation to the Masullo Investigation.

137. Existing USN policies relevant to the Masullo Investigation required administrators to:

    a. Ensure a fair and objective investigation is conducted.

    b. Maintain confidentiality as much as possible and refrain from unnecessarily sharing information or making unnecessary statements.

    c. Refrain from taking action against an investigated party until the investigation is complete.

    d. Follow the advice of attorneys and consultants retained by USN to advise.

138. The reasons for these policies were to protect the privacy of the people involved, to promote the integrity of the investigation, to respect the rights of the parties, and to decrease risk to individuals who provided evidence, the party who asserted allegations, and USN.

139. Prior to the Masullo Investigation and while Mr. Reed was Director, the necessity and importance of these polices was demonstrated when allegations against another USN faculty member proved to be unfounded.

140. One existing USN policy regarding employee terminations was to maintain confidentiality of the reasons for termination.

141. The reason for this policy was to decrease risk that a terminated employee would sue the party who asserted allegations, individuals who provided evidence, and/or USN.

142. When the Alumnus first reported her allegations on May 2, 2024, Mr. Reed was attending an all-day civic leadership event at Leadership Nashville.

28

143. When Mr. Reed received a voicemail from USN's Assistant Head of School (AHS) alerting him of the allegations, he immediately left the event to return to USN's campus.

144. Prior to Mr. Reed's return, USN's Chief Financial Officer (CFO) contacted Fisher Phillips to alert them of the allegations and obtain advice. The CFO contacted Fisher Phillips because she historically managed that relationship with the firm.

145. The Fisher Phillips' attorneys were experienced and qualified investigators with regards to investigations such as the one involving USN students in 2021 and the Masullo Investigation.

146. On his way back to campus, Mr. Reed telephoned the Board President and left a voicemail advising him of the allegations.

147. Jackson Spalding public relations was retained to advise. Jackson Spalding was selected because USN's Director of Communications had worked well and effectively with the before and they had advised during 2021 PR Crisis.

148. With the lack of specific policies related to the Alumnus' report, Mr. Reed could develop and implement measures to support the Alumnus as long as they did not conflict with existing policies.

149. After he returned to campus on that day, May 2nd, Mr. Reed:

    a. ensured a "Care Team" consisting of three faculty/staff members of the Alumnus' choosing was formed to provide support for the Alumnus due to the seriousness and nature of the allegations;

    b. ensured counseling support was arranged for the Alumnus and her friends supporting her;

    c. ensured USN's administrators were in contact with the Alumnus' family;

d.  ensured a working plan was created with the input from senior members of the USN administrative team, which included removing Dr. Masullo from all campus/student interactions; evaluating mandatory reporting obligations; creating parent and student communications; possible outreach to former students of Masullo and their families; support for faculty; teaching coverage for Dr. Masullo's classes; and forming a group/team of administrators to execute the plan;

e.  ensured USN's IT department removed Dr. Masullo's access to USN facilities and technology;

f.  assigned the assistant head of school (AHS) and chief financial officer (CFO) the task of flying to Delaware the next day to remove Dr. Masullo from a student trip he was leading;

g.  ensured the AHS met with the Alumnus and her parents that afternoon to discuss the allegations and provide the plan of action, including his planned trip to retrieve Dr. Masullo the next day;

h.  determined with Fisher Phillips attorneys Marie Scott and Courtney Leyes that the Disclosure did not report a violation of law that required USN to report the Alumnus' allegations against Dr. Masullo because the Alumnus was eighteen years old as of June 2023 and therefore the mandatory reporting laws related to potential children abuse did not apply to the allegations against Masullo;

i.  ensured Ms. Scott and Ms. Leyes initiated an independent investigation; and

j.  communicated directly with the Board President and provided a report on the allegations and plan of action.

150.    The Alumnus selected Jeff Edmonds, Michael Hansen, and Beth Eberl as the faculty/staff members to serve as her "Care Team" to support her during the investigation.  At least one of them attended every meeting the Alumnus had with the investigators and USN administrators.

151.    At the time of the Alumnus' Disclosure, Dr. Masullo had worked at USN approximately fifteen years and had no history of any serious performance issues or any misconduct reports.

152.    At the time of her Disclosure, the Alumnus:

   a.   reported that Dr. Masullo had exceeded appropriate boundaries through physical contact, attention, gifts, and communication through emails and texts;

   b.   denied that any "sexual contact" occurred between her and Dr. Masullo;

   c.   denied that any "explicit photographs" were sent or received; and

   d.   did not report nor characterize any of Dr. Masullo's actions as "grooming."

153.    Mr. Reed, with less than two years' experience at USN, knew he needed to carefully ensure that USN followed its policies regarding investigations and responding to crises so that the many USN Stakeholders who admired Dr. Masullo would have confidence in the integrity of the investigation.

154.    Mr. Reed also was aware that a delay in retaining external independent investigators for the sexual misconduct investigation contributed to 2021 PR Crisis.

155.    Therefore Mr. Reed knew he needed to ensure that USN carefully followed its policies and best practices regarding the Masullo Investigation and use external independent investigators to ensure the integrity of the investigation and that USN Stakeholders would have confidence in its results.

156.    Dr. Masullo was not an at-will employee and therefore USN needed evidence to terminate him for Cause.

157.     Therefore Mr. Reed knew if USN later terminated Dr. Masullo based on the allegations against him and Dr. Masullo then sued USN for wrongful termination, it would be important for USN to have conducted a fair and thorough investigation to defend against the lawsuit. This would include having determined and included all applicable bases for termination.

158.     Mr. Reed's son had dated the Alumnus when they were schoolmates the prior year. Therefore, the Alumnus had been to Mr. Reed's home, and he had known her on a more personal level than other students.  With this in mind, he was concerned that this personal history could create an appearance of a conflict of interest or bias if he were perceived as directly involved in conducting or influencing the investigation.

159.     Also, Mr. Reed wanted to ensure the Alumnus felt as comfortable as possible during the investigation.

160.     Therefore, Mr. Reed asked the AHS to check with the Alumnus to see if she preferred communicating her formal report to him.  The AHS told Mr. Reed that she preferred to communicate it to the AHS.  Therefore, Mr. Reed delegated primary responsibility to the AHS for communicating on behalf of administration with the Alumnus and her family.

161.     At the same time, Mr. Reed made himself available to the Alumnus whenever she wanted to meet.  During the course of the investigation and afterwards, he met with her in person every time she asked, which was three separate occasions:  May 7, May 23, and July 10, 2024.

162.     On May 3, 2024, at Mr. Reed's direction, the AHS and CFO flew to Delaware, placed Dr. Masullo on suspension, and accompanied him on his flight back to Nashville.  After accompanying him to retrieve his parked car, Dr. Masullo never set foot on USN's campus again.

163. On May 7, 2024, the Alumnus went to Mr. Reed's office because she feared Dr. Masullo might return to campus and was very anxious that other students might learn she was the person who made allegations against Dr. Masullo.

164. This meeting further instilled in Mr. Reed that the Alumnus wanted her identity to remain confidential and bolstered his resolve to ensure details of the investigation remained as confidential as possible.

165. Mr. Reed assured the Alumnus that everything was being done to protect her identity from disclosure, that an investigation was underway, and that Dr. Masullo would not return to USN while the investigation was underway. Mr. Reed told her that she should hear from the investigators very soon about her interview. Mr. Reed was open and sympathetic to the Alumnus during this meeting.

166. On May 9, 2024, Fisher Phillips' attorneys conducted the Masullo Investigation's first witness interviews. Ms. Scott interviewed the Alumnus and four witnesses she identified who were also USN students. Dr. Edmonds and Dr. Hansen attended as the Care Team supporters for the Alumnus and the four witnesses.

167. On May 18, 2024, Mr. Reed met with the USN faculty at the final faculty meeting of the academic year.

168. Mr. Reed explained to the faculty during the May 18th meeting that he could not provide details about the pending investigation because of the existing USN policies regarding maintaining confidentiality of ongoing investigations.

169. If Mr. Reed had violated this policy by sharing confidential information with faculty, he would have violated USN's Bylaws and his Employment Agreement's provisions that require him to perform his job consistent with USN policies.

170.   If Mr. Reed had violated this policy by sharing confidential information with faculty, he would have increased the risk that the Alumnus would be identified as the person who accused Dr. Masullo of misconduct, which she had told Mr. Reed she feared.

171.   On May 20, 2024, Mr. Reed and Ms. Scott met with the Board and conveyed the following information:

    a.   Two weeks ago, a high school senior disclosed allegations of inappropriate conduct by a faculty member.

    b.   Due to the seriousness of the allegations, he was sharing Dr. Masullo's name with them, but they should keep the information confidential.

    c.   After receiving the Disclosure, his administrators immediately assembled a team to take initial steps.

    d.   He immediately contacted Board President Kopstain and advised him about the allegations.

    e.   He advised Board President Kopstain that he had contacted Fisher Phillips attorneys to review administration's process and establish next steps.

    f.   His administrators had removed Dr. Masullo from all contact with students and he placed the employee on leave effective immediately including prohibiting access to campus, email and all USN community members.

    g.   Based on the initial review, USN administrators were working through an investigation with the Fisher Phillips attorneys who specialize in these types of cases.

    h.   He was notifying the Board that he had some very serious concerns.

i.   The investigation is being conducted by the attorneys and administration will be working with a crisis communication specialist from the same public relations firm who helped the school in 2021.

j.   The allegation concerned inappropriate behavior, but administrators had no indication that it was criminal in nature.

172.   At no time during the Board meeting did Mr. Reed communicate to the Board that the Masullo Investigation was only a "personnel" or "employment" matter.

173.   Throughout the Masullo Investigation, Mr. Reed kept the Board President and the USN Board apprised of the investigation's progress.

174.   Throughout the Masullo Investigation, the attorneys at Fisher Phillips – Ms. Scott and Ms. Leyes – communicated directly with the Board President and the USN Board and kept them apprised of the investigation's progress.

175.   On or around May 19, 2024, the Alumnus graduated from USN.

176.   On May 23, 2024, Mr. Reed again met in person with the Alumnus after she requested another meeting.  Ms. Scott, Dr. Edmonds, and Dr. Hansen also attended this meeting.

177.   Mr. Reed was open and sympathetic to the Alumnus during this meeting.

178.   During this meeting, Mr. Reed apologized to the Alumnus by saying, on behalf of the school, he was sorry her senior year had to end with her enduring the investigation, he admired her bravery coming forward with her Disclosure, and he appreciated how willing she and her friends had been to meet.

179.   Mr. Reed also explained that USN's policy was to follow the investigative process and that they had to be meticulous to make sure the investigation was done right.

180.   Mr. Reed again told the Alumnus that he would meet with her whenever possible.

181.    The Alumnus stated that she would "feel better" if there was an "independent investigation."  Mr. Reed explained that Fisher Phillips was independent because the attorneys were not employees of the school, were only retained to investigate, will not represent USN in any related litigation, and were not controlled or influenced by him or any other USN leader.

182.    The Alumnus was satisfied with the meeting, which was reflected in Dr. Edmonds' message to the Alumnus's parents "We were heartened by [Mr. Reed]'s responses and have more clarity around the investigation and how it is unfolding." Ex. A at p. 22.

183.    After the Alumnus graduated on May 19th, she still came to campus almost daily while the Masullo investigation was pending in May and June because she was completing a mural art project in the hallways.

184.    USN placed no restrictions on where she could go on campus or with whom she could speak.

185.    USN provided counseling services to the Alumnus during the summer of the investigation.  Mr. Reed also authorized USN's paying for outside counseling sessions for the Alumnus.

186.    The attorneys Ms. Scott and Ms. Leyes had provided the Alumnus with their cell phone information and told her she could call or text them at any time.

187.    The Alumnus availed herself of this opportunity.  Between May 7 and June 20, 2024, the Alumnus emailed, texted, or met with Ms. Scott or Ms. Leyes at least 23 times.  Excluding the week the Alumnus was on vacation in France, this totaled 23 times in 37 calendar days.

**June 20, 2024 - Board Recognizes & Rewards Mr. Reed for Another "Great" Year**

188.    For both full academic years Mr. Reed served as Director, the Board considered Mr. Reed's job performance as exemplary and great.

36

189.     Under the terms of the Employment Agreement, Mr. Reed was eligible for salary

increases.  Whether to award Mr. Reed salary increases and the amount of any increase were

matters of the Board's discretion.

190.     Under the terms of the Employment Agreement, Mr. Reed was eligible for discretionary

performance bonuses of up to 10% each year based upon the Board's discretion.

191.     The purpose behind these contract terms was for USN to reward Mr. Reed for exemplary

job performance.

192.     If Mr. Reed had not performed well, the Board would not have approved the salary

increases or bonuses.

193.     For both full academic years Mr. Reed served as Director and as recently as July 2024,

the Board authorized and paid Mr. Reed $25,000 in salary increases.

194.     For both full academic years Mr. Reed served as Director, the Board authorized paying

Mr. Reed the maximum discretionary performance bonuses of 10% of his salary.  USN paid the

most recent bonus to him in July 2024.

195.     On June 21, 2024, when the Board President notified USN's CFO that the Board had

approved Mr. Reed's 2024 bonus, the Board President wrote to Mr. Reed:

> *You had a great year, full of challenges of course, but much has been accomplished*
>
> *that sets the stage for an event (sic) brighter future.*

196.     Prior to December 20, 2024, neither the Board nor any representative of USN

communicated or issued a warning, counseling, or punishment to Mr. Reed regarding his job

performance nor provided him with a negative job performance review.

197.     The actions of the Board in awarding Mr. Reed his $25,000 salary increases and the

maximum possible bonuses, the lack of warnings or counseling from the Board regarding his job

performance, and the Board President's words of praise on June 21, 2024 are evidence that Mr. Reed's job performance during his first two academic years at USN had been "great."

**June 20 - July 3, 2025: Masullo Investigation Ends, Mr. Reed Terminates Dr. Masullo**

198.    By June 20, 2024, the Fisher Phillips attorneys had concluded the Masullo Investigation and provided a verbal report to Mr. Reed.  Based on their findings, he made the decision to terminate Dr. Masullo for policy violations.

199.    As the B&T Report would later conclude, Ms. Scott met with the Alumnus and Dr. Edmonds on June 20, 2024 and advised them that USN had decided to terminate Dr. Masullo. She further advised that USN would formally terminate him once the paperwork was completed.

200.    By "paperwork" Ms. Scott was referring to completing the Masullo Investigation written report and a separation agreement for Dr. Masullo that would include a release of claims against the Alumnus and other student and alumni witnesses.

201.    On June 25, 2024, Fisher Phillips delivered the Masullo Investigation written report to USN.

202.    On June 26, 2024, Board President Kopstain emailed Mr. Reed regarding the Masullo Investigation report and a separation agreement Dr. Masullo would receive:

> *Thank you, Amani. I read the entire report and appreciate the opportunity to do so and that this has been handled as expeditiously as possible and concludes with what, based on the facts outlined in the investigation, are an appropriate set of next steps including regarding Dr. Masullo's employment at USN, a mutual non-disparagement arrangement with financial consideration, and the various additional next steps outlined. We should discuss how best to update the Executive Committee and Full Board to ensure Board communication is timed appropriately in relation to*

*investigation outcome communications with Dr. Massulo (sic). I stand by to discuss*
*and help with this board communications and anything else as useful.*

203.    The Board authorized creating a separation agreement to be presented to Dr. Masullo when he was terminated and would include severance payments to Dr. Masullo in exchange for his release of claims.

204.    The Board determined paying Dr. Masullo severance was in the best interest of USN, the Alumnus, her family, and the other witnesses in the investigation because it included a release of any and all claims Dr. Masullo could bring against the Alumnus or anyone else who participated in the Masullo Investigation.

205.    Accordingly, the Fisher Philips attorneys drafted the separation agreement,[20] and the Board President reviewed and approved it.  Mr. Reed signed it on behalf of USN.

206.    On July 3, 2024, Mr. Reed delivered to Dr. Masullo his notice of termination.  Mr. Reed also presented the Separation Agreement to Dr. Masullo.

207.    Dr. Masullo signed the Separation Agreement on or about July 19, 2024, which included the release of claims.  Therefore, Dr. Masullo released all potential claims against USN, the Alumnus, her family, and the other witnesses in the investigation that accrued prior to his signing the Separation Agreement.

208.    Fisher Phillips attorneys reported that it had discovered three faculty members, including Dr Edmonds and Dr Hansen, had violated policies either preceding the Masullo Investigation or during and recommended that USN.  They recommended USN should "formally document and discuss" the violations.  All three faculty members are still employed by USN and all are white/Caucasians.

---

[20] Hereinafter the "Separation Agreement"

209.    The Care Team members believed Ms. Scott and Ms. Leyes had performed admirably as investigators.

210.    On July 8, 2024, Dr. Edmonds texted Ms. Scott:

*Hi Marie. Thank you for your role in all of this. You have been kind and understanding at every turn.*

**July 10, 2025: Mr. Reed & Alumnus Meet a 3rd Time, Attorney Appears Unannounced**

211.    After Dr. Masullo's termination, the Alumnus asked again to meet with Mr. Reed, and they scheduled a meeting for July 10, 2024.  She indicated that another alumnus would also attend.

212.    Mr. Reed contacted the Alumnus' father and invited him as well.

213.    The meeting occurred at Mr. Reed's office on July 10th and the Alumnus, her father, and the other alumnus arrived at the agreed time.

214.    Arriving with the three planned attendees were three unplanned and unannounced attendees: attorney Alex Little, the other alumnus' mother, and an unidentified person via phone.

215.    Mr. Reed asked Mr. Little if he was acting as the Alumnus' attorney, and he said "no." He stated he was acting as her "translator."

216.    Mr. Reed was concerned about Mr. Little's appearance as well as the other two announced attendees, but he conducted the meeting.

During the July 10th meeting, the Alumnus requested that USN provide her with information related to what other witnesses had said or provided during the Masullo Investigation, identify the policies that Dr. Masullo had violated that led to his termination, and label his misconduct as "grooming."

217. Existing USN policies regarding confidentiality and employee terminations did not authorize Mr. Reed to comply with her requests.

218. Both the Bylaws and Mr. Reed's Employment Agreement required him to perform his job duties consistent with these policies

219. Therefore, the Bylaws and the Employment Agreement imposed legal obligations on Mr. Reed to follow the policies and not provide the information the Alumnus requested.

220. If Mr. Reed had provided the Alumnus with the information she requested, he would have violated USN's existing policies and therefore violated his legal obligations under the Bylaws and his Employment Agreement.

221. As a corporate officer of USN, Tennessee law imposed fiduciary duties on Mr. Reed to make all decisions solely in the best interests of USN and to follow its policies.

222. Therefore, Tennessee law imposed legal obligations on Mr. Reed to follow the policies as part of his fiduciary duties and not provide the information she requested.

223. Mr. Reed explained that USN policy did not allow him to comply with her requests and he was required to follow USN policy.

224. If Mr. Reed had provided the Alumnus with the information she requested, he would have violated USN's existing policies and therefore violated his legal obligations as a fiduciary under Tennessee law.

225. Mr. Reed's response to the Alumnus' request was also based upon legal advice he received from the Fisher Phillips attorneys.

226. USN policy was for administrators to follow the legal advice of USN's attorneys.

227. Therefore, if Mr. Reed had complied with the Alumnus' requests, he would have violated USN's policy requiring him to follow USN's attorneys' legal advice and therefore violated his

legal obligations under the Bylaws and his Employment Agreement, and his legal obligations as a fiduciary under Tennessee law.

228. While the B&T Report discusses the July 10th meeting, during the B&T attorneys' interview with Mr. Reed they never asked him about the meeting, nor did they or any Sims Funk attorney ever ask him about the meeting.

**August 8 - 22, 2024: Alumnus Requests Board Meeting, Board Refuses, Crisis Results**

229. On or around August 8, 2024, the Alumnus contacted Trustees and requested a meeting with them to discuss the concerns she raised with Mr. Reed.

230. Because the Bylaws established the Board as USN's highest level of leadership and its policymaking authority, the Board possessed the authority to provide any information to the Alumnus as long as it complied with the Trustees' fiduciary duties owed to USN.

231. Therefore, the Board was the appropriate authority for the Alumnus to contact to request confidential information and to ask that Dr. Masullo's conduct be labeled as "grooming."

232. The Board refused to meet with the Alumnus.

233. The Board later admitted in a September 20, 2024 letter to its Stakeholders that its refusing to meet with the Alumnus was a mistake and apologized to her and the Stakeholders. It wrote

> *This year, we did not provide the support that every single person who walks through our hallways deserves. An alumna was incredibly brave and courageous in sharing the unacceptable and inappropriate behavior of former faculty member Dean Masullo, and our full response did not align with the high standards the USN community has clearly articulated in recent weeks. We failed her and you. For that, we are truly sorry.*

234. As the B&T Report later concluded, the Board's refusal to meet with her and choosing not to share the information she requested likely resulted in the PR Crisis that followed, stating:

> [E]ventually the Board, chose not to share this information. While facts related to employment decisions are generally maintained in confidence to reduce risk and avoid public scrutiny, there was no legal obligation preventing the School from discussing the reasons why Dr. Masullo was terminated or the specific policies he violated. Had the School shared this information with [the Alumnus] and others closely involved in her Disclosure, we believe it is unlikely the School would find itself in the situation it is in today.

Ex. A at p. 37-38.

**Aug. 22, 2025: Trustees Receive Letter Defaming Mr. Reed, Leak it to the Public**

235. On August 22, 2024, Alex Little wrote a letter to the Board as the Alumnus' attorney objecting to its refusal to meet with the Alumnus and defaming Mr. Reed.

236. As the B&T Report would later conclude, Trustees received and leaked Mr. Little's August 22[21] letter to the public[21] in violation of their fiduciary duty. (Ex. A at p. 54.)

237. The Leaked Letter included the following statements, which contained false information intended to defame Mr. Reed:

a. "The only person willing or allowed to speak to [the Alumnus] with any connection to USN was Ms. Scott."

b. "Every time [the Alumnus] requested a meeting, only Marie [Scott] would show up."

---

[21] Hereinafter the "Leaked Letter"

c. "When Director Reed finally agreed to meet with the [Alumnus] in July, she told him that she would not have reported what happened with Mr. Masullo if she knew that USN was going to respond this way."

d. "So [the Alumnus] finally went to Amani's office and knocked on the door. He was in there, saw [her] through the window, and would not answer the door."

e. "When the end of June came and went without a conclusion to the investigation, and without [the Alumnus] hearing from anyone at the school, she publicly spoke about these matters on social media."

f. "Later, when [the Alumnus] made repeated requests for someone at USN to reach out to past students, Mrs. Scott continued to tell her no, claiming that the investigation was confidential,' so they could not say anything."

g. "[The investigation] had no concern for other students who may have been impacted by Dr. Masullo's egregious behavior."

h. "A true 'independent' investigation would align with the best practices recommended by organizations like the Southern Association of Independent Schools."

i. "Nothing the school has done over the past few months reflects any awareness that this matter involves something more than an employment issue."

j. "The so-called independent investigation of Dr. Masullo was in fact an investigation to help the school justify firing him and a tool to keep the school out of hot water. It was not, in fact, an independent investigation, it did nothing to protect or assist [the Alumnus]."

238. The Leaked Letter further indicated that Mr. Reed had not apologized to the Alumnus or her family.

239. Each of the above statements in the Leaked Letter were knowingly false when made.

240.     Each of the above statements in the Leaked Letter were capable of being rebutted by USN with facts known to be true at the time the statements were made.

241.     Mr. Little made the statements and published them to third-parties with intent to harm Mr. Reed's reputation.

242.     Trustees leaked the Leaked Letter with intent to harm Mr. Reed's reputation.

243.     The following evidence from the B&T Report proves the Leaked Letter's statements set forth above in paragraph 237 are false:

a.   Mr. Reed had met with the Alumnus in person all three times she requested a meeting – on May 7, 2024, May 23, 2024, and July 10, 2024.  Ex. A at  p. 18,19, 21, and 24.

b.   The Alumnus told the B&T investigators when they interviewed her that she stated she had "waved through the window of the Director's office."  Contrary to the Leaked Letter, the B&T Report does not state that the Alumnus ever "knocked" on his door. Ex. A at  p. 23-24. The Report does not specify whether she stated she waved through the outer door window from the hallway into the reception area or through Mr. Reed's frosted glass window from outside the reception area into his office, but it does state that the investigators "spoke to everyone involved. Those in the meeting told us they did not see [the Alumnus] . . .." Ex. A at  p. 23-24.

c.   Mr. Reed ensured the school formed a "Care Team" consisting of three faculty members who "had a connection with USN" and she chose to serve to "support her through the process of her Disclosure and the ensuing investigation."  Ex. A at  p. 33.

d.   Less than 24 hours after the Disclosure, Mr. Reed sent the AHS and CFO to Delaware to retrieve Dr. Masullo and ensure he had no further contact with any students or the USN campus. Ex. A at pp

e.   Mr. Reed and other senior administrators met with the Alumnus on numerous occasions to offer and provide in-school counseling support. Ex. A at pp. 15-22.

f.   Mr. Reed authorized USN's paying for psychological therapy for the Alumnus related to the trauma she experienced from Dr. Masullo's misconduct. Ex. A at p. 22.

g.   As late as June 20, 2024, the Alumnus provided the names of other alumni the Alumnus identified other "alumni who had contacted her about Masullo." And Ms. Scott "attempted to contact these alumni, speaking with one in July and leaving a message for another that went unreturned." Ex. A at  p. 22.

h.   Ms. Scott met with the Alumnus and Dr. Edmonds on June 20, 2024 and told them the investigation was complete, USN was terminating Dr. Masullo's employment, and the termination would officially occur after the paperwork was completed.  Ex. A at  p. 38.

i.   The B&T Report mentions Fisher Phillips attorneys (by their pseudonym "former Outside Counsel") eighty-two times.  Not once does it state or indicate any finding or belief that their investigation was not "independent." Ex. A at  p. 1-78.

j.   The B&T attorneys define the B&T Investigation as independent because "Our investigation was independent of interference or influence. We received no direction from the Board of Trustees ("Board"), the Head of School ("Director"), or anyone else at USN. Our findings and recommendations are our own."  Under this standard, the Fisher Phillips investigation of Dr. Masullo was "independent."  Ex. A at p. 1.

k.   No evidence existed that a crime was committed by Dr. Masullo. Ex. A at p.

l.   No evidence existed that Dr. Masullo engaged in sexual contact with the Alumnus or any other student or alumnus. Ex. A at p. 27.

m. No evidence existed that Dr. Masullo engaged in inappropriate conduct with another student or Alumnus. Ex. A at p. 27.

244. The following evidence from additional sources proves the Leaked Letter's statements set forth in paragraph 237 are false:

a. Dr. Edmonds wrote in a September 9, 2024 letter[22]:

*We spoke ahead of each meeting about the points that she wanted to make and the questions she wanted to ask. When [the Alumnus] became too emotional to speak or had difficulty articulating her thoughts to lawyers, I did my best to speak for her as we had agreed." And he characterized himself as an "administrator who was actively reaching out and supporting [the Alumnus] and her family.*

b. Dr. Edmonds also stated he attended the meeting with the Alumnus on May 23, 2024 with Mr. Reed.

c. The Alumnus was on campus almost daily in May and June 2024 with USN's permission and Mr. Reed's knowledge doing art and photography projects. Neither Mr. Reed nor anyone else restricted her from moving about campus or from speaking to anyone.

d. Although the Southern Association of Independent Schools' Accreditation Standard 2.13 is for a school's "governing body [to provide] adequate risk management policies," it has not recommended nor established any best practices regarding investigations.

e. There were no known or established "best practices" regarding such investigations in May 2024. While a task force of the National Association of Independent Schools (NAIS) had published a report four years before Mr. Reed arrived at USN regarding sexual misconduct

---

[22] Hereinafter the "Edmonds Letter"

investigations of faculty, the report was not intended nor created "best practices" that would apply to the Masullo Investigation.

f. The NAIS task force report begins by stating: "This report is not intended as a detailed, stand-alone tactical plan for schools to address sexual abuse and educator sexual misconduct." It also states: "The statements herein are recommendations, not mechanical mandates."

g. As reported by Fisher Phillips. Mr. Reed apologized to the Alumnus during their May 23rd meeting on behalf of the school, he was sorry her senior year had to end in such a way with her having to endure the investigation, he admired her bravery coming forward with her report, and he appreciated how willing she and her friends have been to meet.

h. Ms. Scott directly told Mr. Little in an August 1, 2024 email that she witnessed Mr. Reed apologize to the Alumnus during the May 23rd meeting and expressed his sympathy for her.

i. Mr. Reed apologized to the Alumnus's father in a July 3, 2024 email, stating he "appreciated the frustration you, [his wife], [the Alumnus] and your entire family are feeling as this process unfolds" and that he was "deeply sorry."

245. A reporter with The Nashville Scene obtained a copy and wrote an article about the 2024 PR Crisis, which then spread the Leaked Letter's false information throughout Nashville.

246. It was foreseeable to a reasonable person that leaking the Leaked Letter would cause harm to Mr. Reed because the sensitivity of its subject matter, the allegations' portrayal of Mr. Reed as uncaring, deceptive and cowardly, and the aggressive nature of its tone.

247. It was reasonably foreseeable to the Trustees who leaked the Leaked Letter that its allegations would cause significant harm to Mr. Reed's reputation.

248. Mr. Reed asked the Board for permission to respond publicly and rebut the false allegations contained in the Leaked Letter.

249. The Board denied Mr. Reed permission to respond publicly and rebut the false allegations contained in the Leaked Letter.

250. It was foreseeable to a reasonable person that denying Mr. Reed's request to respond to the Leaked Letter's false allegations would result in significant harm to Mr. Reed because the USN Stakeholders and public would continue to believe the unrebutted allegations to be true.

251. USN Stakeholders gained access to the Leaked Letter and a significant number believed its accusations regarding Mr. Reed were true.

252. The Leaked Letter directly resulted in and caused USN Stakeholders to form negative opinions about Mr. Reed.

253. The Leaked Letter directly resulted in and caused USN Stakeholders to protest against Mr. Reed and call for his resignation or termination.

254. Thus, the Trustees' leaking the Leaked Letter resulted in and caused USN Stakeholders' forming negative opinions about Mr. Reed and calling for his resignation or termination.

255. Because USN denied Mr. Reed's request to rebut the allegations and USN did nothing to rebut them, the Leaked Letter's resulted in significant harm to Mr. Reed because the lack of rebuttal directly contributed to the Stakeholders believing the accusations regarding Mr. Reed were true.

256. As of the date of filing this Complaint, the Board has not attempted to identify the Trustees who leaked the Leaked Letter.

257. As of the date of filing this Complaint, the Board has not initiated a bone fide investigation to identify a Trustee who leaked the Leaked Letter.

258. As of the date of filing this Complaint, the Board has not held any Trustee accountable for leaking the Leaked Letter.

259. As of the date of the filing of this Complaint, the Board has done nothing to publicly state or highlight that the B&T Report and/or other evidence directly rebuts allegations about Mr. Reed contained in the Leaked Letter.

260. As of the morning of January 7, 2025, Trustees were still leaking confidential information from Board meetings, which is known because Mr. Reed first learned from a friend that the Board had voted the night before to terminate him. The friend, who was not a Trustee, heard the information from a Trustee.

261. Upon information and belief, USN's Board had never before leaked confidential and negative information about a Director that was presented or discussed in a Board meeting.

262. Upon information and belief, A USN Trustee had never breached a fiduciary duty that resulted in foreseeable harm to a Director.

263. Upon information and belief, USN's Board had never before prohibited a Director from publicly responding to information publicly circulating about him or USN.

264. Upon information and belief, USN's Board had never before failed to investigate a known breach of fiduciary duty by a Trustee.

265. The Trustees' breaching their fiduciary duty in a way that would cause foreseeable harm to Mr. Reed is evidence of racial discrimination and discriminatory intent.

266. The Trustees' leaking the Leaked Letter was with malice or reckless indifference to Mr. Reed's federally protected rights due to the foreseeable harm it would cause Mr. Reed.

267. The Board's refusal to permit Mr. Reed from rebutting the allegations in the Leaked Letter was with malice or reckless indifference to Mr. Reed's federally protected rights due to the foreseeable harm it would cause Mr. Reed.

**Aug. - Dec. 2025: USN Responds to 2024 PR Crisis with B&T Investigation**

268. In August 2024, the Board retained the global public relations firm Finn Partners on behalf of USN to advise on the 2024 PR Crisis.

269. In August 2024, the Board formed an Ad Hoc Committee for Student Safety[23] to oversee the Board's response to the 2024 PR Crisis.

270. The Board formed the Committee because a standing committee for student safety did not exist.

271. Since its inception, the Committee's purpose has been: "to determine the best course of action for the Board pertaining to a school safety matter."

272. Upon information and belief, as of the date of filing of this Complaint, the Board has not yet formed a standing committee on school safety.

273. The Committee would later recommend to the Board that it fire Mr. Reed.

274. Only one (1) out of six (6) members of the original Committee was African American or of African-American descent.

275. The Committee included Board President Kopstain and USN parent Mike Bivens.

276. According to the B&T Report, "The vast majority of witnesses who we spoke to expressed doubts about the Ad Hoc Committee's neutrality and the Board's professed intent to be transparent about the results of this investigation." Ex. A at p. 53.

---

[23] Hereinafter the "Committee"

277.    One of the B&T Report's stated reasons for this was the inclusion of the Board President Kopstain on the Committee "could pose a potential conflict of interest." Ex. A at p. 53.

278.    USN's Conflict of Interest Policy states:

*It is the policy of the School to maintain the highest standards of integrity in its governance and business operations and to avoid creating even the perception of unprofessional or unethical practices.  Individuals may not use their positions to influence decisions for the personal advantage of themselves, family, or friends.*

Ex. E at p. 1.

279.    The Policy states the following regarding disclosures:

*If there is any appearance of conflict of interest, even though the conflict may not exist in actuality, the Individual should disclose the particular situation promptly in writing to the Director of the School prior to the completion of any School business transaction with respect to which such potential conflict of interest exists. If the matter involves a member of the Board or a member of a Board committee (a "Board Individual"), the Director will in turn inform the Executive Committee of the Board (the "Executive Committee"). This policy includes the obligation to report a perceived or potential conflict of interest by any other Individual, including the Director. Any participant in a decision process that has a potential conflict of interest should disclose the potential conflict promptly.*

Ex. E at para 6.

280.    Board President Kopstain had a conflict of interest because he was involved in the key decision-making in the Masullo Investigation and because, as a Trustee, he faced potential personal liability for the breaches of duty revealed by the B&T Report.

281.    Because of this conflict, the Conflict of Interest Policy required Board President Kopstain to disclose this potential conflict and he should have refrained from participating in any Committee or Board discussion to terminate Mr. Reed, voting to recommend Mr. Reed's termination, or voting to terminate Mr. Reed.

282.    His failure to do so constituted a breach of USN's Conflict of Interest Policy and a breach of his fiduciary duties.

283.    As a member of the Committee that was duly authorized by the Board to carry out a governance function, Mr. Bivens was subject to the policies of the Board and owed the same fiduciary duties that Trustees owed to USN.

284.    In the fall of 2024, Mr. Bivens' child was a USN senior student who helped organize student protests against Mr. Reed calling for his termination.  His child participated in those protests.

285.    Mr. Bivens therefore had a conflict of interest participating in any Committee or Board discussion to terminate Mr. Reed, voting to recommend Mr. Reed's termination, or voting to terminate Mr. Reed because he had a personal interest in the decision that created a conflict of interest or the appearance of a conflict of interest.

286.    Because of this conflict, the Conflict of Interest Policy required Mr. Bivens to disclose this potential conflict and he should have refrained from participating in any Committee or Board discussion to terminate Mr. Reed, voting to recommend Mr. Reed's termination, or voting to terminate Mr. Reed.

287.    In September 2024, the Board retained Sims Funk PLLC law firm to advise on its response to the 2024 PR Crisis.

288. USN Stakeholders objected to retaining Sims Funk because, of its sixteen attorneys, none were people of color and, of its partner-level attorneys, none were women. The objecting Stakeholders asserted the firm's lack of diversity was inconsistent with USN's values of diversity, equity, and inclusion. Nonetheless, the Board retained the firm.

289. Attorneys Funk and Peal recommended hiring B&T to investigate the Masullo Investigation.

290. The Board hired B&T to investigate with the following general purposes:

 a. reviewing USN's Board and administration's actions during the Masullo Investigation;

 b. determining whether, with regards to the Masullo Investigation, any Trustee or administrator had violated the law or USN best practices or policies; and

 c. recommending any policy changes to the Board to improve how it prevents and responds to allegations of educator sexual misconduct.

291. B&T conducted the Investigation from September through December 2024.

292. The B&T Investigation cost USN over $1 million in fees and expenses.

293. During the B&T Investigation, Mr. Reed attended all regular twice-weekly meetings of the Committee, which also included at least one Sims Funk attorney.

294. During the B&T Investigation until December 20, 2024, no Committee member or attorney ever told or indicated to Mr. Reed that he was the subject or target of the B&T Investigation or that his employment interests were potentially at risk. He always viewed himself as a witness and part of the USN's team who would implement the policy changes recommended by the B&T attorneys.

295.    During the B&T Investigation, both Board President Kopstain and Mr. Peal told Mr. Reed that his interests were "aligned" with USN's interests.

296.    During the B&T Investigation, Mr. Reed requested permission to address defamatory information about him publicly circulating within USN and throughout Nashville, but Board President Kopstain and Mr. Peal denied his request.

**Oct. 27, 2024: Mr. Reed Reports Racial Discrimination to the Board, Board Ignores Him**

297.    From January 22 – March 1, 2024, a USN parent who is a white/Caucasian man ("Parent 1") sent a series of emails to Mr. Reed, the Board President, and various Trustees in which he attacked USN's "anti-racist policies."

298.    Parent 1 wrote:

> *"Anti-racism, while momentarily a clarion call of virtue, is now completely discredited as just racism (including a recent NYT editorial). Any effort at equity (equality of outcomes) is discriminatory at its core. Again, sounds good, but toxic in the end."*

299.    Parent 1 also wrote that USN's DEI policy is "likely to cause deterioration in academic performance."

300.    Parent 1 claimed he had spoken "with other members of our community that are understandably unwilling to share directly with the Board. In the current atmosphere, supporting DEI is welcomed and criticizing it is alienating."

301.    Board President Kopstain emailed other Trustees that he viewed Parent 1's criticisms of USN's antiracism policies "unfounded" and "frankly offensive."

302.    Board President Kopstain never responded on behalf of USN or the Board in a way that rejected or challenged the statements he found offensive.

303.    Parent 1's emails were not the first indication that USN stakeholders objected to USN's DEI policy based upon a false assumption that it leads to "deteriorating academic performance."

304.    On October 8, 2023, an email from white/Caucasian former parents and current grandparents of USN students ("Parents 2") stated, without evidence, that USN's "long standing tradition of academic excellence . . . now appears to be eroding due recent administrative changes."  It concluded, "We cannot overstate our concern for the overall rapidly deteriorating state of educational standards at the school, and we strongly encourage the Board of Trustees to make prompt necessary changes to correct this alarming trend."

305.    Mr. Reed viewed the email as referring to his hiring as one of the "recent administrative changes" and making a false correlation between racial inclusivity and deteriorating academic standards.

306.    Board President Kopstain indicated in an email to other Trustees that evidence undermined the claims in Parents 2's letter.

307.    He further indicated he understood the racial implications and the letter was criticism of Mr. Reed by writing:

> I believe this is a moment for us to show our support to our Head of School, Amani, while acknowledging that the USN community has undergone much recent, and in my view positive, change and that our collective expression of support of the school and its leadership are the most helpful thing we can provide at this time.

308.    Mr. Reed was very concerned the letters from Parents 1 and Parents 2 indicated a potentially widespread racially discriminatory undercurrent in the USN community and specifically towards him as the first racial minority to serve as Director.

309.  Mr. Reed was also concerned because the Board's responses to the authors were weak by not confronting the racist implications.

310.  In October 2024, Mr. Reed became more concerned when the Nashville Scene articles covering the Dr. Masullo investigation repeatedly pointed out that Mr. Reed was the "first person of color" to serve as USN's Director and quoted an unidentified USN parent referring to the protests against his leadership as a "civil war."

311.  The Nashville Scene article prompted Mr. Reed to email the Board President and Trustee Benjamin Goldberg on October 27, 2024:

> I am writing to raise an issue that pre-dated the current [Alumnus] matter but, I believe, has been exacerbated by it. Because this issue is so critical to me, I ask that you reply to confirm that you received this email. The issue is race and its influence on how my work has been viewed by the USN community over the past two years. Once the [Alumnus] matter is resolved, I request that members of the Board, members of the leadership team, and I participate in an open and honest dialogue on this issue. I firmly believe that my appointment as the first person of color to head the school was broadly supported by the USN community and I greatly appreciate the Board's support. I also believe, however, that some of my appointments and decisions did not sit well with a significant population within our community and that this dissatisfaction with my actions has created a bias against me – particularly in regards to the [Alumnus] matter – that is wholly unfair and, at the end of the day, rooted in racism. I certainly am not alleging that every critic of mine is motivated by race, but I am communicating to you as a person of color that there is ample evidence that there exists a significant constituency who are motivated by my race and my

*promotion of a diverse workplace. One need only look at emails that have been sent*

*to the Board.   As you are aware, the emails from [Parent 1] to the Board on January*

*22 and March 1, 2024 were grossly offensive and overtly expressed a racist view that*

*any effort of the school to promote a diverse workforce would inevitably result in the*

*academic decline of the school.  [Parent 1] was not just a parent expressing criticism*

*for administrative decisions or hiring practices, he clearly was relishing an*

*opportunity to express numerous racist tropes - the most offensive being that attempts*

*to promote a diverse workforce is "now completely discredited as just racism."   An*

*email to the Board from [Parents 2] on October 8, 2023 was not overtly racist, but it*

*did contain numerous unfounded and unsupported allegations regarding "recent*

*administrative changes and resultant academic decline." In the absence of any*

*objective evidence of an "overall rapidly deteriorating state of educational standard*

*at the school" that [Parents 2] alleges, her letter really "cries out" (to use her*

*phrase) for identifying what the true basis of her concern is with the "recent*

*administrative changes."  I was also taken aback by the September 30th Nashville*

*Scene article quoting "[t]he mother of one 11th-grade student describes the current*

*atmosphere at the school . . . as a 'civil war'" and then references my being the first*

*head of color. While a reference to civil war may be more innocuous to a white*

*person, I can assure you that the term is very racially loaded to a person of color and*

*the Scene's choice to use such a quote in its reporting was shocking to me.*

*Considering these examples as a whole, I assert they evince an undercurrent of*

*racism among a significant segment within the USN community that warrants the*

*attention of the Board and a frank discussion of how it is unfairly impacting the*

*perception of my work at USN. I have full confidence that the Board will understand my concerns and will be receptive to a conversation about how to further our mission towards diversity and inclusion in our community. It is imperative that I raise the issue with you now so my concerns can be added to the Board's agenda. The impact of race on the [Alumnus] matter should certainly be analyzed at the appropriate time to consider how much of the criticism against me is attributable to people like the parent who would never objectively assess my performance due to my race. Moreover, an overall analysis is also warranted to ensure that our stated goal of diversity and inclusion is achieved. I look forward to discussing this with you and continuing to work together.*

312. The Board President responded, "thank you for note and I am responding initially to confirm receipt."

313. The Board President never mentioned his email or the issue again.

314. The Board President never brought the issue before the Board, nor placed the issue on the agenda.

315. From Mr. Reed's October 27th email, the Board was on notice that Mr. Reed believed he was being harassed and discriminated against, and his employment was being negatively affected by racial harassment and discrimination.

316. Mr. Reed's communicating these concerns about racial harassment and discrimination to the Board was a protected activity under state and federal anti-discrimination law.

317. USN had a non-discrimination policy that was revised and approved by the Board as recently as May 4, 2016.

318. The non-discrimination policy states:

*University School of Nashville (USN) is committed to providing equal opportunity in all of our employment practices, including selection, hiring, promotion, transfer, and compensation, to all qualified applicants and employees without regard to age, citizenship, color, creed, disability/handicap, gender identity including transgender status, marital status, military or veteran status, national origin, race, religion, sex, sexual orientation, or any other protected status in accordance with the requirements of all federal, state, and local laws. If you believe you have been treated inconsistently with this policy, please immediately report your concern to the Human Resources Director or the Director of Finance. You will not be retaliated against for bringing forth a complaint in good faith.*

319.    This non-discrimination, equal opportunity policy applied to Mr. Reed's employment.

320.    Mr. Reed's October 27th email reported to the Board treatment that was inconsistent with USN's non-discrimination, equal opportunity policy.

321.    The EEOC requires employers, including USN, promptly and adequately investigate a complaint of racism like Mr. Reed's complaint:

*Once an employer has notice of potentially harassing conduct, it is responsible for taking reasonable corrective action to prevent the conduct from continuing. This includes conducting a prompt and adequate investigation and taking appropriate action based on the findings of that investigation.*

"Enforcement Guidance on Harassment in the Workplace", EEOC Guidance No. 915.064, April 29, 2024.

322.    Neither USN nor the Board promptly or adequately investigated Mr. Reed's complaint of racial discrimination.

323.   After Mr. Reed sent his October 27th email to the Board, a noticeable, negative change in demeanor occurred with regards to how the Board and Board President Kopstain communicated with Mr. Reed.

324.   Prior to the October 27th email, Board President Kopstain was responsive, friendly and congenial towards Mr. Reed in his written and verbal communications.

325.   After the October 27th email, Board President Kopstain was much less responsive and when he did respond was short, abrupt, and/or angry in his written and verbal communications with Mr. Reed.

326.   The failure of USN or the Board to investigate Mr. Reed's complaint violated the EEOC's requirement set forth in its above-quoted guidance.

327.   Upon information and belief, Mr. Reed's reporting his concerns of racial harassment and discrimination created animosity against him among members of the Board.

328.   Upon information and belief, this animosity directly resulted or contributed to the Board's deciding to terminate Mr. Reed's employment in retaliation and to avoid confronting the issues raised in Mr. Reed's report of concerns of racism.

### Dec. 18, 2024: B&T Report Criticizes the Board, Reveals Conflicts of Interest

329.   The B&T attorneys delivered their B&T Report to the Committee on December 18, 2024.

330.   The B&T Report concludes Trustees failed to appreciate or uphold their fiduciary duties to USN. Ex. A at 53-54.

331.   The Tennessee Nonprofit Corporation Act requires nonprofit directors/trustees to appreciate and uphold their fiduciary duties.  Therefore, by concluding Trustees failed to appreciate or uphold their fiduciary duties to USN, the B&T Report concludes the Trustees violated Tennessee law.

332.     Under Tennessee law, a nonprofit director/trustee may be held personally liable for damages caused to the nonprofit corporation by breaches of fiduciary duty.

333.     The B&T Report concludes the Trustees' failures to fulfill their fiduciary duties eroded the Board's credibility with USN Stakeholders and its ability to manage the 2024 PR Crisis. Ex. A at p. 54.

334.     Therefore, the B&T Report provides a factual basis to hold Trustees personally liable for failing to fulfill their fiduciary duties.

335.     The B&T Report does not conclude that Mr. Reed breached a fiduciary duty or violated a law.

336.     The B&T Report concludes that Trustees breached USN policies and failed to perform their duties by adopting necessary policies as required by the Bylaws, which state the Board is responsible for setting "all policy concerning the governance, operation and financial viability of the School." Ex. A at p. 4, 52-53, 57.

337.     The B&T Report does not conclude that Mr. Reed breached USN policies.

338.     The B&T Report concludes that the Board refused to meet with the Alumnus.

339.     The B&T Report concludes that Mr. Reed met with the Alumnus every time she asked to, which was three separate occasions.

340.     The B&T Report states that the Board was ultimately responsible for the 2024 PR Crisis that precipitated the B&T Investigation because it "chose to not share" requested information with the former student who made the allegations against Dr. Masullo. Ex. A at p. 37-38.

341.     Specifically, the B&T Report states:

> [E]ventually the Board, chose to not share that information. While facts related to employment decisions are generally maintained in confidence to reduce risk and

*avoid public scrutiny, there was no legal obligation preventing the School from*
*discussing the reasons why Masullo was terminated or the specific policies he*
*violated. Had the School shared this information with the Alumnus and others closely*
*involved in her Disclosure, we believe it is unlikely the School would find itself in the*
*situation it is in today.*

Ex. A at p. 37-38.

342. The B&T Report states that the Board had failed to consult "ample resources" on the issue of educator sexual misconduct and adopt a policy to prevent and investigate educator sexual misconduct. Ex. A at p. 36 and 50.

343. The B&T Report states, "Crises occur in even the best institutions. Well-run institutions are prepared to deal with them." The Report found that the Board had not prepared USN by adopting a crisis response policy. Ex. A at p. 57.

344. The B&T Report states that the Board and/or its Trustees failed to support Mr. Reed as a new Director, violated multiple policies, and failed to have adequate policies. Ex. A at pp. 51-54.

345. Specifically, the B&T Report states that the Board and/or its Trustees:

a. "[D]o not fully appreciate their fiduciary duties or have failed to uphold them." Ex. A at p. 54;

b. Failed to have adequate bylaws after "the Board formed an ad hoc committee roughly four years ago to update the bylaws, that task proved to be labor intensive, and the project stalled." Ex. A at p. 52;

c. Violated their duty of confidentiality by leaking documents and information from meetings when "confidential information discussed at Board meetings following Student 1's

Disclosure, her Social Media Post and the August Letter, found its way into the public sphere."
Ex. A at p. 54;

     d.   Failed "to accept and publicly support board decisions" <u>Ex. A</u> at p. 53;

     e.   Violated their "Code of Business Conduct and Ethics Policy." <u>Ex. A</u> at p. 53-54;

     f.   Violated their "Conflicts of Interest Policy." <u>Ex. A</u> at p. 53-54; and

     g.   Failed to support their new head of school, Mr. Reed, and have a succession plan:

*"The Board [had a] (sic) duty to not only select the Director, but also to support the Director once s/he is installed. Although the School devoted substantial time and resources to introducing the new Director to the community in 2022, the Board did not create a specific succession plan for the Director or the School as it navigated this critical transition period. . . . Based on our investigation, the Board could have done more to assist the new Director during the transition. Anecdotally, it appears that much of what the Board and the Director did was focused on his integration into the broader Nashville community, and less on USN's distinct constituencies."*

<u>Ex. A</u> at p. 51.

346.    USN failed to report that Trustees had violated the Conflict of Interest Policy in its most recent IRS Form 990 filing and inaccurately stated that it enforces its Conflict of Interest Policy. These actions undermine the credibility of USN and its Board.

347.    The fiduciary duty of loyalty ensures a director/trustee acts with undivided loyalty in the best interests of the nonprofit organization and does not seek to benefit personally from the organization's activities.

348.    Under Tennessee law, the fiduciary duty of loyalty prohibits a nonprofit director/trustee from voting on a matter when she/he possesses an undisclosed and unresolved conflict of interest.

349.    Under Tennessee and federal law, a conflict of interest occurs where an individual's legal fiduciary obligation to further the organization's interests is at odds with their own personal interests.

350.    Under Tennessee law, if a Trustee voted on a Board matter with which she/he failed to disclose a potential conflict of interest or had a conflict of interest, it would constitute a breach of the fiduciary duty of loyalty.

351.    Under USN's Conflict of Interest Policy, Trustees had a duty to recognize potential conflicts of interest and disclose those potential conflicts to the Board President when they arise. Per the Policy, the Board would then review the potential conflict of interest.  If the review determined a conflict existed or the appearance of a conflict existed, then the conflict of interest must be resolved or, if it cannot be resolved, the conflicted Trustee must recuse herself/himself from being present at Board discussions or voting on the matter.

352.    Because the B&T Report concluded (a) the Board failed to follow its policies and execute its responsibilities and (b) likely caused the 2024 PR Crisis and (c)Trustees had failed to "appreciate their fiduciary duties or have failed to uphold them" and (d) their breaching their duty of confidentiality "eroded the community's confidence and trust in the Board and its ability to manage the current crisis" (Ex. A at p. 54), the B&T Report provides a factual basis for USN to potentially hold the Trustees personally, legally liable for the harm they caused USN.

353.    Because the B&T Report provides a factual basis for USN to potentially hold the Trustees personally, legally liable for the harm they caused USN, the B&T Report provided

notice on December 18, 2024 to the Committee members who were Trustees[24] that they could be held personally liable to USN and that this potential liability for monetary damages created a conflict of interest for them.

354.     Because the Trustee Committee Members were on notice of this potential liability and their conflicted interests with USN, they had an obligation to disclose the potential conflict of interest to the Board.

355.     The Trustee Committee Members did not disclose their potential conflict of interest and therefore breached their duty of loyalty to USN, which created another basis for USN holding them personally liable.

356.     The Committee members voted to recommend the Board terminate Mr. Reed for Cause while they possessed potential, undisclosed conflicts, which created another basis for USN holding them personally liable.

357.     The Committee included one attorney member and also had access to the legal counsel of Messrs. Funk and Peal.  Therefore, they had access to legal advice on the conflict of interest issue and willfully violated it.

358.     The Committee members' willful violation of the Conflict of Interest Policy and their fiduciary duty to avoid conflict is further evidence of their racial discriminatory intent and racial discrimination against Mr. Reed to terminate him without a factual basis for Cause.

359.     Because the B&T Report revealed a factual basis for USN to hold the Trustees legally responsible for the harm caused by them, the appropriate actions would have been to (a) refrain from taking further action, (b) retain new, separate counsel for the Trustees, and (c) form a

---

[24] Hereinafter the "Trustee Committee Members"

special committee of the Board comprised of Stakeholders who were not current Trustees and to whom the Board delegated authority to assess the situation and vote on next steps.

360.     The Committee did not do any of these things.

### Dec. 18, 2024: B&T Report Provides Notice to Sims Funk of Conflict of Interest

361.     On December 18, 2024, Sims Funk law firm's client was USN.

362.     Because USN is an organization, Rule 1.13 of the Tennessee Rules of Professional Conduct (TRPC) "Organization as Client" applied.

363.     Under TRPC 1.13, the Trustees were "constituents" of USN and Sims Funk's attorneys' relationship to the Trustees were as USN's constituents.

364.     Rule 1.13's comment explains:

> *There are times when the organization's interest may be or become adverse to the interest of one or more of its constituents. In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization, of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation. Care must be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.*

TRPC 1.13, comment 9.

365.     Because the B&T Report disclosed USN's interests "may be or [had] become adverse" to the Trustees vis-à-vis their breaches of fiduciary duty and responsibility for the 2024 PR Crisis for which USN could hold the Trustees liable, TRPC 1.13 obligated the Sims Funk attorneys to

advise each Trustee of the conflict or potential conflict of interest and that: (a) they cannot represent the Trustee as a constituent, (b) the Trustee may wish to obtain independent representation, (c) they cannot provide legal representation for the Trustee, and (d) discussions between them and the Trustee may not be privileged.

366.    Upon information and belief, the Trustees never obtained independent representation.

### Dec. 18, 2024: B&T Report Reveals Board Breached SAIS Accreditation Standards

367.    The B&T Report provided evidence and gave the Board notice that the Trustees' leaking of the Leaked Letter and the Board's other failings violated its accreditation standards.

368.    SAIS provide accreditation to USN as an independent K-12 school. USN must provide evidence that it complies with the "SAIS Accreditation Standards & Indicators"[25] to achieve accreditation and maintain accreditation.

369.    At all times relevant to this Complaint, the Trustees were aware of the SAIS accreditation standards and that USN must comply with the Standards to maintain accreditation.

370.    At all times relevant to this Complaint, Messrs. Funk and Peal were advising the Trustees as USN's attorneys, were aware of the SAIS accreditation standards, and knew that USN must comply with the Standards to maintain accreditation.

371.    The B&T Report revealed multiple instances, both during and before the Masullo Investigation, when Trustees failed to meet the corporate governance Standards necessary to maintain USN's accreditation.

372.    "Standard 2: Governance & Leadership" states:

---

[25] Hereinafter the "Standards"

*The school provides a governance, leadership, and organizational structure that*
*promotes its mission.  In an SAIS-accredited school, trustees and administrators*
*clearly understand their roles.*

373. The B&T Report concluded that Trustees failed to "appreciate or uphold their fiduciary duties" (Ex. A at p. 54), which evinces the Board failed to uphold Standard 2 because Trustees did not understand their role.

374. Standard 2.2 states that a SAIS-accredited school "Complies with all applicable statutes and governmental regulations"

375. The B&T Report concluded that Trustees failed to "appreciate or uphold their fiduciary duties" (Ex. A at p. 54), which evinces the Board failed to uphold Standard 2.2 because Tenn. Code Ann. § 48-51-301(a) imposed the fiduciary duties on the Trustees and they did not appreciate or uphold them.

376. Upon information and belief, the Board never investigated nor determined who leaked the Leaked Letter, which further evinces the Board failed to uphold Standard 2.4 because it made no effort to hold Trustees accountable for failing to fulfill their legal duties.

377. Standard 2.4 states a SAIS-accredited school

*Establishes by its governing process policies to ensure no conflict of interest between*
*businesses, professional or parental roles, and duties to the school. . . . Board*
*members should not participate in discussions that relate to conflicts of interest*
*involving their businesses, or themselves, or their family relationships. Annual signed*
*consent forms, orientation, and on-going training are typical methods of*
*demonstrating adherence.*

378.    The B&T Report concluded that the Board did not "rigorously enforce" its Conflict of Interest Policy and Trustees did not electronically sign their required annual disclosures (Ex. A at p. 54-55), which evinces that the Board failed to uphold Standard 2.4 because it did not comply with its Conflict of Interest Policy or take the disclosure process seriously.

379.    Standard 2.5 states, SAIS-accredited schools "develop protocols to speak as one voice outside of meetings."

380.    The B&T Report concluded that Trustees failed "to not only keep all board deliberations confidential, but also to accept and publicly support board decisions, even if they privately disagree with them" (Ex. A. at p. 53), which evinces that the Board failed to uphold Standard 2.5 because it did not "develop a protocol to speak as one voice outside of meetings."

381.    SAIS Standard 2.8 states:

> *The school is prepared to maintain stability during transitions of leadership for both trustees and the head of school. Orderly succession planning and practice help to ensure the continuity of mission. Succession plans must account for board member and board leadership transitions as well as head of school transition.*

382.    The B&T Report concluded that "the Board did not create a specific succession plan for the Director or the School as it navigated this critical transition period" (Ex. A at p. 51), which evinces that the Board failed to uphold Standard 2.8 because it did not maintain stability during Mr. Reed's transition period by creating a succession plan.

383.    Standard 2.13 states, a SAIS-accredited school:

> *Assures that the governing body provides adequate risk management policies for the protection of the school and . . . to protect its financial stability and administrative operations from protracted proceedings and claims for damage."*

384.    The B&T Report found that the Board failed to consult "ample resources" on the issue of educator sexual misconduct, adopt a policy to prevent and investigate educator sexual misconduct, and were "unprepared" for the 2024 PR Crisis by not adopting an appropriate "crisis communication plan" (Ex. A at p. 36, 50, and 57), which evinces that the Board failed to uphold Standard 2.13 because it did adopt these risk management policies.

385.    The Board was intimately familiar with the SAIS Standards and therefore was aware that the B&T Report's findings reveal that the Board failed to live up to the Standards regarding governance.

386.    The Board's termination of Mr. Reed knowing it had failed to meet SAIS Standards on governance is further evidence of their racial discriminatory intent and racial discrimination against Mr. Reed by terminating him without a factual basis for Cause.

**Dec. 19, 2024: Mr. Reed Reads Report, Objects to Inaccuracies**

387.    On the evening of December 18, 2024, while Mr. Reed was hosting USN's faculty and staff holiday party, attorney Robert Peal telephoned Mr. Reed and invited him to read the Report that night at his office at Sims Funk.

388.    While the time of day was unusual, Mr. Peal's contacting Mr. Reed directly was not unusual because Mr. Reed and Mr. Peal had been in regular, direct contact at least weekly since the beginning of the B&T Investigation.

389.    Mr. Reed advised he could read the Report the next day. He arrived by himself at Sims Funk's offices on December 19, 2024.

390.    Mr. Peal's telephoning Mr. Reed directly on December 18, 2024 proves that Mr. Peal was still treating Mr. Reed, in his capacity as USN's Director, as a "constituent" of Mr. Peal's client, USN, as contemplated in TRPC 1.13.

391.    TRPC 1.13 required Mr. Peal to promptly advise Mr. Reed if Mr. Peal believed USN's interests were "adverse" with Mr. Reed's interests.

392.    As of December 19, 2024, he had never done so.

393.    Mr. Peal had also previously stated to Mr. Reed that USN's interests and Mr. Reed's interests were "aligned" and had never withdrawn or corrected that statement.

394.    Mr. Peal also had legally advised Mr. Reed that morning on the content of Mr. Reed's response to an anonymous complaint that had been made related to the Masullo Investigation, which Mr. Reed relied upon and submitted it.

395.    Therefore, when Mr. Reed arrived alone at Sims Funk's offices on December 19, 2024 to read the B&T Report, he believed and understood that his and USN's interests were still aligned and therefore Mr. Peal was still provided legal representation to him as USN's constituent by virtue of Mr. Reed being the USN's Director and Mr. Peal being USN's attorney.

396.    After reading the Report, Mr. Reed talked to Mr. Peal as USN's attorney and sought his advice regarding inaccuracies in the Report.  Mr. Reed identified numerous inaccuracies in the Report that related to his actions and required correction.  He also objected to the B&T Report's containing judgments about meetings and Mr. Reed's actions when the B&T attorneys did not ask Mr. Reed any questions about the topics in his interview.

397.    Mr. Peal indicated that he would discuss the inaccuracies with the B&T attorneys.

398.    When Mr. Reed left the Sims Funk offices, he believed that Mr. Peal would ensure the inaccuracies were corrected.

399.    The inaccuracies were never corrected.

400.    Mr. Reed also discussed with Mr. Peal that the Report rebutted the defamatory statements in the Leaked Letter and Edmonds Letter.

401.	During the B&T Investigation, Mr. Peal and Board President Kopstain had instructed Mr. Reed that he could not rebut the defamation to the USN stakeholders.  Now that the B&T Investigation was complete, he requested the Board highlight the Report's findings to USN's Stakeholders to correct the defamation.

402.	Specifically, in rebuttal of the defamatory statements in the Leaked Letter, the Report found:

	a.	The Fisher Phillips investigators met with the Alumnus and Dr. Edmonds on June 20, 2024 and told them that the investigation had concluded and USN had decided to terminate Dr. Masullo's employment.

	b.	The Fisher Phillips investigators followed up with the other students and alumni the Alumnus identified as having information about Dr. Masullo.

	c.	No evidence existed that Mr. Reed negatively compared Dr. Edmond's behavior with the Alumnus to that of Dr. Masullo.

	d.	No evidence existed that Mr. Reed lied to USN stakeholders about the Fisher Phillips investigators being "independent".

	e.	No evidence existed of sexual contact by Dr. Masullo of the Alumnus or any other student.

	f.	No evidence existed of other students or alumni being subjected to similar misconduct.

	g.	No evidence existed Mr. Reed tried to "cover up" a crime.

	h.	No legal duty existed to report the Disclosure to authorities.

i.   No evidence existed that the Alumnus ever knocked on his door to meet with him and he ignored her.  While she told investigators she tried to wave to him through his office window, there is no evidence that anybody in his office saw her or ignored her.

j.   No evidence existed that Mr. Reed ever refused to meet with the Alumnus and, in fact he met with her every time she asked.

k.   No evidence existed that Mr. Reed refused to apologize to the Alumnus or her family.

403.   When Mr. Reed left the Sims Funk offices, he believed that Mr. Peal would ensure the Board highlighted the Report's findings to USN's Stakeholders to correct the defamation.

404.   The Board never highlighted nor reported to USN stakeholders that the B&T Report rebutted the false statements in the Leaked Letter or Edmonds Letter.

**Dec. 24, 2024: USN Notifies Mr. Reed on Christmas Eve He Faces Termination**

405.   On the afternoon of Christmas Eve 2024, USN notified Mr. Reed via a telephone call (hereinafter the "Christmas Eve Call") from Messrs. Funk and Peal that the Committee had voted to recommend to the Board that USN terminate his employment "for Cause" as defined by his Employment Agreement.

406.   Mr. Funk advised during the call that the Board would vote on the recommendation at the end of the holiday season on January 3, 2025.

407.   No legitimate, non-discriminatory reason existed for USN to notify Mr. Reed on the afternoon of Christmas Eve that he faced the prospect of termination.

408.   The timing of the Christmas Eve Call was chosen by USN to Cause mental distress on Mr. Reed and his family.

409.   The timing of the Christmas Eve Call is additional evidence of USN's and the Board's treating Mr. Reed less favorably than it treated the white/Caucasian Directors who preceded him.

410.    The timing of the Christmas Eve Call is evidence of USN and the Board's malicious intent against Mr. Reed.

411.    The Christmas Eve Call was the start of what has proven to be a traumatic period for Mr. Reed and his family with severe pain and suffering and mental anguish.

412.    Because of the Christmas Eve Call, USN and the Board have forever tainted the Christmas holiday season for Mr. Reed and his family by associating it with the trauma of receiving word that Mr. Reed faced the prospect of a mid-year termination and therefore the destruction of his career.

413.    A school's terminating a head of school mid-academic year creates a stigma that follows him/her because it implies gross incompetence or malfeasance and therefore significantly diminishes the possibility that the terminated individual will find comparable employment.  This fact is well-known among recruiting professionals who serve private independent schools in the United States.

414.    Mr. Reed disputed that "Cause" existed for his termination.

415.    Because he disputed Cause existed, Section 7 of his Employment Agreement applied.

416.    USN advised Mr. Reed that the Committee based their recommendation on the results of the B&T Report.

417.    Mr. Funk stated during the Christmas Eve Call that he believed the Employment Agreement "essentially" said that "anything that shines a negative light on the school" could constitute "Cause" under the Contract.

418.    The Employment Agreement does not contain language that can be reasonably interpreted as "essentially" allowing USN to terminate Mr. Reed essentially for anything that "shines a negative light on the school."

**Dec. 24, 2024 - Jan. 6, 2025: Committee Calls Special Meeting, Violates Bylaws**

419.    A special meeting of the Board was called for January 3, 2025 pursuant to Bylaw 1.5.

420.    Bylaw 1.5 states:

*Special meetings of the Board may be called by petition of ten (10) members of the Board or by the President. Notice of such special meetings must be given at least five (5) days in advance to all Board members. The notice shall specify those matters to be voted on at the special meeting. No business other than that specified in the notice may be considered at the special meeting.*

421.    Upon information and belief, Board President Kopstain called for the special meeting of the Board.

422.    Board President Kopstain's calling for a special meeting regarding the Committee's recommendation to terminate Mr. Reed was improper because, as a Trustee Committee Member, he was on notice from the B&T Report that, at the very least, he had a potential conflict of interest with USN.

423.    On January 2, 2025, Mr. Peal notified Mr. Reed by email that the special meeting was rescheduled for Monday, January 6, 2025.

424.    As USN has stated in prior legal filings, USN provided the Trustees with the B&T Report on January 5 and 6, 2025.

425.    The B&T Report contains 58 pages of single spaced text and 20 pages of exhibits.

426.    In his January 2, 2025 email Mr. Peal stated: "no recommendation has been made yet to the Board, the Board has not yet had a chance to review the report . . .."

427. Based upon Mr. Peal's statement four days before January 6, 2025, any notice of the January 6th meeting did not comply with Bylaw 1.5 because "at least five (5) days in advance" the Trustees had not received notice of "those matters to be voted on at the special meeting."

428. The notice of meeting for January 6, 2025 did not comply with Bylaw 1.5 because the Trustees did not receive the B&T Report until the day of or the day before the meeting, which was the matter to be voted on at the special meeting.

429. Because the notice was defective, the actions of the Board on January 6, 2024 were *ultra vires*.

### Dec. 26, 2024 - Jan. 3, 2025: USN Ignores Notice of Resignation

430. On December 26, 2024, Mr. Reed provided written notice to USN that he was resigning "for Good Reason" to Messrs. Funk and Peal.

431. Under the terms agreed to by USN and Mr. Reed as part of the Employment Agreement, Mr. Reed would be entitled to eighteen months of severance for resigning for "Good Reason" as defined therein. One of the defined "Good Reasons" was "any material breach of this Agreement by USN . . .."

432. Mr. Reed's notice of resignation for Good Reason stated his reason was (a) USN fully intended to publish the B&T Report on its website, as confirmed by Mr. Funk's statement on the Christmas Eve Call, and (b) the Report made disparaging comments about Mr. Reed, therefore publication would be a material breach of the non-disparagement clause section 5(d) of the Employment Agreement.

433. During the B&T Investigation, the Board had assured USN stakeholders that it would be transparent and share as much of the B&T Report as possible with them when it was finished.

434. During the Christmas Eve Call, Mr. Funk stated, "I don't see any way in which we get away without releasing the [B&T] report. They've said too many times the report's going to be public, the report's going to be public, the report's going to be public."

435. Not only was Mr. Reed concerned that the B&T Report contained inaccurate and disparaging comments about him in breach of the Employment Agreement, but he was also concerned that the Report still contained the inaccurate and disparaging information he had discussed with Mr. Peal on December 19, 2024.

436. USN ignored Mr. Reed's notice of resignation until January 3, 2025, when Mr. Reed asked for a response.

437. In response, USN rejected it. Mr. Peal emailed on behalf of USN that he was not aware what in the B&T Report was disparaging about Mr. Reed.

438. Mr. Peal also wrote: "considering what's already been published by third partes regarding Mr. Reed, we would be interested in understanding in how anything in the report is different from what's already been said about him."

439. Mr. Peal's statements ignore:

   a. The Board purportedly based its decision to fire Mr. Reed for Cause upon the B&T Report, so it must have contained disparaging comments.

   b. The non-disparagement clause of the Employment Agreement did not contain an exception for disparagement that has "already been said" by third-parties.

   c. The B&T Report concluded the Board caused the spread of the defamatory information "into the public sphere" when Trustees leaked the Leaked Letter in breach of their fiduciary duty, thereby causing the defamation to be "published by third-parties."

    d.  Mr. Peal himself had communicated to Mr. Reed for months that he could not respond to the defamation that had been published by third-parties.

440.    Mr. Peal's statements are evidence that the Board had a strategy of exploiting the Leaked Letter's defamation by leaking it into the public sphere to turn Stakeholders' opinions against Mr. Reed and then prevent him from defending himself by forbidding him from publicly rebutting the defamation.

441.    USN's ignoring Mr. Reed's notice of resignation for Good Reason and its subsequent denial of his right to exercise his right of resignation for Good Reason constituted a breach of the Employment Agreement.

442.    USN's ignoring and denial of Mr. Reed's Resignation for Good Reason constitutes a breach of the implied the covenant of good faith and fair dealing and a bad faith breach of the Employment Agreement because it was an enforceable contractual term, USN knew it was required to provide severance pursuant to the contract, USN refused to perform knowing that it constituted a breach of contract, the justifications for denying the Resignation for Good Reason were unfounded, and USN knew that the breach would Cause severe economic harm to Mr. Reed.

443.    Upon information and belief, USN had never breached a Director's employment agreement.

444.    Upon information and belief, USN had never willfully breached a Director's employment agreement or acted in bad faith.

445.    USN's ignoring and then denying Mr. Reed's notice of resignation for Good Reason is further evidence that the Board, with no justification whatsoever and in the face of its own

responsibility for the 2024 PR Crisis, wished to punish Mr. Reed by firing him without the severance to which he was contractually entitled.

446.     These Board actions were unprecedented in the history of USN's prior Directors and evidence that the Board possessed racially discriminatory intent and acted in a racially discriminatory manner against Mr. Reed.

### Jan. 5, 2025: Mr. Reed Writes Letter Notifying Board of EEOC Charge & Objections

447.     On January 5, 2025, Mr. Reed delivered a letter to the Board communicating:

    a.   His objection to their denial of his rights to know the factual bases of the Committee's termination recommendations so he could respond,

    b.   His objection to the vindicative, cruel and punitive actions taken against him,

    c.   His being silenced by the Board while the Leaked Letter's defamation circulated unrebutted,

    d.   He filed an EEOC discrimination charge against the Ad Hoc Committee and USN,

    e.   His objecting to the Board's ignoring then denying his resignation for Good Reason notice, and

    f.   Mr. Peal's unethical withholding information from him and not notifying him of his potential adverse interest pursuant to TRPC 1.13.

448.     USN's attorneys handed out the letter to the Board on January 6, 2025.

449.     Regarding the ethical concerns with Mr. Peal, the Christmas Eve Call was initiated and conducted by Messrs. Funk and Peal.

450.     Mr. Funk stated on the Christmas Eve Call that he believed Mr. Reed's signing the Masullo Separation Agreement on July 3, 2024, which was five months and twenty-two days prior to the call, was "massively problematic for the school and, frankly, for Amani personally."

451. Messrs. Funk and Peal were intimately familiar with the Separation Agreement because they filed a lawsuit against Dr. Masullo on October 9, 2024 for breaching it.

452. Thus, Messrs. Funk and Peal believed months before the Christmas Eve Call that USN's interests were adverse to Mr. Reed's interests.

453. Despite communicating and meeting with Mr. Reed at least on a weekly basis during the months of the B&T Investigation, neither Mr. Funk, Mr. Peal, nor any other attorney of USN ever indicated to Mr. Reed during the Investigation that his signing the Masullo Separation Agreement on behalf of USN was problematic for him or USN.

454. During the Investigation, no attorney or other person representing or advising USN ever indicated to Mr. Reed that his signing the Separation Agreement on behalf of USN was problematic or a mistake for him or USN.

455. During the Investigation, no attorney or other person representing or advising USN ever indicated to Mr. Reed that he was the subject or target of the Investigation, nor that his continued employment was in jeopardy.

456. In fact, Board President Eric Kopstain and Mr. Peal both assured Mr. Reed during the B&T Investigation that his interests were "aligned" with USN's interests.

457. On December 18, 2024, Mr. Peal continued to act like Mr. Reed's interests and USN's interests were still aligned when he provided legal advice and approved Mr. Reed's response to an anonymous complaint that had been filed with the SAIS regarding Mr. Reed's conduct during the Masullo Investigation.

458. On December 18, 2024, Mr. Peal continued to act like Mr. Reed's interests and USN's interests were still aligned when he contacted Mr. Reed directly and invited him to review the B&T Report at Sims Funk's offices.

459. On December 19, 2024, Mr. Peal continued to act like Mr. Reed's interests and USN's interests were still aligned when Mr. Reed came to his offices to review the B&T Report, he and Mr. Peal discussed Mr. Reed's concerns with the Report, and Mr. Peal stated that he would discuss his concerns with the B&T attorneys.

460. As USN's attorneys, Rule 1.13 required if USN's "interest may be or become adverse to the interest of one or more of its constituents" that Messrs. Funk and Peal must "advise any constituent, whose interest the lawyer finds adverse to that of the organization, of the conflict or potential conflict of interest."

461. Because Messrs. Funk and Peal believed Mr. Reed's signing the Separation Agreement was "massively problematic" for him, they had an affirmative duty to advise him of the conflict under Rule 1.13. They never did.

462. This failure not only resulted in an ethical disclosure issue, but also a conflicts issue because their failure to abide by Rule 1.13 meant that Messrs. Funk and Peal could no longer ethically advise USN because Mr. Reed had shared information with them without notice that they were actively working to orchestrate his firing.

463. In violation of EEOC guidance, USN took no action in response to Mr. Reed's notice of filing a discrimination charge against USN and Trustees.

464. The Board did not respond in any way to the concerns raised in Mr. Reed's January 5th letter.

465. The Board had a fiduciary duty to investigate the EEOC claim and to obtain independent legal counsel to address the other concerns raised in the letter. Their failure to do so is further evidence of their discriminatory and retaliatory intent against Mr. Reed.

**Jan. 6, 2025: The Board Votes to Fire Mr. Reed, Violates Law**

466.    Mr. Funk stated during the Christmas Eve Call that he would provide "a definitive list" of the factual bases upon which the Committee based its recommendation to terminate his employment.

467.    Neither Mr. Funk nor anyone else ever provided a list of factual bases upon which the Committee based its recommendation to terminate his employment.

468.    After the Christmas Eve Call, Mr. Reed followed up by requesting the factual bases for the Committee's to terminate his employment for Cause.

469.    USN, through Messrs. Funk and Peal, refused to provide the factual bases for the Committee's to terminate his employment for Cause.

470.    No legitimate, non-discriminatory reason existed for the USN to deny Mr. Reed the factual bases for the Committee's to terminate his employment.

471.    Section 7 of the Employment Agreement provides:

> *The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement . . . promptly by negotiations between Mr. Reed (or his designee) and the Board of Trustees. Any Party may give the other Party written notice of any dispute not resolved in the normal course of business. Within ten (l0) days after the effective date of such notice, Mr. Reed (or his designee) and a designated representative of USN shall meet at a mutually acceptable time and place within the Nashville, Tennessee metropolitan area, and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute.*

<u>Ex. C</u>. at p. 6.

472.    Because Mr. Reed disputed Cause existed for his termination, under Section 7 of his Employment Agreement, Mr. Reed was legally entitled to receive notice of the factual bases of the Committee's recommendation.

473.    USN's refusal to provide the factual bases for the Committee's recommendation to terminate information constitutes a breach of Section 7 of his Employment Agreement.

474.    USN's refusal to provide this information constitutes a breach of the implied the covenant of good faith and fair dealing and a bad faith breach of Section 7 of the Employment Agreement because it was an enforceable contractual term, USN knew it was required to provide the factual basis as part of its notice, USN refused to perform knowing that it constituted a breach of contract, and that the breach would likely result in termination of Mr. Reed's employment.

475.    A fundamental aspect of the American concept of due process is that a person has a right to know the charges against him/her and have an opportunity to respond.

476.    Section 7 of the Employment Agreement was consistent with this concept of due process.

477.    USN's refusal to provide this information was inconsistent with the American concept of due process.

478.    Upon information and belief, prior to Mr. Reed's denial, never in USN's history had it denied a Director the facts upon which USN was basing any discipline or punishment.

479.    Upon information and belief, prior to Mr. Reed's denial, never in USN's history had it knowingly breached a term of a Director's employment contract.

480.    The Board's unprecedented refusal to provide Mr. Reed with the factual bases for the Committee's recommendation to terminate his employment in direct breach of his Employment

Agreement is evidence that racial discrimination and/or retaliation was a determinative factor in its decision to terminate Mr. Reed's employment.

481. After the Christmas Eve Call, Mr. Reed requested that he be allowed to appear before the Board before it voted on the Committee's recommendation to terminate his employment so that he could address the Trustees' concerns.

482. USN, through Messrs. Funk and Peal, denied Mr. Reed's request to appear before the Board before it voted on the Committee's recommendation to terminate his employment so that he could address the Trustees' concerns.

483. No legitimate, non-discriminatory reason existed for USN to deny this request.

484. Under Section 7 of his Employment Agreement, Mr. Reed was entitled to appear before the Board before it voted on the Committee's recommendation because he disputed "Cause" existed for his termination.

485. USN's refusal to permit him to appear before the Board was a breach of Section 7 of his Employment Agreement because the Board was required to meet with him and negotiate in good faith in an attempt to resolve the dispute.

486. USN's refusal to permit him to appear before the Board constitutes a breach of the implied the covenant of good faith and fair dealing and a bad faith breach of Section 7 of the Employment Agreement because it was an enforceable contractual term, USN knew it required a meeting between the Board USN to try to resolve the dispute, USN refused to perform knowing that it constituted a breach of contract, and that the breach would likely result in termination of Mr. Reed's employment.

487. A fundamental aspect of the American concept of due process is that a person has a right to a hearing before his/her accuser.

488.    Section 7 of the Employment Agreement was consistent with this concept of due process.

489.    USN's refusal to permit him to appear before the Board was inconsistent with this American concept of due process.

490.    Upon information and belief, prior to Mr. Reed's denial, never in USN's history had it ever denied a Director's request to appear before the Board.

491.    Upon information and belief, prior to Mr. Reed's denial, never in USN's history had it ever denied a Trustee's request to appear before the Board.

492.    The unprecedented nature of the Board's denial of Mr. Reed's request to appear before the Board is evidence that racial discrimination and/or retaliation was/were the reason(s) it terminated Mr. Reed's employment.

493.    Racial discrimination and/or retaliation was/were the reason(s) USN denied Mr. Reed the factual bases for the Committee's recommendation to terminate his employment.

494.    On January 6, 2025, the Board voted on the Committee's recommendation and voted to terminate Mr. Reed's employment for Cause based upon B&T Report.

495.    The Board's voting to terminate Mr. Reed's Employment Agreement for Cause was a breach of contract because no Cause existed.

496.    USN's terminating Mr. Reed's Employment Agreement for Cause without a factual basis existed  constitutes a breach of the implied the covenant of good faith and fair dealing and a bad faith breach of the Employment Agreement because it was an enforceable contractual term, USN, the Board knew that no factual basis for Cause existed, and USN knew that the breach would Cause severe economic harm to Mr. Reed.

497.    Upon information and belief, USN had never breached a Director's employment agreement.

498. Upon information and belief, USN had never willfully breached a Director's employment agreement or acted in bad faith.

499. These Board actions were unprecedented in the history of USN's prior Directors and evidence that the Board possessed racially discriminatory intent and acted in a racially discriminatory manner against Mr. Reed.

500. No legitimate, non-discriminatory reason existed for the Board to rush a decision to terminate over the holiday season between December 24th and January 6th.

501. The fiduciary duty of care imposed by Tennessee law on nonprofit directors and trustees requires them to make certain they receive detailed information beforehand about matters that are going to be discussed and voted on at a meeting, carefully and proactively read all the materials they receive, and be informed before voting on major Board actions.

502. Failing to fulfill this duty of care is a breach of fiduciary duty under Tennessee law, for which the trustee may be personally liable to the nonprofit for the harm it suffers.

503. Each Trustee had a fiduciary duty of care that included, prior to voting on the termination of Mr. Reed, reading and understanding the following relevant documents:

    a. the B&T Report, which consisted of sixty-three single-spaced pages and fifteen pages of exhibits;

    b. Mr. Reed's January 5, 2025 letter to the Board objecting to the Committee's recommendation to terminate and raising ethical considerations about Sims Funk's attorneys, which consisted of nineteen single-spaced pages;

    c. Mr. Reed's Employment Agreement and its provisions regarding termination; and

    d. the Bylaws and its provisions regarding terminating the Director.

504. Upon information and belief, all Trustees were physically and intellectually capable of reading and understanding the B&T Report, Mr. Reed's letter, the Employment Agreement, and the Bylaws.

505. Upon information and belief, not all Trustees read and understood the B&T Report, Mr. Reed's letter, the Employment Agreement, and the Bylaws prior to voting to terminate Mr. Reed.

506. In other legal filings related to Mr. Reed's termination and filed on April 24, 2025, USN states, "A copy of the full B&T Report was provided to all Trustees on January 5 and 6, 2025." And, "On January 6, 2025, a copy of the Reed Letter was made available to all Trustees."

507. In the same April 24th filing, USN could not positively affirm that all Trustees present at the January 6th Board meeting read the B&T Report before voting to fire Mr. Reed.

508. In the same April 24th filing, USN could not positively affirm that all Trustees present at the January 6th Board meeting read Mr. Reed's January 5th letter before voting to fire Mr. Reed.

509. The combined word count of the B&T Report and Reed Letter is approximately 35,800 words.

510. In the 108 days between January 6 – April 24, 2025, USN and its attorneys could have positively confirmed whether each of the twenty-four Trustees in attendance on January 6th had read the B&T Report and/or the January 5th Letter by asking them if they had, which then would have allowed USN to positively affirm in its filing whether they had.

511. The fact that USN's attorneys did not positively affirm this fact in the April 24th legal filing is evidence that they did not ask the Trustees if they read the B&T Report and Mr. Reed's January 5th Letter prior to voting to terminate him.

512.    After initially reading the B&T Report, Mr. Reed suggested that he and the Alumnus and her family meet to discuss the Report's findings in an effort to heal the rift that formed between them.

513.    During the Christmas Eve Call, Mr. Funk referred to the request as a "Kumbaya meeting" and dismissed the possibility of it being effective, stating:

> *based on everything we've ever heard from [the Alumnus' family], you know what they want? . . . They want Amani's head on a platter. . . . And they want Edmonds as the new head of school.*

514.    USN notified Mr. Reed by letter on January 7, 2025 that the Board had voted to terminate his employment for Cause.

515.    The termination letter attached as <u>Exhibit D</u> is the only explanation he has received for his termination.

516.    The termination letter does not contain nor explain the facts the Board relied upon to determine Cause.

517.    Mr. Reed first received the news of his termination not from the termination letter, but from a third-party, who had heard the news directly from a Trustee.

518.    The information about the Board terminating Mr. Reed was confidential at the time and the Trustee's sharing this Board information with the third-party was yet another Board leak and another breach of fiduciary duty.

519.    The Trustee's sharing the information was particularly egregious given that the B&T Report put all Trustees on notice that the prior leaks of Board information constituted breach of fiduciary duty.

520.

**Post-Jan. 7, 2025: USN Engages in More Deceptive & Punitive Actions**

521.     Since terminating Mr. Reed's employment, USN and the Board have engaged in numerous deceptive acts that further its lack of factual basis for terminating Mr. Reed, its intent to punish him, and its discrimination against him,

522.     On January 7, 2025, USN published on its website a misleading and deceptive "Board Summary of the Independent Investigation Report on Dean Masullo Matter"[28] that omitted the B&T Report's findings of the Trustees' serious violations of law and policy and ultimate responsibility for the 2024 PR Crisis and misrepresents and exaggerates the Report's findings regarding Mr. Reed.

523.     The publishing of the Board Summary was superfluous and unnecessary because (a) USN also published the B&T Report online for anybody to read and (b) no former statement by USN or the Board obligated them to publish a summary.

524.     The Board Summary was a public relations document that exaggerated the B&T Report's opinions regarding Mr. Reed's actions and obscured its numerous factual findings of the Board's legal, policy and best practice violations.

525.     The Board Summary misrepresented the B&T Report's findings and misled its readers by not disclosing the Trustees' numerous violations of law, policy and ethics that the Report found, instead understating: "The Board did not rigorously enforce good governance practices or adhere to the duty of confidentiality."

526.     Not once does the word "fiduciary duty" appear in the Board Summary despite the B&T Report's multiple findings that Trustees violated law by breaching their fiduciary duties.

---

[28] Hereinafter the "Board Summary"

527.    Among the "key findings" the Board Summary refers to Mr. Reed, "the Director" sixteen times.  In contrast, the key findings only include four bullet points related to the key findings regarding the Board.

528.    The Board Summary stated Mr. Reed "did not directly address USN faculty until late August 2024."  This is demonstrably false because (a) Mr. Reed directly addressed the USN faculty on May 18, 2024, which was the first available faculty meeting after the Disclosure and the last faculty meeting until the beginning of the next academic year in August and (b) it was told with knowledge that it was false because the meeting was attended and witnessed by the entire faculty.

529.    During the May 18, 2024 meeting, Mr. Reed advised the faculty of the investigation.  He was also careful not to violate policy regarding confidentiality of investigations, not only because he was legally required to by contract and the Bylaws, but also because the Alumnus had expressed her fear that she would be identified as the accuser during Mr. Reed's meeting with her on May 7th.

530.    The Board Summary misrepresented that the Report concluded "the school likely could have prevented the community crisis had it been transparent with her."  This is inaccurate and misleading because the B&T Report states that the Board was the highest level of leadership at USN and "the Board chose not to share that information" with the Alumnus, which likely led to the 2024 PR Crisis.  The Board Summary's framing the failure as that of "the school" instead of "the Board" mispresents and obscures the Report's finding that the Board made the ultimate decision on the matter.

531. The Board Summary inaccurately states that Mr. Reed did not inform the Board about the Alumnus' Disclosure until two weeks after she made it and he characterized it as a "personnel matter."

532. This is demonstrably false because the Board knew about the Alumnus' Disclosure because Board President Kopstain knew about it on May 2, 2024 and was aware of the full extent and nature of the allegations.

533. It is also demonstrably false because Mr. Reed fully discussed the matter with the Board at their first meeting after the Alumnus' Disclosure and shared extensive information that it involved serious allegations of inappropriate conduct and discussed the details.

534. The Board Summary also failed to mention that the B&T Report exonerated Mr. Reed for the defamatory statements made in the Leaked Letter and Edmonds Letter.

535. The Board Summary also exaggerated the B&T Report's disparaging opinions regarding Mr. Reed's conduct.

536. USN's publishing the B&T Report and the Board Summary constitutes a breach of the implied the covenant of good faith and a bad faith breach of the non-disparagement clause of the Employment Agreement because it was an enforceable contractual term, USN knew it was required to refrain from disparaging Mr. Reed, USN refused to refrain from publishing the documents knowing that doing so constituted a breach of contract, and that the breach would likely result in economic harm and mental distress to Mr. Reed.

537. After terminating Mr. Reed, USN held $23,000 of Mr. Reed's money in an account and did not dispute that it was Mr. Reed's money.

538. USN withheld the money from Mr. Reed for six months after he repeatedly demanded that USN transfer it to his bank account.

539. No legitimate, non-discriminatory reason existed for USN to withhold these funds.

540. The only reason USN withheld these funds was to further antagonize and punish Mr. Reed and further exacerbate the financial hardship it created by wrongfully terminating his employment.

541. After terminating Mr. Reed, USN denied him access to his office to retrieve his personal belongings. Furthermore, it delayed delivering his person items for weeks.

542. In other legal filings, USN has repeatedly misrepresented his Employment Agreement's language.

543. To justify terminating Mr. Reed, USN relies on section 6(c) of the Employment Agreement, entitled "Termination by USN for Cause" and which states in relevant part:

> *As used in this Agreement, "Cause" shall mean a good faith, reasonably based determination by the Board of Trustees that there has been (i) any material failure of Mr. Reed to perform his duties specified in Section 2 of this Agreement (other than any such failure resulting from Mr. Reed's incapacity due to illness and other than death or disability which are addressed separately in this Agreement in Section 7(d)) after written notice of such failure has been given to Mr. Reed by the Board of Trustees and such failure shall have continued for thirty (30) days after receipt of such notice, (ii) gross or willful negligence or intentional wrongdoing or misconduct in the conduct of his USN job responsibilities. (iii) intentional and material breach by Mr. Reed of Sections 5 or 6 of this Agreement, {iv) conviction of Mr. Reed of a felony offense involving moral turpitude, or (v) any **_similar_** actions or inactions by Mr. Reed which have, or are reasonably likely to have, a material adverse effect on his ability to effectively perform his duties or on the financial prospects or condition of USN.*

Ex. C at p. 5 (emphasis added).

544.    In USN's filings in two other legal proceedings, USN has intentionally omitted the word "similar" when quoting the section.

545.    USN's omitting the word "similar" is evidence that USN knows that the B&T Report does not provide any factual basis that Mr. Reed engaged in any action or inaction "similar" to the preceding clauses of §6(c)(i) through (iv).

546.    On the Christmas Eve Call, Mr. Funk stated that he believed the Employment Agreement, "essentially" allowed USN to terminate Mr. Reed for "anything that shines a negative light on the school", which is a misinterpretation of the Employment Agreement that could only be argued if the Employment Agreement lacked the word "similar" in clause (v).

547.    This is evidence that USN knew it lacked a factual basis for Cause because the other actions in clauses preceding clause (v) cannot be viewed as "similar" to what the B&T Report states regarding Mr. Reed's actions and inactions.

548.    On January 1, 2025, Mr. Reed's attorney served a litigation hold letter (hereinafter the Litigation Hold Letter") upon USN by hand delivery to its attorney, Mr. Peal.

549.    Delivering a letter such as the Litigation Hold Letter is a common procedure used by attorneys to trigger a probable opposing party's obligation to preserve evidence.

550.    From the discussion Christmas Eve Call, USN was aware litigation was "reasonably anticipated" from Mr. Reed and therefore USN had a duty to preserve evidence.

**Feb. 22, 2025: Poll Shows Board Continues to Lack Credibility**

551.    In the weeks following USN's termination of Mr. Reed, the Board held "town hall" style community meetings to discuss the concerns of USN stakeholders.

552.    The meetings were public relations events intended to assuage USN's stakeholders' concerns about USN's governance and the Board's firing Mr. Reed.

553.    In late January 2025, after the town hall meetings, the USN Parent Union conducted a "USN parent/stakeholder survey on governance." On February 22, 2025, it reported the following results related to the responses to the survey's questions:

    a.   If you attended one of the recent community meetings with the Board of Trustees executive committee, did it make you feel …

- 85.7% chose "worse about USN governance"
- 4.76% chose "better about USN governance"

    b.   Do you feel confident in the ability of USN's current Board of Trustees to rebuild trust within the community and lead the school in a good direction going forward?

- 88% chose "no"
- 4% chose "yes"

    c.   Would you support some type of collective action by parents to ask the Board's executive committee (Eric Kopstain, Benjamin Goldberg, and Kristin Wilson) to resign?

- 80% chose "yes"
- 8% chose "no"

554.    The survey concluded by asking for suggestions for people who may make good Trustees and asking for "other thoughts about how to improve USN governance." The responses included the following statements:

    o   *If the report was so damning as to require Amani's firing, then why isn't the Exec Comm being disbanded? It reeks of white privilege that the only person held accountable is a Black man while the white board members keep their roles. This*

*seems anti to USN values. Since the board can vote to get rid of board members, it would be helpful for the board to do so as a sign of good faith. The idea we'll have 4 directors in an 18 month period is wild. I'd recommend they make an internal hire for a 2 year director stint to repair the damage to the community and rebuild our governance. Then do a search for a permanent ED from a place of strength and not where we are now. Who in their right mind and highly qualified Will take this job?*

o *I don't feel comfortable nominating anyone at this time because there is no formal job description listing out the responsibilities of what it entails to sit on the board. The report released on January 7th noted many board members were not certain what their responsibilities were. Including the board president not realizing bylaws stating the board president needs to be a member of all committees. I have sat on the board of a local non profit in the past and it was made clear what my responsibilities were prior to me applying to be a board member.*

o *I believe the existing board needs to be changed immediately and a new board be elected that places a greater focus on improving the quality of our education, encourages transparency, and addresses the concerns we all have.*

o *Yes, the current Board of Trustees executive \*must\* resign - they are very destructive and have put USN's financial posture at serious risk due to their complete incompetence.*

o *It seems like the board historically not listened to feedback, wants, needs, and requests from faculty or parents.*

o *Hire a paid board consultant to advise and run meetings, and assess board members capacity to serve, report to the community on board's work and school performance.*

o *I worry that there may be legal implications related to the board. Specifically, voiced outrage at their incompetence may support Amani's law suit. I was very disturbed that they seem to lack even a hint of understanding of their shortcomings or ability to rebuild trust.*

o *Kopstein continuing to serve his chair of the board has created so much division and angst at the school. I understand the issue is related to the pending lawsuit and having the board resign in total, but to his failures as the leader of the board, it is imperative that he resign.*

o *Mr Kopstain needs to go. I truly believe if he was forced out or resigned prior to Mr. Reed being fired, USN would not have a discrimination lawsuit against it. He is incompetent and completely selfish.*

https://www.surveymonkey.com/results/SM-YuT5yk_2FIc_2FqcJKdepyj0Kw_3D_3D/

555.    No Trustee or Board officer has been removed or has resigned due to the Masullo Investigation, the B&T Investigation or the B&T Report.

556.    The results of the poll is evidence of the Board's lack of credibility and adds to the evidence that the Board's termination of Mr. Reed was not for legitimate reasons.

**Sept. 11, 2025: Law Professor & Governance Expert Opines in Support of Mr. Reed**

557.    Prof. Eric F. Amarante is a tenured law professor at the University of Tennessee Winston College of Law. He has taught and written extensively on legal topics covering nonprofit law and corporate governance and is an expert in those fields.

558.    Mr. Reed retained him as an expert witness to:

> [R]eview the Independent Investigation Report conducted by Barnes & Thornburg LLP, dated December 18, 2024 . . . and provide a written opinion about whether the Report provides a factual basis to conclude that, within the contexts of the Tennessee Nonprofit Corporation Act and my understanding of the conventional, established roles and responsibilities of governing boards and executive employees of nonprofit corporations, Mr. Amani Reed and/or the Board of Trustees (the "**Board**") of the University School of Nashville (the "**School**") and its members failed to perform their respective roles or fulfill their duties.

Ex. B at p. 1.

559.    Prof. Amarante concluded:

> As to Mr. Reed, it is my conclusion that the Report provides no factual basis to conclude that he failed to perform his role or his duty as school director. The Report discloses no illegal or inappropriate behavior by Mr. Reed within the context of the conventional role of a nonprofit officer or executive, and the Report provides no basis to conclude that Mr. Reed failed to fulfill his responsibilities. With respect to the Board, however, the Report highlights several actions or omissions that qualify as violations of fundamental nonprofit board responsibilities.

Ex. B at p. 1.

560. Regarding Mr. Reed, Prof. Amarante notes the B&T Report included two findings implicating him: "the School's overall response 'exhibited an overreliance on outside advisors, suffered from a lack of coordination, and prioritized process over people'" and "communication throughout the process was not timely, clear, or accurate." Ex. B at pp. 1-2.

561. Prof. Amarante emphasizes, "however, it is important to note that the fifth finding greatly constrained Mr. Reed's actions." The fifth finding he refers to is: "the School suffered from significant governance flaws" and "concludes that the Board, not Mr. Reed, violated fiduciary duties." Ex. B at p. 2.

562. Prof. Amarante also emphasizes that the B&T Report's "the criticisms [of Mr. Reed] ignore the conventional roles of nonprofit boards and executives." Ex. B at p. 2.

563. Prof. Amarante defines the conventional roles:

*In general, the board is charged with setting the nonprofit's overall vision and mission and protecting its assets, while officers and other executives are responsible for the nonprofit's day-to-day activities. . . . One particularly relevant board responsibility is to establish and maintain policies, which in turn govern the actions of the officers and executives. These responsibilities are well-settled in Tennessee law, and is, in fact, codified in the School's bylaws. . . . [T]he Board is responsible for establishing policies and procedures to govern Mr. Reed's role as School Director. Mr. Reed's responsibility is to manage the daily operations of the School by following the Board's policies.*

Ex. B at p. 2.

564. Regarding the Report's citing the *Recommendations for Independent School Leaders* by the Independent School Task Force on Educator Sexual Misconduct to support criticizing Mr.

Reed for not sharing information about the investigation more broadly, Prof. Amarante explains why this a proper criticism of the Board, but not Mr. Reed:

> [I]t is the Board's responsibility to identify risks, stay up-to-date on best practices, and make appropriate changes to the School's policies. A nonprofit executive could certainly be involved in such a process, but Mr. Reed does not have the authority to unilaterally adopt and implement policies that have not been approved by the Board. This is, again, a fundamental principle of nonprofit corporate governance: the board of directors establish the policies and executives implement the policies.

Ex. B at p. 4.

565.    Prof. Amarante concludes:

> In sum, the Report reserves its most harsh criticisms for the Board and does not identify any instance in which Mr. Reed violated any legal duty or failed to fulfill any other responsibility as the School Director. Mr. Reed followed policies established by the Board and observed advice from Counsel. Although the Report exposes the Board's failure to competently fulfill its duties, there is nothing in the Report to suggest that Mr. Reed's actions as School Director were unlawful or inappropriate.

Ex. B at p. 4.

566.    Prof Amarante's Memorandum and expert opinion are evidence that, within the context of the Tennessee Nonprofit Corporation Act and the conventional, established roles and responsibilities of governing boards and executive employees of nonprofit corporations, the Board's decision to terminate Mr. Reed for Cause had no basis in fact, law, or conventional norms of nonprofit practice.

567.    Accordingly, Prof. Amarante's Memorandum and expert opinion supports Mr. Reed's position that the Board's relying upon the B&T Report as a factual basis to terminate Mr. Reed is pretextual and that the actual reason for firing Mr. Reed was its discrimination against him based upon his race and/or for reporting that he was being subjected to racial discrimination/harassment.

**Damages: USN's Unlawful Actions Caused Mr. Reed Catastrophic Harm & Damages**

568.    USN's wrongful termination of Mr. Reed and its related actions resulted directly in his being unemployed since his termination, have had a catastrophic effect of his ability to attain comparable employment, and have greatly reduced his future earning potential.

569.    As found by the B&T Report, the Board intentionally and unlawfully leaked the Leaked Letter in breach of fiduciary duty knowing that it contained false and defamatory information about Mr. Reed.

570.    It was foreseeable to a reasonable person that leaking the Leaked Letter would damage Mr. Reed's reputation and standing among Stakeholders and the public at large.

571.    Once it entered the "public sphere," Mr. Reed asked permission to respond and rebut the defamation.  The Board refused permission and that he and USN would not respond while the B&T Report was pending.

572.    It was foreseeable to a reasonable person that USN and Mr. Reed not responding to or rebutting the Leaked Letter would damage Mr. Reed's reputation and standing among Stakeholders and the public at large.

573.    As found by the B&T Report, the Leaked Letter led to news coverage both inside and outside Nashville, which then led to more damage to Mr. Reed's reputation as it spread across

the internet and led to protests from USN's students and faculty calling for Mr. Reed's termination or resignation.

574. It was foreseeable to a reasonable person that leaking the Leaked Letter would picked up by news media and the damage to Mr. Reed's reputation would spread across the internet.

575. The internet stories that contain the false, unrebutted defamation about Mr. Reed still exist on the internet today and are easily found by searching Mr. Reed's name.

576. The Board published an unnecessary, superfluous Board Summary on the day it fired Mr. Reed that contained false and misleading information that lied or exaggerated about the findings regarding Mr. Reed and omitted or grossly understated the findings about the Board and Trustees.

577. The obvious intent of the Board was to further unfairly damage Mr. Reed's reputation and punish him for reporting racial discrimination and filing an EEOC charge against Trustees.

578. The false and misleading Board Summary still exists on the internet today because USN has kept it on its website.

579. In the private independent school industry, a school's firing its head of school during an academic year creates more disruption, stress, controversy, and costs than a more orderly transition of leadership at the end of an academic school year.

580. Therefore, it is widely understood and accepted in the private independent school industry that a firing of a head of school during an academic year signifies that the head of school committed an egregious and harmful to the school to warrant the timing of the firing.

581. USN knew when it terminated Mr. Reed for Cause during the middle of an academic year and after the highly publicized PR Crisis created by its Trustees' leaking confidential

information and it Board's other actions in breach of fiduciary duties that it was destroying Mr. Reed's reputation and future earning capacity.  It chose to terminate him anyway.

582.    Mr. Reed has pursued and applied for new employment, but USN's public vilification of Mr. Reed has directly prevented Mr. Reed from obtaining comparable employment, including employment for mid-level administrator positions at private independent schools.

583.    USN's wrongful termination has created such financial harm to Mr. Reed that he has had to spend his life savings and withdraw retirement savings from qualified retirement accounts – incurring severe costs and penalties in doings so – to pay his daily expenses.

584.    USN's Board is comprised of highly educated individuals including attorneys and at least one attorney who specializes in employment law.  Therefore, USN acted maliciously because it knew that its treatment of Mr. Reed violated Federal anti-discrimination law but chose to terminate him anyway.  In the alternative, USN acted with reckless disregard because it knew its treatment of Mr. Reed may violate Federal anti-discrimination law but chose to terminate him anyway.

585.    As of the date of filing this Complaint, Mr. Reed has incurred $468,765 in lost compensation, $25,834 in lost retirement benefits, $25,834 in deferred compensation, health benefits worth $22,714, $675 in mental health therapy costs, $615,980 in costs associated with selling his house, relocating, and liquidating retirement assets.  These costs and damages were directly and proximately caused by USN's unlawful actions in terminating his employment.

586.    Mr. Reed planned to continue to work at the same level and capacity for at least another fifteen years.  USN's unlawful actions in terminating his employment directly and proximately caused a catastrophic loss of future earning capacity.  At his final salary alone and excluding

benefits, raises, bonuses, and cost of living adjustments, this equals $7,500,000 in lost wages and future earning capacity.

587.    USN's actions directly and proximately caused severe mental anguish, pain and suffering to Mr. Reed, resulting in symptoms of insomnia, panic attacks, weight gain, depression, anxiety and increased high blood pressure.  Mr. Reed has sought mental health therapy to cope with these symptoms, for which Mr. Reed has incurred the costs.

588.    USN's actions directly and proximately caused severe mental anguish, pain and suffering to Mr. Reed's wife and son, resulting in symptoms of insomnia, panic attacks, weight gain, depression, and anxiety.  Mr. Reed's wife and son have sought mental health therapy to cope with these symptoms, for which Mr. Reed has incurred the costs.

## FIRST CAUSE OF ACTION

## Racial Discrimination pursuant to Section 1981

589.    Mr. Reed incorporates by reference the allegations contained in the previous numbered paragraphs.

590.    USN violated § 1981 because Mr. Reed and USN entered the Employment Agreement, it was an enforceable contract for employment and USN terminated Mr. Reed's employment without a factual basis for Cause in violation of §6(c) "Termination by USN for Cause."  Mr. Reed's status as an African-American was the determinative factor in its breach of the Employment Agreement and its decision to terminate his employment.  But for his status as an African American, USN would not have breached the Employment Agreement nor terminated his employment.

591.    Evidence of USN's discriminatory intent exists by virtue of the stark contrast in how the Board treated Mr. Reed's predecessor, Dr. Durnan, during and after the 2021 PR Crisis.  The

Board took no action whatsoever to warn, counsel, or punish him for his actions that contributed to the 2021 PR Crisis. Given the similarity in the misconduct investigations of 2021 and 2024 and the crises that resulted, USN cannot provide any legitimate non-discriminatory basis to explain why it took no action whatsoever towards Dr. Durnan but took the severest action of terminating Mr. Reed.

592. Evidence of USN's discriminatory intent exists by virtue of the Board's acts and omissions towards Mr. Reed that were unprecedented towards any prior Director in the 110 year history of USN and its predecessor PDS. To wit, Mr. Reed was the first USN Director:

    a.  not to be a white/Caucasian man,

    b.  to be a person of color,

    c.  to be African-American, and

    d.  to be involuntarily terminated by USN.

And he was the first USN Director to be:

    e.  punished or disciplined by a USN Board without being told the factual basis for the punishment or discipline,

    f.  punished or disciplined by a USN Board without given an opportunity to respond to or challenge the factual basis for the punishment or discipline,

    g.  punished or disciplined by a USN Board without being afforded an opportunity for a meeting or hearing to discuss the Board's concerns or the factual basis for the punishment or discipline,

    h.  denied an opportunity by a USN Board to appear before his fellow Trustees during a Board meeting,

i.   denied an opportunity to meet with the Board after, just three months earlier, it had admitted and apologized for its mistake for not meeting with the Alumnus, who is white/Caucasian,

j.   punished or disciplined by a USN Board and Committee that were acting in direct violation of USN's Conflict of Interest Policy,

k.   punished or disciplined by a USN Board and Committee that were acting in violation of SAIS Accreditation Standards for corporate governance,

l.   willfully and wrongfully subjected to the leak of confidential board information by a Trustee in breach of fiduciary duty and with intent to harm his reputation,

m.  willfully and wrongfully denied permission to rebut false information about him,

n.   willfully and wrongfully denied his right to the housing benefit contained in his employment contract,

o.   willfully and wrongfully denied his right to the retirement benefits contained in his employment contract,

p.   willfully and wrongfully denied his right to resign "for Good Reason" contained in his employment contract,

q.   willfully and wrongfully denied his right to the dispute resolution process contained in his employment contract,

r.   willfully and wrongfully denied his right to not be disparaged by USN contained in his employment agreement,

s.   subjected to any willful or wrongful breach of a material term of his employment contract,

t.   willfully and wrongfully denied the basic concepts of fairness and due process commonly exercised by employers in the United States,

u.   actively deceived by Trustees, specifically when Board President Kopstain believed Mr. Reed's signing the Masullo Separation Agreement was "massively problematic" for him but withheld that information and falsely assured him that his interests were "aligned" with USN's interests,

v.   subjected to cruel and punitive actions during or after his employment, specifically when USN notified of his likely termination on the afternoon of Christmas Eve, withheld funds for six months that were indisputably his, and denied his access to his personal property for weeks after his termination,

w.   criticized for following USN policies, specifically when USN relied upon a B&T Report that stated he was required to implement policies but then criticized him for doing so during the Masullo Investigation,

x.   subjected to a smear campaign, specifically when USN published a false, misleading, and superfluous "Board Summary" of the B&T Report after he was terminated.

593.   Evidence of USN's discriminatory intent exists because USN's proffered reason for his termination is unsupported by facts.  To wit:

a.    USN has cited the B&T Report as its factual basis and reason for terminating Mr. Reed's employment "for Cause."  The B&T Report, however, does not provide a factual basis for the Board to have found that "Cause" existed as defined by the Employment Agreement.

b.   The B&T Report states that Mr. Reed was required by the Bylaws to "implement the policies adopted by the Board" and then concludes that he did implement the policies of the Board.

594. USN's proffering a false and factually unsupported basis for terminating Mr. Reed is evidence of USN's discrimination and discriminatory intent against Mr. Reed as its first African-American Director.

595. The Memorandum from Prof. Eric Amarante provides further evidence by stating his expert opinion that, within the context of the Tennessee Nonprofit Act and the conventional roles of nonprofit officers and executive, the B&T Report did not provide a factual basis to conclude that Mr. Reed failed to perform his role or duty as Director, failed to perform his responsibilities, or engaged in illegal or inappropriate behavior.

596. USN's hiring a white/Caucasian individual to permanently replace him as Director is evidence of USN's discrimination and discriminatory intent against Mr. Reed as its first African American Director.

597. USN's only considering white/Caucasian individuals as the four finalists to permanently replace him as Director is evidence of USN's discrimination and discriminatory intent against Mr. Reed as its first African American Director.

598. USN's decision to not fire or punish the three white/Casuscasion employees who were found to have violated USN's polices before or during the Masullo Investigation is evidence of USN's discrimination and discriminatory intent against Mr. Reed as its first African American Director.

599. USN's termination of Mr. Reed and its related actions has resulted in his being unemployed since his termination, has had a catastrophic effect of his ability to attain comparable employment, and greatly reduced his future earning potential. USN knew when it terminated Mr. Reed for Cause during the middle of an academic year after the highly publicized

PR Crisis created by its Board's actions and breaches of fiduciary duty that it was destroying Mr. Reed's reputation and future earning capacity.

600.    USN's Board is comprised of highly educated individuals including attorneys and at least one attorney who specializes in employment law.  Therefore, USN acted maliciously or with reckless indifference for Mr. Reed's federally protected rights because it knew that its treatment of Mr. Reed violated Federal anti-discrimination law but chose to terminate him anyway.  In the alternative, USN acted with reckless disregard because it knew its treatment of Mr. Reed may violate Federal anti-discrimination law but chose to terminate him anyway.

601.    USN's action of discrimination against Mr. Reed directly and proximately caused him economic damages in the form of lost wages, future earning capacity, and costs associated with relocating and selling his home.  USN's action of discrimination against Mr. Reed directly and proximately caused him emotional distress, pain and suffering resulting in loss of sleep, depression and anxiety.

602.    USN's actions and discrimination against Mr. Reed were with malice or reckless indifference to Mr. Reed's federally protected rights.

## SECOND CAUSE OF ACTION

### Retaliation pursuant to Section 1981

603.    Mr. Reed incorporates by reference the allegations contained in the previous numbered paragraphs.

604.    USN violated Section 1981 by terminating Mr. Reed's employment based upon his reporting to the Board on October 27, 2024 that he was being subjected to racial discrimination in his employment and/or on January 5, 2025 notifying the Board that he had filed a charge of discrimination with the EEOC against Trustees.  Mr. Reed's reporting racial discrimination to

the Board and his filing a charge of discrimination with the EEOC are both protected activities for purposes of Section 1981. But for his engaging in one or both protected activities, USN would not have terminated his employment.

605.    After Mr. Reed's October 27, 2024 email reporting his racism concerns, Board President Kopstain stopped timely responding to Mr. Reed's texts and emails and several times ignored them altogether. This is evidence of retaliatory intent.

606.    Evidence of retaliatory intent includes the Board's acts and omissions towards Mr. Reed after October 27, 2024 that were unprecedented towards any prior Director in the 110 year history of USN and its predecessor PDS. To wit,:

    a.    The Board awarded Mr. Reed the maximum bonuses and salary as recently as July 2024,

    b.    The Board President emailed him "You had a great year" in June 2024,

    c.    The President praised his handling of the Masullo Investigation in an email dated June 26, 2024,

    d.    The Board President's communications were positive and convivial prior to October 27th

607.    After October 27, 2024, he was:

    a.    Ignored by the Board President or responded to with short or angry responses,

    b.    Terminated by the USN Board without being told the factual basis for the punishment or discipline,

    c.    Terminated by the USN Board without given an opportunity to respond to or challenge the factual basis for the punishment or discipline,

d.   Terminated by the USN Board without being afforded an opportunity for a meeting or hearing to discuss the Board's concerns or the factual basis for the punishment or discipline,

e.   Denied an opportunity by a USN Board to appear before his fellow Trustees during a Board meeting,

f.   Denied an opportunity to meet with the Board after, just three months earlier, it had admitted and apologized for its mistake for not meeting with the Alumnus, who is white/Caucasian,

g.   Punished or disciplined by a USN Board and Committee that were acting in direct violation of USN's Conflict of Interest Policy,

h.    Punished or disciplined by a USN Board and Committee that were acting in violation of SAIS Accreditation Standards for corporate governance,

i.    Willfully and wrongfully denied his right to the dispute resolution process contained in his employment contract,

j.    Willfully and wrongfully denied his right to not be disparaged by USN contained in his employment agreement,

k.   Willfully and wrongfully denied the basic concepts of fairness and due process commonly exercised by employers in the United States,

l.    Actively deceived by Trustees, specifically when Board President Kopstain believed Mr. Reed's signing the Masullo Separation Agreement was "massively problematic" for him but withheld that information and falsely assured him that his interests were "aligned" with USN's interests

m.   Subjected to cruel and punitive actions during or after his employment, specifically when USN notified of his likely termination on the afternoon of Christmas Eve, withheld funds

for six months that were indisputably his, and denied his access to his personal property for weeks after his termination,

n. Criticized for following USN policies, specifically when USN relied upon a B&T Report that stated he was required to implement policies but then criticized him for doing so during the Masullo Investigation,

o. Subjected to a smear campaign, specifically when USN published a false, misleading, and superfluous "Board Summary" of the B&T Report after he was terminated.

608. Evidence of USN's discriminatory intent exists because USN's proffered reason for his termination is unsupported by facts. To wit:

a. USN has cited the B&T Report as its factual basis and reason for terminating Mr. Reed's employment "for Cause." The B&T Report, however, does not provide a factual basis for the Board to have found that "Cause" existed as defined by the Employment Agreement.

b. The B&T Report states that Mr. Reed was required by the Bylaws to "implement the policies adopted by the Board" and then concludes that he did implement the policies of the Board.

609. USN's proffering a false and factually unsupported basis for terminating Mr. Reed is evidence of USN's retaliation and retaliatory intent against Mr. Reed as its first African-American Director.

610. The Memorandum from Prof. Eric Amarante provides further evidence by stating his expert opinion that, within the context of the Tennessee Nonprofit Act and the conventional roles of nonprofit officers and executive, the B&T Report did not provide a factual basis to conclude that Mr. Reed failed to perform his role or duty as Director, failed to perform his responsibilities, or engaged in illegal or inappropriate behavior.

611.     USN has cited the B&T Report as its factual basis and reason for terminating Mr. Reed's employment "for Cause" as defined in his employment Agreement.   This proffered factual basis and reason, however, fails and is pretextual because the B&T Report does not provide a factual basis for the Board to have found that "Cause" existed as defined by the Employment Agreement.  The B&T Report states that Mr. Reed was required by the Bylaws to "implement the policies approved by the Board" and then concludes that he did implement the policies of the Board.  Thus, USN's proffering a false and factually unsupported basis for terminating Mr. Reed is evidence of USN's retaliation and retaliatory intent against Mr. Reed for engaging in protected activities.

612.     USN's hiring a white/Caucasian individual to permanently replace him as Director is evidence of USN's retaliation and retaliatory intent against Mr. Reed for engaging in protected activities.

613.     USN's only considering white/Caucasian individuals as the four finalists to permanently replace him as Director is evidence of USN's retaliation and retaliatory intent against Mr. Reed for engaging in protected activities.

614.     USN's Board is comprised of highly educated individuals including attorneys and at least one attorney who specializes in employment law.  Therefore, USN acted maliciously or with reckless indifference for Mr. Reed's federally protected rights because it knew that its treatment of Mr. Reed violated Federal anti-retaliation law but chose to terminate him anyway.  In the alternative, USN acted with reckless disregard because it knew its treatment of Mr. Reed may violate Federal anti-retaliation law but chose to terminate him anyway

615.     USN's termination of Mr. Reed and its related actions has resulted in his being unemployed since his termination, has had a catastrophic effect of his ability to attain

comparable employment, and greatly reduced his future earning potential. USN was fully aware when it terminated Mr. Reed for Cause during the middle of an academic year after the highly publicized PR Crisis created by its Board's actions and breaches of fiduciary duty that it was destroying Mr. Reed's reputation and future earning capacity. Thus, its actions were taken with malice or reckless indifference to Mr. Reed's federally protected rights.

616.    USN's action of discrimination against Mr. Reed directly and proximately caused him economic damages in the form of lost wages, future earning capacity, and costs associated with relocating and selling his home. USN's action of discrimination against Mr. Reed directly and proximately caused him emotional distress, pain and suffering resulting in loss of sleep, depression and anxiety.

617.    USN's actions and retaliation against Mr. Reed were with malice or reckless indifference to Mr. Reed's federally protected rights.

## PRAYERS FOR RELIEF

Wherefore, premises considered, Plaintiff requests this Court enter an Order of Judgment in favor of Plaintiff containing the following:

1.      finding Defendant USN liable to Plaintiff Amani Reed for violating the Civil Rights Act of 1866, 42 U.S.C. § 1981 for unlawful racial discrimination based upon its unlawful termination of his employment;

2.      finding Defendant USN liable to Plaintiff Amani Reed for violating the Civil Rights Act of 1866, 42 U.S.C. § 1981 for unlawful retaliation based its unlawful termination of his employment;

3.      awarding Plaintiff Amani Reed compensatory damages of $16,000,000 in damages for direct/actual damages and indirect/consequential damages to be paid by Defendant USN;

4.    awarding Plaintiff Amani Reed $5,000,000 in compensatory damages for pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life to be paid by Defendant USN;

5.    awarding Plaintiff Amani Reed the maximum amount of appropriate punitive damages available under the law against Defendant USN;

6.    awarding Plaintiff Amani Reed his reasonable attorneys' fees and expenses pursuant to Civil Rights Act of 1866, 42 U.S.C. § 1981 to be paid by Defendant USN.

Respectfully submitted,

T. McKee Law, PLLC

s/ Todd C. McKee
_____

Todd C. McKee
BPRN 18123
4235 Hillsboro Pike, Ste. 300
Nashville, TN 37215
(615) 916-3224
tmckee@tmckeelaw.com