# EXHIBIT A



**BARNES & THORNBURG LLP**

1600 West End Avenue
Suite 800
Nashville, TN 37203-3494 U.S.A.
(615) 621-6021

www.btlaw.com

Joy Boyd Longnecker
Partner
615-621-6012
joy.longnecker@btlaw.com

JD Thomas
Partner
615-621-6011
jd.thomas@btlaw.com

December 18, 2024

Robert A. Peal, Esq.
Sims Funk, PLC
3102 West End Avenue, Suite 1100
Nashville, TN 37203
rpeal@simsfunk.com

> Re: University School of Nashville – Independent Investigation Report

Dear Rob:

Enclosed with this letter is the final report ("Report") from our independent investigation of the facts and circumstances surrounding Dean Masullo's tenure at USN, which included, but was not limited to, his conduct with regard to a particular student, and the School's response to the student's allegations about Masullo's conduct. We have chosen to refer to all the individuals named in the report, other than Dean Masullo, by title. With this Report we are also providing a confidential description of all defined terms and titles in the report.

We understand that the Ad Hoc Committee may wish to release all or a portion of this Report to the USN community. We offer no advice and take no position on whether such actions would waive any applicable privilege or protection that may apply to this report or any of the attorney client privileged or work product protected material that we created during our work on this report. We recommend you carefully consider such issues prior to any disclosure.

Please feel free to contact us if you have any questions or concerns.

Sincerely,

Joy Boyd Longnecker

JD Thomas

Atlanta  Boston  California  Chicago  Delaware  Indiana  Michigan  Minneapolis  Nashville  New Jersey
New York  Ohio  Philadelphia  Raleigh  Salt Lake City  South Florida  Texas  Washington, D.C.

Case 3:25-cv-01319   Document 1-1   Filed 11/13/25   Page 2 of 79 PageID #: 117

**CONFIDENTIAL INDEX OF DEFINED TERMS AND INDIVIDUALS NAMED BY TITLE**

| Defined Term | Full Description |
|---|---|
| Ad Hoc Committee | Ad Hoc Committee for School Safety formed September 20 |
| Administrator 1 | |
| Administrator 2 | |
| AHS | |
| Alumni 1 | |
| August Letter | |
| Board President | |
| Care Team | |
| CFO | |
| Current Outside Counsel | |
| Director | |
| Director of Communications | |
| Director of Counseling | |
| Disclosure | |
| Former Director | |
| Former Outside Counsel | |
| GSA | Gender and Sexuality Alliance |
| High School Leadership Team | |
| Mock Trial Trip | Mock trial trip in Delaware from which Dean Masullo was removed |
| Parent 1 | |
| Social Media Post | |
| Student 1 | |
| Student 1's Lawyer | |
| Teacher 1 | |
| Teacher 2 | |
| Teacher 3 | |
| Teacher 4 | |



**R E P O R T**

| | |
|---|---|
| TO: | Ad Hoc Committee on School Safety |
| | University School of Nashville Board of Trustees |
| FROM: | J.D. Thomas and Joy Boyd Longnecker |
| DATE: | December 18, 2024 |
| SUBJECT: | Independent Investigation Report |
| | Confidential |



## TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    EXECUTIVE SUMMARY ................................................................................. 1

III.   INVESTIGATION OVERVIEW ........................................................................ 2

       A.    Our Process ............................................................................................ 2

IV.    FACTUAL BACKGROUND .............................................................................. 4

       A.    History and Relevant Background of the School ...................................... 4

       B.    Relevant Facts ........................................................................................ 6

             i.    Masullo's Employment at USN and History of Inappropriate
                   Conduct with Other Students ........................................................ 6
             ii.   Interactions Between Masullo and Student 1 ................................. 8
             iii.  Student 1's Disclosure ................................................................. 14
             iv.   The School's Initial Response ...................................................... 15
             v.    The School's Initial Investigation and Ensuing Response ............. 18
             vi.   School's Response Following Student 1's Social Media Post ......... 23

V.     FINDINGS .......................................................................................................... 26

       1.    Finding No. 1: Masullo's Conduct Was Inappropriate By Any Measure. 26

             A.    Masullo's actions were objectively improper and violated
                   numerous USN policies regardless of his stated intent or any
                   label that could be assigned. ........................................................ 26

                   i.    Masullo's conduct was consistent with "grooming"
                         behavior. ........................................................................... 29

       2.    Finding No. 2: The School's initial response was generally appropriate. . 31

       3.    Finding No. 3: USN's overall response exhibited an overreliance on
             outside advisors, suffered from a lack of coordination, and prioritized
             process over people. ................................................................................ 33

             A.    The School's response suffered from a lack of planning and
                   internal coordination and communication. ................................... 33



B. The School's response focused on process over people. ................ 37

C. The School's response ignored the widespread and persistent impacts of Masullo's actions and resulting termination. .............. 38

D. The manner in which the School responded to Student 1's Disclosure has adversely impacted the likelihood of students reporting similar conduct in the future. ........................................ 40

4. Finding No. 4: Communications throughout the process were not timely, clear, or accurate, which eroded trust and confidence in the School and its leadership. ..................................................... 41

A. Student 1 .................................................................................. 41

B. The USN Community ............................................................... 44

C. Parents .................................................................................... 47

i. Parents of Student 1 ...................................................... 47

ii. Other Parents................................................................. 48

D. Faculty .................................................................................... 48

5. Finding No. 5: Student 1's Disclosure exposed and magnified governance flaws ....................................................................... 50

A. The Board of Trustees did not fully appreciate or appropriately plan for the special challenges presented by the former Head of School's retirement in 2022 and the transition period and leadership turnover that followed.................................................. 50

B. The Board was unprepared for this crisis...................................... 52

C. Board members do not appreciate their fiduciary obligations....... 53

VI. RECOMMENDATIONS ...................................................................... 54

VII. CONCLUSION.................................................................................... 58



# I.    INTRODUCTION

In September 2024, Sims Funk, PLC, Current Outside Counsel for University School of Nashville ("USN" or "School"), engaged Barnes & Thornburg LLP ("B&T") to conduct a comprehensive independent investigation of, among other things:

- the facts and circumstances surrounding a report ("Disclosure") from a student ("Student 1") about the inappropriate conduct of an English teacher, Dr. Dean Masullo ("Masullo") during the 2023-2024 academic year;

- whether Masullo engaged in similar conduct with other students during his tenure at USN; and

- the School's response to Student 1's Disclosure and communications with the community, and anything else we believed was relevant based on what we learned during our investigation.

Our letter detailing the full scope of our engagement is on the School's website and attached as **Exhibit 1**. Our investigation was independent of interference or influence. We received no direction from the Board of Trustees ("Board"), the Head of School ("Director"), or anyone else at USN. Our findings and recommendations are our own.

# II.    EXECUTIVE SUMMARY

Our investigation found no single point of failure or single individual who is wholly responsible for the events that are the subject of this Report. The exception to this is Masullo himself, who is clearly to blame for engaging in and concealing conduct he knew was inappropriate and in violation of multiple School policies. We found that while some USN employees thought Masullo sometimes behaved strangely, no one was aware of the full extent of his inappropriate conduct. Notably, we found no fault with Student 1's actions, either before or after her Disclosure. A summary of our findings, which are discussed in detail below, are as follows:

1. The School quickly determined Masullo violated numerous policies. Masullo's conduct did not fall within the category of behavior that would have triggered a mandatory reporting obligation or constituted a "sexual offense" under Tennessee law. Based on our investigation, Masullo's actions were consistent with "grooming" behavior. Regardless of any label, however, Masullo's actions were

Atlanta  Boston  California  Chicago  Delaware  Indiana  Michigan  Minneapolis  Nashville  New Jersey
New York  Ohio  Philadelphia  Raleigh  Salt Lake City  South Florida  Texas  Washington, D.C.

objectively inappropriate, had no place in the school setting, and should have resulted in his swift termination.

2. The School's initial response to Student 1's Disclosure was generally appropriate. The School assembled the right team of people, recognized the conduct Student 1 disclosed was extremely concerning and likely grooming, took immediate steps to remove Masullo from interaction with students, and sought to support Student 1.

3. In the week following Student 1's Disclosure, the School's response faltered. It became too reliant on these advisors, failed to involve critical members of senior School leadership, and lacked a cohesive plan. The response that did occur prioritized process over people and ignored the widespread effects of Masullo's actions and removal. The School could have avoided the public backlash from Student 1's July 1, 2024 Social Media Post by responding to her reasonable requests for information.

4. The School's communications throughout its response to the Disclosure were poorly conceived and failed to follow best practices. Communication failures occurred at the School's senior leadership level and at the Board level. These failures undermined trust in senior leadership and in the Board among every School constituency, including faculty, staff, students, parents and alumni.

5. The Board's governance structure prevented it from effectively responding to, and supporting, the School in the wake of Student 1's Disclosure.

## III.  INVESTIGATION OVERVIEW

### A.  Our Process

This Report is not a record of every fact, document, or witness statement we collected during our investigation. Describing or even summarizing the facts learned from all of the interviews conducted and documents reviewed would be neither productive nor possible. As such, the facts below are those that we deem to be most relevant to the issues we were asked to investigate, with key events and information highlighted where appropriate. This Report is also not intended to be an ongoing assessment of the School's response to Student 1's Disclosure. Our investigation and analysis generally ends at the time we were engaged. We did, however, consider facts or circumstances occurring after that date if they had relevance to earlier events.

We were retained on September 20, 2024, and we immediately began gathering facts. To do so, we worked with the School and its Current Outside Counsel to assemble information compiled as part of the prior investigation. We also collected facts and information that were already in the public sphere. We met with Student 1 and her attorney to gather facts in her possession. We interviewed numerous current and former School employees and sought additional documentary and other information from them.

We collected and reviewed documents, email, and other communications from the School. We spoke with other students, alumni, parents and individuals who agreed to participate and share their perspectives and stories. Generally, we pursued facts if and only to the extent they were within our investigation's scope.

At the outset of our investigation, we created a hotline number and email address to allow individuals with relevant information to contact us. We worked with the School to ensure that this number and email were delivered to the entire USN community, including all alumni who attended the School during Masullo's tenure for which the School had contact information. We confirmed the School published the hotline number and email on the School's website. Nine individuals contacted us at the email we established and three called the hotline number.

Because our contact information was available to the entire USN community, students, alumni and their parents who may have had an adverse experience with Masullo were able to contact us if they wished to do so. We concluded that allowing those individuals to make the choice whether or not to do so was the least likely to cause additional harm or distress. We did not take the same approach with employees and former employees of the School, and contacted those that we wanted to speak to, regardless of whether they contacted us.

Over the course of our investigation, we interviewed forty-two witnesses. These witnesses included Student 1, members of the School's administration, current and former employees, Board members, parents, alumni, and current students. Masullo refused to be interviewed. We adopted an open-ended approach to our questioning of all witnesses, and told them they could tell us anything they believed was relevant or important. We invited every witness we spoke with to reach out to us if they remembered new information, believed they needed to clarify what they said, or simply wanted to provide us more information.

We reviewed approximately 5,000 pages of documents. These included, but were not limited to, e-mails, text messages, the School's Employee Handbook ("Handbook"), the Board bylaws, communications from administration, the Board, faculty members, and parents in response to the Disclosure, the investigative materials from the law firm ("Former Outside Counsel") that represented the School in its initial investigation, social media content surrounding the Disclosure, and internal documents from the School. We also conducted an after-hours tour of the School, inclusive of the library, Masullo's former classroom, and faculty and administration offices.

The facts that we uncovered during our investigation and a detailed description of our findings and recommendations are set forth below. We have attempted to formulate recommendations geared toward ensuring the School is better prepared to detect and prevent misconduct in the future, and to respond appropriately if it does. While we identified failures, our investigation also left us impressed by the School, its

students and alumni, and many of its faculty and administrators. Though failures occurred, we do not believe they are fatal to the School's future. Indeed, we believe the School is already on the road to addressing many of them, and it has the capacity to address all of them if the recommendations in this Report are embraced. While this period of time has been painful for the School, we believe that USN can emerge as a stronger, safer, and better place as a result.

## IV.   FACTUAL BACKGROUND

### A.   History and Relevant Background of the School

USN is a K-12, independent, all-gender, non-sectarian day school.[1] The School's origins trace back to the founding of the Winthrop Model School in 1888 by the Peabody College Board of Trustees. In 1915, the Winthrop Model School became the Peabody Demonstration School ("PDS") and a part of the Peabody College of Education at Vanderbilt University ("Peabody College"). When Peabody College decided to close PDS in 1974, a group of PDS parents, alumni, students, and teachers created a new institution on PDS's campus, dedicating USN to continuing this historic legacy. Today, the School's student body includes 1,081 students from fifty-five zip codes in Middle Tennessee. Thirty-eight percent of those enrolled are students of color, and twenty-two percent are from international families representing fifty-five countries.

USN lists academic excellence, a diverse community, and a commitment to putting its students first as its greatest strengths. USN's culture reflects its students-first approach. During our investigation, multiple witnesses cited the close student-faculty relationships at USN as a source of pride and something that distinguished USN from other private schools. USN students are described as diverse, bright, talented, curious, ambitious, and self-directed. They are selected for their capacity and readiness to take full advantage of USN's robust curricular and co-curricular programs.

USN faculty at all levels are billed as attentive to students and their own professional learning and growth.[2] The faculty and administration are described as having built a strong culture of continuous school renewal and thoughtful, disciplined innovation. USN views its faculty as having an important voice in the school improvement process, and this shared governance philosophy is inherently collaborative.

Like other independent schools, USN is self-funded and self-governed by the Board ("Board"). The Board's main roles are threefold: (1) determine and safeguard the School's mission[3]; (2) act as the School's fiduciary, setting "all policy concerning the

---

[1] This background is generally excerpted from https://www.usn.org/about, accessed November 26, 2024.

[2] *See generally* USN Director Position Statement, July 1, 2022, Retrieved November 26, 2024.

[3] The School's Mission Statement is available on its website and reads: "University School of Nashville models the best educational practices. In an environment that represents the cultural and ethnic

governance, operation and financial viability of the School"; and (3) engage and oversee the Director of the School who is "responsible to the Board for the implementation of the policies adopted by the Board."[4] As the governing body for the School, the Board's primary focus is long-term, strategic planning.

USN's day-to-day operations are managed by the School's Director, who works closely with the Board to implement the policies approved by the Board and to carry out the School's mission. The Director has authority to make day-to-day personnel decisions, including hiring and firing, and has the ability to engage third parties to assist with operations of the School. The Director is supported by a business office that includes a Chief Financial Officer and Director of Marketing and Communications ("Director of Communications"), among other positions. Each of the School's three divisions (lower school, middle school, and high school) has its own head. In 2024, the School created a new position for the Assistant Head of School for Academics, which also reports to the Director.

USN is accredited by the Southern Association of Independent Schools ("SAIS"). USN has been a member of SAIS since 1996.[5] SAIS is the largest regional independent school association in the country.[6] USN is also a member of the National Association of Independent Schools ("NAIS"). NAIS is a U.S.-based membership organization for private, nonprofit, K-12 schools. NAIS and SAIS provide support to their school members in the form of data, research, resources, and professional learning to help educators and administrators perform at their top level.[7]

Each employee of USN is subject to the School's Handbook.[8] All USN employees must sign and acknowledge receipt of the Handbook upon hiring and each time it is updated. New employees must complete a number of child and other safety-related training courses during their onboarding process, including "Protecting Children: Identifying and Reporting Sexual Misconduct K-12" and "Mosaic: Prevent Discrimination and Harassment Together: Faculty & Staff – K12." Employees must also complete a mandatory "Driver Safety Fundamentals – K12" training before driving a USN-owned vehicle; a vehicle rented or leased by USN; a personal vehicle on USN business; or submitting a mileage reimbursement.

---

composition of Metropolitan Nashville, USN fosters each student's intellectual, artistic, and athletic potential, valuing and inspiring integrity, creative expression, a love of learning, and the pursuit of excellence."

[4] *See* USN Bylaws, Art. § 1.1

[5] *See* https://account.sais.org/member-school-directory/university-school-of-nashville, accessed November 26, 2024.

[6] *See* https://sais.org/about-sais/about-sais-overview/, accessed November 26, 2024.

[7] *See* https://www.nais.org/about/about-nais/, accessed November 26, 2024.

[8] As part of our investigation, we asked the School to provide all policies and procedures applicable to USN employees and all trainings that would have been provided to faculty and staff who were employed by the School in the 2023-2024 school year.

In recent years, the School has also provided child safety and abuse prevention training to faculty. These trainings include the "Back-to-School Training for All Employees" in August 2024, which is referenced later in this Report, and Darkness to Light's flagship training, "Stewards of Children,"[9] which covers – among other topics – reporting obligations and professional boundary setting with students. The School's Director of Communications has provided a number of in-service trainings and sent annual reminders to employees that reference the School's social media and electronic communications policies and crisis alert card/points of contact. USN contracts with a third-party (Lighthouse Services) to administer its employee hotline. Employees can use this confidential hotline to anonymously report workplace concerns such as fraudulent, unlawful, or unethical behavior.

USN's counseling department also offers students a variety of wellness and safety programs. Beginning in ninth grade, students attend age-appropriate programs on, *e.g.*, healthy relationships; maintaining a wellness plan; the language of violence; common mental health disorders and self-care; human sexuality; active bystander training; and consent. For eleventh and twelfth graders, the School recently began incorporating a program with a speaker from Vanderbilt University's Sexual Assault Center, who addresses topics such as sexual assault; sexual harassment; grooming; and how to get help.

## B.    Relevant Facts

### i.    Masullo's Employment at USN and History of Inappropriate Conduct with Other Students

Masullo was hired as an English teacher at USN in 2009. At the time of the events in question, Masullo had spent approximately fifteen years at USN in its English Department. Witnesses uniformly described Masullo's teaching style as organized, lecture-focused, and designed to lead students to a specific conclusion from textual sources, rather than to prompt classroom discussion. Masullo also served as the faculty advisor to the Gender and Sexuality Alliance ("GSA") and an advisor to students conducting independent studies.

By the time of our investigation, Masullo had vacated his classroom, and the layout had changed. Witnesses described his classroom as cluttered but curated. Masullo kept personal mementos, notes, and pictures, including pictures of students on his walls. He also put a system in place to cover every window in his classroom. Other faculty occasionally observed cardboard covering the window on Masullo's classroom door. Student 1 recalled watching Masullo measuring and cutting the cardboard down to the exact size to push into the window. Once he was satisfied with the fit, he taped a small handle of sorts to the cardboard to be able to pull it out. When in place, the cardboard

---

[9] *See* https://www.d2l.org/education/stewards-of-children/, accessed December 5, 2024.

blocked any view inside of Masullo's classroom from people walking past in the hallway. In addition, he installed curtains for the windows lining the top of the wall adjacent to the hallway, as well as for the windows lining the top of the wall that looked outside. We were told by student witnesses that Masullo explained the cardboard window covering facilitated film watching.

It was widely known, including by IT staff, that Masullo almost exclusively used his personal laptop for schoolwork and teaching, which he told witnesses was necessary because it worked better than the school-issued laptops.

Multiple witnesses described instances where Masullo crossed professional boundary lines with students, played favorites, met with students behind closed doors in his classroom, and made students feel uncomfortable. One former student recalled taking a test in Masullo's sophomore English class. The student walked up to Masullo's desk to ask a question about the test. Masullo followed the student back to her seat, massaged the student's shoulders, and then leaned down and whispered, "You are my poetry queen" into her ear. The student told us that at the time, she found this interaction more odd than bothersome and did not report it. Another student described Masullo hugging her aggressively and then crying into her hair. One alumni stated Masullo attended off-campus movies with students at the Belcourt Theatre with no other faculty member or parent present. In several instances, alumni described receiving out of place and personalized gifts from Masullo. One alumni described receiving an ornate bouquet of red roses from Masullo after a performance.

Former students – including Student 1 – told us Masullo gave them significant one-on-one attention, made them feel special, became a close confidant, showered them with compliments, and made an outsized effort to share in the students' interests in music or other art forms. When not in class, these students told us they often spent a lot of time in Masullo's classroom, including before, during, and after school. They said Masullo wielded a disproportionate amount of influence over them, and they found themselves seeking his attention or approval, and felt jealous when he would show similar individualized action to other students. These students also told us Masullo would orchestrate out-of-school interactions with them, appearing in places these students visited outside of school, including a dress shop, a movie theatre, a men's clothing store, and a record store. They also indicated Masullo sought other opportunities to interact with them socially.

Masullo's heightened focus and attention appeared directed to students who were experiencing personal or familial turmoil. However, we found no evidence that Masullo ever encouraged these students to seek counseling, talk to a therapist, or take any other steps to tap into the mental health resources offered by the School. At least one alumnus told us Masullo served as his therapist, counselor, and close confidant. Many of the students who came forward indicated they felt a deep sense of loyalty and admiration for Masullo and saw their relationship with Masullo as something more than a

teacher/student relationship. Certain of these former students stated Masullo told them that he left items to them in his will or wanted them to serve as pallbearers at his funeral. Parents of some of these students stated their children's relationships with Masullo adversely impacted their own relationships with their children.

A number of students indicated that after leaving USN and/or learning about Student 1's Disclosure, they found themselves questioning the motivation behind Masullo's fixation and attention. They expressed they had come to view this fixation and attention as inappropriate and/or disconcerting. Some of these students told us they came to believe Masullo cultivated close relationships with them for his own benefit and stated they felt like their relationships with Masullo limited their academic or social experience at USN. Several students also confirmed they exchanged text messages with Masullo one-on-one.

Multiple faculty members told us Masullo would sometimes refer to female students as "love" or "sweetheart." While Masullo was confronted about the use of these terms at least once, and stopped for a time, faculty who interacted with him said he would eventually start using these terms again.

The discomfort and tension was not limited to students. Other teachers indicated they believed Masullo manipulated students to reach his own professional ends, such as teaching the classes he wanted to teach with minimal oversight, or worked to turn them against other teachers in the English department. One Teacher ("Teacher 4") also described ongoing tension within the English Department about Masullo's refusal to change his teaching style, and his strong resistance to changing his curriculum. Another teacher described Masullo's style as "polarizing" among students. There were anecdotal reports that Masullo encouraged a petition circulated by some students protesting the change to the tenth grade English curriculum that affected a class he had long taught.

### ii. Interactions Between Masullo and Student 1

In the Fall of 2023, Student 1 began her senior year at USN. She turned eighteen in the summer between her junior and senior years. At the beginning of the Fall 2023 semester, Student 1 indicated that she had just gone through a breakup and was having a harder time at home. She enrolled in Masullo's "Literature in the City" class. Student 1 described her initial interactions with Masullo as normal and mentor-like. In the second half of the Fall 2023 semester, Student 1 and her group of friends would sit in Masullo's classroom during free periods, and they began to see him as a confidant.

Over winter break, and prior to the Spring 2024 semester, Student 1 spoke with a recent alumni of USN ("Alumni 1"). Alumni 1 was a family friend and former Masullo student. She informed Student 1 that toward the end of Alumni 1's senior year, Masullo had behaved oddly, and become more fixated on Alumni 1, attempting to hold Alumni 1's hand on at least one occasion. At the time, Alumni 1 was experiencing a difficult time

with her family, and Masullo served as a pivotal person in her life. After Alumni 1's graduation, she became uncomfortable with Masullo's actions and the attention he paid to her and chose to cease interacting with him.

For the Spring 2024 semester, Student 1 signed up for an independent study class centered around film and photography. This independent study was originally advised by another teacher. When Student 1 mentioned her dissatisfaction with her independent study advisor to Masullo, Masullo offered to serve as her advisor. At Masullo's urging, Student 1 asked and was permitted to switch her independent study advisory to Masullo.

On January 26, 2024, Masullo attended a School-sponsored music festival called "Baby Zeitgeist" that Student 1 helped coordinate. That night, he gave Student 1 his personal cell-phone number. Masullo approached Student 1 as she was cleaning up and stated that he wanted her to have his cellphone number so that she could reach out if she ever needed anything. The first text exchanged privately between Student 1 and Masullo occurred the next day, January 27, 2024. This, and the many subsequent one-on-one texts between Masullo and Student 1 that followed, occurred off any systems controlled or monitored by USN and were unobservable by the School or anyone else.

On January 27, 2024, Masullo's band played a show at an all-ages venue in Nashville. Masullo asked Student 1 to attend the show and to take pictures. Student 1 obliged, took pictures, and left before the end of the show. Another faculty member attended the show and confirmed he saw Student 1 there.

Masullo and Student 1 texted often throughout the Spring 2024 semester, during the school day as well as after school hours, or on the weekends. As they did, their communications became increasingly more familiar and removed from the type of communication that would be expected, or appropriate, between a teacher and a student. For example, Masullo would consistently use different iterations of heart emojis, often with multiple emojis in the same message. The first example of heart emojis we reviewed were from Masullo to Student 1, dated February 23, 2024, and included nine purple hearts with no other text. In March, Masullo texted Student 1, "I was watching the Holdovers on the flight this morning and when Silver Joy began to play I thought of you. Grateful to have you in my life." Another text from Masullo to Student 1 in early April stated, "I also want you to know (and to feel) that you can 100% count on me whenever you need help. ❤️". He continued in the same text chain, "Whatever you think you might owe, you pay me back a hundredfold just by being you. You've never been a burden to me, and you never will."

Masullo's texts to Student 1 soon crossed other lines. In one mid-April text exchange, after texting Student 1 "❤️❤️❤️❤️❤️❤️❤️❤️," Masullo said, "So I never thought to do this before, but I looked up where you live." That same day, Masullo told Student 1, "I appreciate how open you are with me." Masullo continued, "It helps me to understand you, and that's important to me because you are important to me," and then

sent three heart emojis "❤️❤️❤️". The next day, Masullo texted Student 1, "Slept with my headphones on in case you texted me in the middle of the night. Didn't want to wake my wife; didn't want to miss the text. As long as you're okay, I'm happy. ❤️". That same day, he sent his home address to Student 1 with the following message: "Entre nous, of course. ❤️".[10] On multiple occasions in these exchanges Masullo texted Student 1 "I love you" or "Love you."

Masullo also engaged in other forms of unobservable communication with Student 1 that fell outside the bounds of typical teacher-student communications. Masullo frequently wrote personal notes to Student 1. Student 1 told us Masullo would hand these notes to her when no one was watching or put them in her locker. Many of these notes featured hand drawn hearts.[11] Student 1's friends indicated they saw these sticky notes in her locker and privately thought they were odd. Student 1 only retained some of these notes, which we examined, but unable to date the majority of them. In addition to the hand drawn heart notes, one note Masullo gave to Student 1 read, "You are my heart's content."[12] Another note reads "Thank you for allowing me into your life, and for being such an important part of mine. I love you."[13]

Masullo gave Student 1 gifts, as well. These included two pairs of Converse shoes, a book, music-themed t-shirts, and a men's size large jean jacket.[14] Masullo also gave Student 1 a special pair of eclipse glasses to watch the April 8, 2024 partial solar eclipse that occurred in Nashville. Masullo told Student 1 that he got her the glasses because those being provided by the School were not good enough. Inside the glasses, Masullo drew eight pink hearts.[15] Student 1 stated that that Masullo encouraged her to watch the eclipse with him using these glasses in an area of the School away from her friends.

Throughout the Spring 2024 semester, as part of her independent study, Masullo and Student 1 would watch movies in Masullo's classroom, often after the school day ended. Student 1 told us Masullo would close the curtains to darken the room. Student 1, and other students, stated Masullo fashioned a piece of cardboard to fit in the small square window of his room, and that he stated he did so to block out light and enhance film viewing. Student 1 stated she would often ask her friends to join these viewings, but at times Student 1 and Masullo would watch movies alone with the door to the classroom closed and the cardboard blocking the view through the window. Student 1 told us on

---

[10]"Entre nous" is a borrowed French phrase that means to keep something "between ourselves" or confidential. https://www.dictionary.com/browse/entre-nous. The main teacher and student characters use this phrase throughout the 2023 film, "The Holdovers."
[11] An example is attached as **Exhibit 2**.
[12] A photo of this note is attached as **Exhibit 2**.
[13] A photo of this note is attached as **Exhibit 3**.
[14] A photo of the gifts is attached as **Exhibit 4**.
[15] A photo of the eclipse glasses is attached as **Exhibit 5**.

one such occasion, Masullo reached for and held Student 1's hand and gradually moved his chair closer to her until his leg was pressed against hers.

On March 23, 2024, Masullo took his wife and Student 1 to a Bob Dylan concert in Louisville, Kentucky. Student 1 originally planned to attend the concert alone and drive herself to the show and back the same day. But Masullo urged Student 1 to ride with him and his wife to Louisville, sit with them at the concert, and stay overnight in their hotel room. When they arrived in Louisville, another School employee attending the concert joined Masullo, his wife, and Student 1 for dinner before the show. Masullo, his wife, and Student 1 shared a hotel room with two beds in Louisville. During the show, Masullo held both Student 1 and his wife's hands.

That School employee who had dinner with them later stated they were surprised to see Student 1 with Masullo and described the experience at dinner as incredibly awkward. That awkwardness was compounded when the employee realized Student 1 was staying in Masullo's hotel room. The employee accidently left their credit card with Masullo at dinner and texted Masullo the next morning, March 24, 2024, to retrieve it. Masullo responded, "Just a heads up: [my wife] and I are dressed. [Student 1]'s in the shower. We will be downstairs between 9:15 and 9:30. Will text you again when we're on the way down." This employee was concerned about Student 1's presence at the concert with Masullo and his wife. Uncertain of what to do, they raised these concerns with a more senior faculty member who is no longer with USN. The former faculty member quickly shut those concerns down and stated that if the employee had concerns about Masullo's actions, they should raise them directly with Masullo.[16]

Prior to the Bob Dylan concert, Masullo had planned an overnight field trip to Columbus, Indiana, ostensibly as part of Student 1's independent study. The trip came about after Masullo, Student 1, and two other students watched the movie "Columbus" for that independent study. Masullo proposed the trip to the students, their parents, and the School. Faculty members we spoke with stated that this type of trip and Masullo's close involvement in Student 1's independent study was unusual compared to other independent study advisors, but it was not viewed as suspicious because of Masullo's tenure and overall eccentricity. On March 5, 2024, Masullo emailed the students' parents, seeking approval for the trip. That email outlined the plan for the field trip but did not mention any adult chaperones other than Masullo. The parents approved the trip, as did the Assistant Head of School for Acdemic ("AHS"). On March 28, 2024, Masullo emailed the itinerary to the parents of the three students and copied the AHS. The AHS responded to the email and said, "Excited for you all! Safe travels! Dean – just reach out should you need anything." Around that time, Teacher 4 became aware that Masullo was taking the trip and was the only chaperone with three female students. Finding this odd, she texted

---

[16] The School employee who saw Masullo and his wife at the Bob Dylan concert with Student 1 reported that when they first started at USN, Masullo told them, in sum and substance, to "be careful" with their interactions with students because a "single allegation could ruin your career."

the AHS to find out if he was aware of it. The AHS replied and confirmed he had approved the trip.

On March 29, 2024, another faculty member and parent of a USN student ("Parent 1") helped Masullo pick up the car he had rented for the trip. Parent 1 remembered thinking it was strange that Masullo wanted to be the single chaperone and offered to chaperone the trip with Masullo. Parent 1 told us Masullo declined. The three female students and Masullo left the afternoon of March 29, 2024. The three students on that trip stated that approximately thirty minutes into the trip, the rental van apparently ran out of gas. Masullo left the three students by themselves in the van on the side of the interstate and went and retrieved gas. The three students stated that after arriving in Columbus, Masullo stopped the van in the road to look at some architecture and a police officer stopped and questioned Masullo about it. Masullo did not contact the parents or any faculty member of the School about either of these incidents and asked the students on the trip not to tell anyone about it, either.

After this incident, Masullo drove to the hotel. The students stayed in one room, and Masullo stayed in a separate room on the same hallway. On March 30, 2024, the students and Masullo went on an architectural bus tour, to the Columbus library, and to a local high school music festival. On the morning of March 31, the two other students on the trip wanted to visit a historic church. Masullo encouraged them to go. The students walked to the church, while Masullo and Student 1 stayed behind at the hotel. Student 1 indicated she was apprehensive about being alone with Masullo at this point and was concerned enough to begin an audio recording on her cell phone. One of the other students on the trip told us they were at the church for about an hour and a half. Masullo and Student 1 met the other two students at the church, which can be discerned from the audio recorded by Student 1. Afterwards, the students visited a water tower in Columbus and then drove back to Nashville and to the car rental facility. The faculty member who assisted with rental arrangements picked up the students from the rental car facility and drove them back to USN.

After returning from the trip, Masullo gathered various keepsakes from the weekend, including photos and a drawing on the back of a menu that one of the other students made of Masullo and Student 1 sitting next to one another in a booth at a restaurant. He then placed the items behind a poster in his classroom and described it to Student 1 as a hidden "time capsule." Months later, after his termination, when Student 1 went back into Masullo's classroom to remove personal items and photos of herself that she did not want returned to Masullo, she checked for the "time capsule." The keepsakes from the trip were gone.

Masullo's inappropriate interactions with Student 1 continued escalating into April. For example, in early April 2024, Masullo invited Student 1 to see his band play, this time, at a venue for adults over twenty-one in Nashville. The fact that the venue's

was twenty-one plus did not deter Masullo from encouraging Student 1 to find a way to attend, which she did.

The same month, Student 1 discussed not having a prom dress in Masullo's classroom with some friends. In mid-April, on a school day, after sending Student 1 a "❤" before school, and "❤❤❤" around lunch time, Student 1 texted Masullo after school asking if he was still at school, and telling him she had found a prom dress. Masullo responded "I'm at home. I will confess that I drove by the shop and saw that your car was in the parking lot. I was happy to see that you were at least trying to find a dress, and now I'm even happier to know that you found one. ❤". Two days later, Masullo told Student 1 in a text, "I'm only going to prom to see you and a handful of other kids. ❤". Witnesses confirmed seeing Masullo at prom on April 20, 2024. Later in April 2024, Masullo encouraged Student 1 to apply for a job at a grocery store where his wife worked and indicated that his wife could help her secure a job. When Masullo was helping Student 1 apply to a grocery store, he texted her, "I guess I just really wanna see your rèsumè. ❤". Student 1 told us by this point she had become uncomfortable with Masullo's conduct, but was unsure of how to respond or whether to report it. By April 26, 2024, Student 1 was trying to avoid Masullo at school and avoided his classroom and hallway when possible. Student 1 told us her hesitation about what to do was in part because she generally liked Masullo as a teacher, he was her independent student advisor, and he was helping her find a job.

On Friday April 26, 2024, USN hosted the Zeitgeist music festival, which Student 1 helped organize and run. Masullo attended. After the festival, Masullo texted Student 1 and said, "❤ ❤ ❤ ❤ ❤" followed by "Have a good night. You deserve it. I'll talk to you over the weekend. ❤". After Student 1 responded, he told her "I'll be on campus tomorrow, let me know if you're around."

On Saturday, April 27, 2024, Masullo was in his classroom. The School was not officially open, but witnesses told us that it is not uncommon for faculty and students to be at the School on weekend days for various reasons. Another faculty member confirmed seeing Masullo in his classroom that morning. Student 1 arrived later that day and went to Masullo's classroom. Student 1 wore a big coat. When Student 1 arrived, she tried to tell Masullo about a project she was working on. Masullo cut her off and said "I can't stand the distance."[17] Masullo then put his hands over Student 1's back and grabbed her waist under her coat and shirt, rubbing his hands over her shoulders, back, and lower waist under her clothes. Masullo sat on his desk and pressed Student 1 into his body, so that Student 1 could feel his crotch. As Student 1 pulled away from the hug, Masullo grabbed her face in both of his hands and kissed Student 1 for at least twenty seconds on

---

[17] *See* Letter to Board of Trustees dated August 22, 2024 ("August Letter").

her cheek, basically touching the corner of Student 1's mouth. Masullo proceeded to thank Student 1 over and over.

After this interaction, Student 1 told us she felt violated. Student 1 reached out to Alumni 1, who had previously mentioned Masullo's odd behavior to Student 1. Student 1 and Alumni 1 compared their experiences with Masullo and concluded that Masullo's conduct with both of them, including individualized attention, texting, gift-giving and handholding, was disturbingly similar. Student 1 told us that this conversation reassured her that she was correct in believing that what Masullo was doing was inappropriate.

On April 28, 2024, Student 1 met with four of her friends from USN. Student 1 shared some details of Masullo's conduct with different members of this group. At this meeting, Student 1 told them what happened and sought their advice about whether Student 1 should report Masullo and if so, how. Students who were present at this meeting described it as intense and emotional, as many of them thought highly of Masullo as a teacher. Several members of the group described discussing what reporting mechanism they could use, and specifically considered using USN's "bias" reporting form[18] before concluding it was inapplicable to Student 1's situation. Members of this group also confirmed that Student 1 expressed concern that reporting Masullo may jeopardize her potential job at the grocery store where Masullo's wife worked. On April 29, 2024, Masullo texted Student 1 about her application to the grocery store. He also wrote "Didn't see you at all today but for class. Hope you're okay."

### iii.    Student 1's Disclosure

On April 29, 2024, Student 1 went into a faculty member's classroom ("Teacher 1"). Student 1 laid out a hypothetical to Teacher 1 and asked what would occur if she reported inappropriate conduct by a teacher. Teacher 1 explained to Student 1 that he is a mandatory reporter and offered to walk with Student 1 to the counseling office or continue discussing the hypothetical. Teacher 1 subsequently informed a School counselor ("Director of Counseling") that a report may be forthcoming.

On April 30, 2024, Student 1 went back to Teacher 1's classroom and continued the hypothetical discussion regarding what to do if a teacher sent personal text messages late at night. The faculty member stated that this hypothetical seemed to cross the line and that if a situation like that occurred it would need to be elevated to the School's administration. Student 1 stated she was worried about the hypothetical teacher losing their job, but that a report would need to happen before Friday. Student 1 knew Masullo was away from school at the time, chaperoning the Mock Trial team's trip (the "Mock Trial Trip"). Her friends reported that Student 1 decided to make her Disclosure at that time, in part, because Masullo was absent.

---

[18] *See* https://tinyurl.com/muep3z8n, accessed December 5, 2024.

On May 1, 2024, Student 1 went to another faculty member's classroom ("Teacher 2"). Student 1 outlined a similar hypothetical about inappropriate conduct. Teacher 2 pulled up the Handbook and the USN Bias Form for Student 1 because Teacher 2 was trying to determine what the conduct was. Student 1 then responded the situation dealt with a teacher crossing a boundary. Teacher 2 then said that if Student 1 had something she wanted to report that she could talk to the Head of High School, the Human Resources Department, or the Director of Counseling. That night, Teacher 2 emailed Student 1 and asked, "Have you talked with your parents? I should have asked that." Student 1 responded that she had not, but she would do so soon. Teacher 2 did not take any immediate action but said he intended to follow up with Student 1 before receiving another message from her late that evening.

Later on May 1, 2024, Student 1 emailed Teacher 1, Teacher 2, and the Assistant Head of High School for Academic Affairs ("Administrator 1"). Student 1's email read in part, "I've been experiencing something inappropriate from an employee of school that I need to report. . . I would really like to sit down with you all to tell you everything, fully aware of your mandated responsibilities as faculty/admin of the school."

On May 2, 2024, Administrator 1 responded he would arrive at school by 7:50 AM and could meet with Student 1 and the other two faculty members in his office. That morning, Student 1 sat with the three faculty members (Administrator 1, Teacher 1, and Teacher 2) and made her Disclosure. She detailed her interactions with Masullo, including the Columbus trip, their text exchanges, and the incident in Masullo's classroom on April 27, 2024.

After Student 1 detailed the interactions, Teacher 2 had to leave to attend to ongoing school activities. Administrator 1 called the AHS and the Director of Counseling to come down to his office to join Administrator 1 and Teacher 1. Student 1 then detailed the interactions with Masullo again for AHS and the Director of Counseling. Student 1 again described the relationship with Masullo initially felt appropriate and mentor-like. She then listed and described Masullo's gifts, notes, text messages, and the interaction on April 27, 2024, in Masullo's classroom. Student 1 then left to go to class.

Teacher 1, Teacher 2, Administrator 1, AHS, and Director of Counseling all noted they found Student 1's account credible, and they believed that Student 1 was telling the truth.

### iv.    The School's Initial Response

After Student 1 left Administrator 1's office, the remaining faculty members met to divide initial tasks. The AHS indicated he would call the Director, interim Chief Financial Officer ("CFO"), and Student 1's parents. The Director of Counseling was tasked with ensuring counseling support for Student 1 and Student 1's friends who were

aware of, and supported Student 1 leading up to, her Disclosure. Administrator 1 began to arrange substitute teacher coverage for Masullo's classes.

The AHS called the CFO because he believed, based on his prior experience at USN in crisis-level situations, the School needed to contact its Former Outside Counsel, and the CFO traditionally managed the School's relationship with Former Outside Counsel. The AHS and CFO first tried to call the Director, but the call went to voicemail. The Director was attending an all-day Nashville civic leadership event off campus. The AHS and CFO then called Former Outside Counsel. Shortly after getting the voicemail, the Director called the AHS back and returned to campus. On his way back to campus, the Director called the President of the Board ("Board President") and left a voicemail.

Around noon that day, the Director, the AHS, the Director of Communications, the CFO, and the Human Resources Director met to discuss what to do next. At this meeting, the AHS and the other administrators created a working plan for the group with several action items and considerations: (1) Masullo's immediate removal from all campus/student interactions; (2) mandatory reporting obligations; (3) parent and student communications; (4) possible outreach to former students of Masullo and their families; (5) support for faculty; (6) teaching coverage for Masullo's classes; and (7) formation of a group/team of administrators to execute the plan.

Their first order of business was placing Masullo on leave and eliminating all contact with students. At that time, Masullo was with the USN Mock Trial team in Delaware, where the team was competing in the national mock trial championship. This group decided the AHS and CFO would fly to Delaware to remove Masullo and place him on a leave of absence. Former Outside Counsel provided talking points to be used with Masullo. The Director of Communications drafted a holding statement[19] to the USN community. No one in this meeting reported considering other methods of removing Masullo and placing him on leave other than flying to Delaware, nor did they consider the possibility of needing to address Masullo's removal with others on the Mock Trial Trip, including students and parents. During this meeting, the assembled group discussed the need to inform the High School faculty that Masullo had been placed on leave before the weekend. They expected that by Monday morning, students would be talking about Masullo's removal from the trip and believed it was important to inform the High School faculty before-hand.

Later that afternoon around 2:00 PM, Student 1's parents met in the AHS's office. The AHS, Student 1, Student 1's parents, Administrator 1, and Teacher 1 were present. The AHS relayed a high-level overview of Masullo's reported conduct to Student 1's

---

[19]A "holding statement" is a statement often prepared by organizations to provide in a crisis. A holding statement typically provides a short description of known facts and reassures the intended audience that the organization is working to address the issue.

parents. The AHS then informed her parents that he and the CFO would be flying to Delaware to remove Masullo from the Mock Trial Trip.

On the afternoon of May 2, 2024, the Director reached the Board President. The Director provided an overview of Student 1's Disclosure and described the team that had been assembled for the investigation.

On the morning of May 3, 2024, Teacher 4 emailed the High School English department about senior exams. She received a bounce-back from Masullo's account and alerted the IT department, because his network access had already been disabled. Meanwhile, the AHS and the CFO arrived at the hotel where the students, Masullo, the Mock Trial Trip's faculty advisor ("Teacher 3"), the team coach and at least three parent chaperones were staying. The AHS and the CFO waited in the lobby with a plan to pull Masullo aside once the team returned to the hotel. No one we interviewed in connection with the removal of Masullo from the Mock Trial Trip indicated there were any attempts to covertly intercept or privately divert Masullo to avoid drawing the attention of the students and parents on the Mock Trial Trip. As a result, when the Mock Trial team returned to the hotel lobby following their first competition of the day, they saw the AHS and CFO and believed they were there to see the team compete. Another teacher on the Mock Trial Trip reported it was apparent to them that the AHS was there for other reasons. After speaking with Masullo, one of the parents on the Mock Trial Trip asked the AHS to talk to the students and explain what was going on. The AHS told sat down with the students and explained that Masullo had to return to Nashville. One student asked if they could ask questions, and the AHS responded "yes." The student asked whether Masullo's removal "was more of a school thing or a family thing?" The AHS responded that it was a "family" thing.

On the way to the airport, the AHS told us Masullo was morose, shaky, and nervous. The AHS informed Masullo that he was not at liberty to discuss the matter with Masullo. Nevertheless, Masullo – unsolicited – asked if this was about his interactions with Student 1 and then mentioned that he had bought shoes for Student 1 and tried to get Student 1 a job at a grocery store. The AHS asked Masullo to turn over his USN laptop and school access card. While waiting for their flight, the AHS and the CFO each alternated sitting with Masullo and relaying Masullo's comments to the School's Former Outside Counsel. Based on Masullo's unprompted admissions, the AHS indicated it was clear to him that Masullo had engaged in at least some of the conduct Student 1 disclosed. The AHS indicated by this point, he was sure that Masullo would not return to USN.

The plan discussed among senior School leadership called for the AHS to return to Nashville on Friday afternoon in time to inform the High School faculty that Masullo had been placed on leave. However the plane carrying the AHS and was delayed, and would not arrive in Nashville in for the AHS to meet with the High School Faculty. As a result, the CFO contacted the Director and asked him if he would meet with the High School faculty to inform them Masullo had been placed on leave. The Director declined,

stating that he had not previously attended a meeting of the High School faculty and did not believe that his first meeting with them should involve delivering this news.

After returning to Nashville, the AHS drove Masullo to his car in the USN parking lot and presented Masullo with a pre-prepared letter outlining the terms of his leave of absence. The AHS was concerned about Masullo potentially harming himself, so he circled the parking lot until Masullo left.

### v. The School's Initial Investigation and Ensuing Response

On Monday May 6, 2024, Administrator 1 emailed a group of faculty and staff, which included the AHS, the Director of Counseling, another high school administrator ("Administrator 2"), Teacher 1, and an administrative assistant a plan for handling Masullo's classes for the remainder of the Spring 2024 semester.

Also on May 6, 2024, an email exchange occurred between Former Outside Counsel, the Director, the CFO, the AHS, and the Human Resources Director about next steps in the School's response. Former Outside Counsel indicated that they planned to interview Student 1 and her friends, Masullo, and alumni. They also requested the AHS send the notes he took during Student 1's Disclosure. The AHS sent these notes as well as the signed suspension letter from Masullo in the email chain. The AHS asked what he could do to assist in the School's response and noted he was concerned about how to handle the messaging behind Masullo's absence. Both the Director and AHS expressed concern that the School needed to communicate about Masullo's absence quickly. The Director stated that "I do not believe we have that much time before the speculation becomes challenging." He provided proposed communications drafted by Administrator 1; one to be sent to Masullo's current students and a separate message to go for the faculty. Former Outside Counsel indicated that the School would describe it as a "leave of absence [but] cannot say more than that. For all they know he could be having a personal emergency."

On Tuesday May 7, 2024, the AHS sent out three communications regarding Masullo's absence: one to Masullo's students and their families, one to Masullo's advisory, and one to faculty. The AHS's email to high school teachers stated Masullo would be "away" from school and was not expected to return that semester. The AHS did not deliver this news in person because he was away from school for a pre-planned trip that could not be changed. This email added, "we ask that you answer questions that may come from students in a way that reflects this message – he's away and we've arranged for coverage, continuity, and support to those he works with." Also on May 7, 2024, an English teacher texted Teacher 4 and asked if Masullo had quit, having heard rumors regarding Masullo's removal from the Mock Trial Trip.

Teacher 4, after being informed of Masullo's leave, emailed Masullo's sophomore students and parents about the plan for finishing out Masullo's classes. That same day,

Former Outside Counsel emailed the Director, stating they wanted to discuss and the investigation and any reporting obligations. The Director responded to set a time, and stated Student 1 came to see him. He stated that "[s]he wanted to make sure she talked with me as I was the decision maker . . . [and] expressed discomfort about the note saying he may be returning to school." The Director stated he "communicated that there was a process and that [Masullo] would not return until that process was complete . . . [and] also shared that we would be conducting a complete investigation and that she would likely be hearing from someone soon."

Also on May 7, the High School Leadership Team[20] discussed the messaging to faculty about Masullo's absence. Both Administrator 1 and Administrator 2 felt it was important for the Director to speak to the high school faculty. They asked the Director to address the high school faculty at the High School Division meeting scheduled for the next day. The Director declined to do so. Administrator 1 asked the Director what they could tell the faculty. The Director responded they could only disclose that Masullo was on leave and clarify, if needed, that Masullo's health was okay. Administrator 2 asked the AHS to talk to the Director about the meeting and ask him to attend. The AHS stated that he had already asked the Director to do so, but that the Director had declined.

On Wednesday May 8, 2024, Administrator 1 emailed the tenth grade English students and parents to check in with them regarding the plan for rest of the semester and thanking Teacher 4 and Teacher 1 for taking over Masullo's classes. The same day, Administrator 1 led the High School Division meeting for faculty and staff. At the meeting, Administrator 1 told faculty that Masullo was away for the rest of the semester and that was all the information he could share at the time.

The same day, the Director, the AHS, Director of Communications, CFO, and Former Outside Counsel had their first meeting, which took place in person. Witnesses present for this meeting said the group examined the gifts and notes that Student 1 had provided, including the eclipse glasses with hand drawn hearts (Exhibit 5), notes (Exhibits 2, 3) and other gifts (Exhibit 4). Witnesses present also stated that Former Outside Counsel described Masullo's conduct as likely being "grooming." The group also discussed opening a hotline to the community to field potential additional reports of Masullo's conduct. No hotline was opened. Former Outside Counsel began their investigation on May 8, 2024, and interviewed several witnesses, including the USN employee who had seen Masullo, Masullo's wife, and Student 1 at the Bob Dylan concert in March.

On May 9, 2024, Former Outside Counsel met with Student 1. At Student 1's request, a member of her informal or *ad hoc* "care team" ("Care Team") – Teacher 1 – also

---

[20] The High School Leadership Team includes Administrator 1, Administrator 2, Teacher 2, the Director of Counseling, Director of College Counseling, the Athletics Director, the Director of Diversity & Community Life, and the High School Administrative Assistant.

participated in the meeting. Student 1 declined to have her parents attend this first meeting with her. Her parents were unaware of this meeting before it occurred. The same day, Former Outside Counsel met individually with four of Student 1's friends, with whom she had discussed the Disclosure prior to coming forward. Administrator 1 again attended these meetings at the students' request. Administrator 1 and the Director of Counseling were not informed these interviews would occur until the morning of May 9. As soon as they learned the students would be meeting with Former Outside Counsel, they hurried to inform the students' parents and give them the option to attend, albeit on short notice. At least one parent told us this provided insufficient time to attend the meeting with their child. These meetings occurred in an office that is now occupied by the AHS and located across from the main entrance to USN's library, an area frequented by students. Student 1 told us as a result it was apparent to other students in the area that something was going on and who was involved.

Over the next few days, Former Outside Counsel reviewed text messages between Student 1 and Masullo. The School also retained an outside public relations firm to assist with internal and external messaging about Masullo and the investigation.

On May 13, 2024, Former Outside Counsel again met with Student 1, who provided additional information and details about her interactions with Masullo. Student 1 explained text messages as well as entries from her gratitude journal that she had shared with Former Outside Counsel. She also showed Former Outside Counsel photos and videos, including video from Masullo's concert she attended on January 27, pictures from Columbus, and pictures from the trip to Louisville for Bob Dylan.

On May 14, 2024, approximately ten days after he had been removed from the Mock Trial trip, Former Outside Counsel met with Masullo. This meeting took place at a site adjacent to the School that was occasionally utilized by the School as meeting space. During this meeting, Masullo admitted the interactions and physical contact Student 1 had reported. His admissions included, among other things, taking Student 1 to the Bob Dylan concert and holding her hand during the concert; leaving the three female students on the side of the road on the way to Columbus; hugging and kissing Student 1 on the forehead and cheek; and giving her gifts. Masullo claimed Student 1 confided in him about family difficulties. Masullo also insisted his motives were pure and claimed that telling a student "I love you" was not a "culturally inappropriate" thing for a USN faculty member to say.

Multiple students, including Student 1, and at least one School administrator, saw Masullo attending this meeting. Student 1 told us she experienced additional trauma and apprehension because Masullo was so close to the School. Parents emailed the Director and the AHS, asking why Masullo was seen with investigators near USN's campus. The AHS responded to the parents via email the same day, explaining the situation, reiterating the investigation was ongoing and confidential, and offering to meet, if needed.

On May 15, 2024, Administrator 1 saw the AHS at School and asked how Masullo's interview went. The substance of this conversation has been the subject of debate. Administrator 1 claimed the AHS told him Masullo presented as credible and saw himself as a father figure for Student 1. Administrator 1 also claimed the AHS made a comment about the potential of Student 1 and her family having ulterior motives due to financial hardship. When asked about this conversation, the AHS stated his comments were taken out of context because he was relaying a comment that had been made by someone else, and Administrator 1 unfairly and inaccurately attributed those statements to him. We did not find any evidence in our investigation to question in accuracy of what the AHS told us or to show that he was the source of this comment.

On May 20, 2024, Former Outside Counsel met with Student 1 and Teacher 1 and told them that Masullo readily admitted that he engaged in the conduct described by Student 1 in her Disclosure. Former Outside Counsel told Student 1 and Teacher 1 that Masullo described his actions as "not dishonorable" and stated that he viewed Student 1 as "the daughter he never had." Former Outside Counsel told Student 1 they found this explanation credible. At this meeting, Teacher 1 challenged Former Outside Counsel's conclusions and pointed out the incongruity between Masullo's professed paternal role and his physical advances toward Student 1 on April 27. Student 1 also informed Former Outside Counsel of the extremely disturbing – and untrue – rumors about her and Masullo engaging in a specific type of sexual activity. Student 1 requested a meeting with the Director, an apology, more communication about the investigation, and acknowledgement for the faculty members who were assisting her. At some point, Teacher 1 observed Student 1 hunched over and crying before she eventually left the room. Student 1 told us that after this meeting she threw up from shock and trauma.

The night of May 20, 2024, the Director and Former Outside Counsel briefed the full Board for the first time about Student 1's Disclosure and the progress of the investigation. At that meeting, Masullo's misconduct was framed as a personnel matter, which the School was handling with the assistance of outside advisors.[21] The Board was informed that Masullo had violated School policies and would likely be terminated.

The AHS proactively updated Student 1 and her parents on the progress of the investigation on May 22 and 23, 2024. Also on May 23, 2024, Former Outside Counsel, the Director, Student 1, Administrator 1, and Teacher 1 met in the Director's office. At this meeting, Student 1 asked for an independent investigation of Masullo, said she was upset by the lack of communication from the Director, and detailed again what happened with Masullo. Student 1 used words like "grooming" to describe what happened to her and asked Former Outside Counsel and the Director if it was "sexual harassment." Former Outside Counsel and the Director declined to answer that question or to specify which policies Masullo violated, explaining they could not go into detail as the investigation

---

[21] The terms "outside advisors" and "former outside advisors" as used in this Report refer to both the School's Former Outside Counsel and former outside public relations/crisis communications advisor.

was confidential and ongoing. When Student 1 expressed concerns about Masullo returning to School and teaching her younger sisters, the Director tried to allay her concerns by conveying to her that he did not expect Masullo to return.

On May 24, 2024, Administrator 1 emailed the parents of Student 1 as well as Student 1's friends who had been interviewed by Former Outside Counsel and stated, "We were heartened by [the Director]'s responses and have more clarity around the investigation and how it is unfolding." The email went on to say that Administrator 1 expected to see, in the next few weeks, "a statement shared with the community that protects the privacy of the girls and also makes clear what happened, the policies violated, and how the school has responded."

On June 7 and 13, 2024, Student 1 texted Former Outside Counsel, asking for an update on the investigation. Former Outside Counsel responded each time that she was traveling and away from the office.

On June 14, 2024, Student 1 contacted the Director of Counseling about outside therapy services. The Director of Counseling went to the Director and asked that the School pay for Student 1's therapy. According to the Director of Counseling, the Director responded the School would pay for counseling surrounding Student 1's interactions with Masullo, but not counseling related to any other issues Student 1 may be dealing with. The Director of Counseling responded that therapy could not be siloed in such a way, and the Director approved the School paying for Student 1's weekly therapy sessions over the summer.

On June 18, 2024, Administrator 1 texted the AHS, informing him that alumni were reaching out to Student 1 about their interactions with Masullo. The next day, Student 1 reached out to Former Outside Counsel and informed her that alumni were approaching her about their own experiences with Masullo.

On June 20, 2024, Student 1, Administrator 1, and Former Outside Counsel met again. Student 1 provided the names of three alumni who had contacted her about Masullo. Former Outside Counsel attempted to contact these alumni, speaking with one in July and leaving a message for another that went unreturned.

On or about June 25, 2024, Former Outside Counsel provided a written report of their investigation to the Director, which the Director promptly shared with the Board President. Former Outside Counsel recommended (1) terminating Masullo for violating multiple policies and (2) offering a severance package to Masullo to protect the School from any future claims by Masullo and to ensure Masullo's cooperation in any future investigation or legal proceedings.

### vi.    School's Response Following Student 1's Social Media Post

On July 1, 2024, Student 1 created a public social media post (the "Social Media Post"), which described what Masullo had done, stated that others with similar experiences were coming forward, and stated the School had failed to communicate with the faculty, parents, and students at USN. Student 1's Social Media Post was reshared by others.

The same day as Student 1's Social Media Post, the Director of Communications reached out to the School's outside public relations firm, urging them to respond. The outside public relations firm recommended not engaging with the Social Media Post. That evening, the Director emailed the Board that the School was aware of the Social Media Post and that the School had hired "independent third-party experts." The email continued, "as personnel matters are confidential and given the sensitivity of the situation, we cannot share additional information."

On July 3, 2024, the Director emailed Masullo, asking for a time to meet and discuss the findings of the investigation. The Director, the AHS, and Masullo met via Zoom that same afternoon, and the Director and the AHS informed Masullo he was being terminated. After the meeting, the Director emailed Masullo a severance agreement for signature.

The same day, the Director met with Former Outside Counsel and Administrator 1 in the Director's Office. Former Outside Counsel asked Administrator 1 to explain his criticisms to the Director of the Director's handling of the investigation. Administrator 1 described fumbling through his points as he was unprepared for the meeting and felt bombarded.

Separately on July 3, 2024, Student 1's parent emailed the Director, asking for an update on the investigation. The Director responded and said the School would not communicate broadly or publicly on a personnel matter and the findings would be directly conveyed to Student 1 by Former Outside Counsel, but that Student 1's parent was welcome to attend that meeting. Student 1's parent replied they would attend the meeting scheduled for July 5, 2024.

On July 5, 2024, Former Outside Counsel met with Student 1, her parent, Administrator 1, and Alumni 1 to share the results of the investigation. The Director was not present. Former Outside Counsel stated that Masullo had been terminated. Once again, Student 1 asked for details about which policies Masullo violated, and what Masullo was told about the reason for his termination. Former Outside Counsel stated they could not share that information due to confidentiality.

Following this meeting, Student 1 she saw the Director and Former Outside Counsel in the Director's office. Student 1 stated that she waved through the window of

the Director's office, texted Former Outside Counsel that she wanted to talk, but neither responded while Student 1 was outside the office. The Director told us he did not see Student 1 outside his office, and Former Outside Counsel indicated they did not see Student 1's text until they had left the School, at which point they responded.[22]

On July 6, 2024, Student 1 emailed the Director, requesting to meet. On July 7, 2024, the Director responded and set up a meeting.

On July 8, 2024, Administrator 1 met with the Director and Former Outside Counsel again. Administrator 1 described feeling better prepared for this meeting and able to discuss the criticisms. Administrator 1 said the Director compared Administrator 1's conduct to Masullo's conduct when Administrator 1 said "[Student 1] is easy to love."

On July 9, 2024, the Director emailed a parent of Student 1, stated Student 1 had scheduled a meeting with the Director, and Student 1's parent should participate if they wanted to do so. The parent of Student 1 responded they would attend.

On July 10, 2024, the Director met with the AHS, Alumni 1, Alumni 1's parent, Student 1, Student 1's parent, and Student 1's lawyer. Student 1 asked for the meeting in a further attempt to get answers to the questions Former Outside Counsel had declined to answer, citing confidentiality concerns. Alumni 1 wanted to retrieve photos of herself and notes she had authored from Masullo's classroom so that he would not be able to retain them. The Director stated the School would allow Alumni 1 to take photos and notes out of Masullo's classroom, but again declined to substantively respond to Student 1's questions. Witnesses present told us this was "not a good meeting" and further exacerbated tensions between Student 1 and the Director and Former Outside Counsel.

On July 12, 2024, the Director provided the first general communication to USN parents and high school students about the Disclosure and initial investigation. The email stated the Director "immediately engaged independent third-party experts to thoroughly investigate the situation, placed High School English Teacher Dean Masullo on leave, and informed his students and colleagues of the absence and interim coverage of classes." The email continued that, "The investigation is complete. Based on the facts as we know them, Masullo violated school policies, and he is no longer a USN employee. [The Director] cannot share details as personnel matters are confidential." The email then linked to the USN Bias Reporting Form and noted that counselors were available to students who wanted to talk.

---

[22] Whether or not anyone in the meeting with the Director, or the Director himself, saw Student 1 has been a point of contention. We spoke to everyone involved. Those in the meeting told us they did not see Student 1, and Student 1 told us it was apparent to her some of them did. We have been unable to identify any intent on the part of anyone involved to mischaracterize what occurred. However, we also determined that the School's subsequent communications with Student 1 failed to directly address this contentious issue head on or take her perspective into account.

On July 22, 2024, Masullo returned his signed severance agreement to the AHS. Pursuant to the agreement, Masullo was paid a total of $28,443.32 in exchange for his agreement to, among other things, cooperate with the School's investigation and release all claims against USN and other "related Parties," including Student 1.

On August 7, 2024, Former Outside Counsel conducted a boundaries training at USN's faculty in-service. One of the factual scenarios in this training largely tracked the same conduct that Masullo had engaged in, but no specific mention was made of Masullo or his termination.

On August 8, 2024, Student 1 emailed the Board, requesting to address the entire Board before she left for college on August 23, 2024. The Board did not respond to Student 1.

On August 22, 2024, Student 1's lawyer sent a letter to the Board detailing Student 1's experience and the School's response to the Disclosure about Masullo (the "August Letter"). The August Letter stated that it summarized what Student 1 would have shared if the Board "had the decency and institutional courage to meet with her and listen to what she had to say" and criticized the School's response to her Disclosure. Around the same time, Student 1 emailed a copy of the August Letter to certain teachers, parents, and community members. Student 1 added paragraphs in the body of the email which stated in part, "This past spring, I was sexually harassed by Dean Masullo." Although the August Letter was addressed to the Board, Student 1 shared it with select faculty members. News of the August Letter spread widely among all USN constituencies, including parents, students, and teachers, as well as the public.

The next morning, August 23, 2024, the Director emailed the USN faculty saying "I am aware of the letter that some of you received yesterday. I will be in the auditorium at 7:45 this morning if you would like to come for a brief check in." Witnesses who attended the meeting told us that while the Director was prepared, he would not answer certain specific questions, most notably whether a mandated report had been made. Witnesses also criticized the way the Director characterized Masullo's conduct towards Student 1. Rather than calm tensions, witnesses reported this meeting only exacerbated them.

On September 7, 2024, an alumni sent an email to the School's administration and selected faculty. This email detailed the alumni's experience at USN and with Masullo, and how Masullo reached out directly to this alumni after being placed on leave. The Director responded saying USN "remains focused on providing safe spaces."

On September 9, 2024, Administrator 1 wrote a letter to the Board stating, among other things, that the Director's July 12, 2024 communication was patently unjust and misleading, and that the Former Outside Counsel's investigation was not independent.

On September 10, 2024, the Board President emailed the USN community, informing them that USN took immediate action after becoming aware of Masullo's conduct, the confidentiality of Student 1 was prioritized, and the investigation was handled appropriately. The same day, a group of faculty members wrote a letter to the Board detailing the lack of clear communication from the School's administration.

On September 13, 2024, the Board President emailed the USN community to advise the USN community there was "new information" and that a new law firm had been engaged as USN's counsel. This email also relayed the Board's plan to convene a Task Force (the "Task Force on Educator/Staff Appropriate Behavior and Misconduct Response, Communication, and Policy Review") to examine USN's policies and response practices.

On September 20, 2024, the Board's newly constituted Ad Hoc Committee for School Safety ("Ad Hoc Committee") informed the community the School failed Student 1 and announced that B&T had been retained to conduct a new independent investigation.

Since then, the Ad Hoc Committee has regularly updated the School community on matters concerning the new independent investigation and the School's path forward.[23]

## V.   FINDINGS

1.   **Finding No. 1: Masullo's Conduct Was Inappropriate By Any Measure.**

A.   **Masullo's actions were objectively improper and violated numerous USN policies regardless of his stated intent or any label that could be assigned.**

At all relevant times, the Handbook applied to Masullo and all other USN employees. Our investigation concluded Masullo violated numerous policies in the Handbook, the nature and gravity of which constituted grounds for his prompt termination. Specifically:

1.   The Handbook (p. 57) provides: "[a]ll one-on-one interactions with students must be interruptible and observable or another employee must be present. In situations where these conditions cannot be met, notification should be given to the employee's immediate supervisor and the parent of the student as soon as possible." Our investigation found Masullo not only repeatedly engaged in uninterruptable and unobservable one-on-one interactions with Student 1, but that he specifically sought out those

---

[23] *See* *University School of Nashville Most Recent Communications*.

interactions. Our investigation also found Masullo initiated similar interactions with students in prior years.

2.  The Handbook (p. 58) states employees of USN must "respect children's rights not to be touched in ways that make them feel uncomfortable. A child's right to say "no" is to be encouraged and respected." The Handbook offers specific examples of "appropriate touch" including "pats on the back or shoulder, side hugs, handshakes, and high fives." *Id.* Our investigation confirmed that Masullo touched Student 1 in ways that not only exceeded what the Handbook defined as appropriate, but were objectively and wholly inappropriate in the teacher-student context.[24] Our investigation also confirmed that Masullo exceeded what the Handbook defined as appropriate touch with other students and could have, or did, make them feel uncomfortable.[25]

3.  The Handbook (p. 58) "discourages employees from having one-on-one electronic communications with students using their personal devices, personal email accounts, or personal social media accounts." While the Handbook does not contain an absolute prohibition on one-on-one electronic communications between students and employees, our investigation found Masullo engaged in numerous one-on-one text communications with Student 1, many of which were personal in nature and unrelated to the School. Our investigation also found Masullo specifically initiated one-on-one electronic communications with Student 1 and other students.

4.  The Handbook (p. 58) "discourages employees from giving gifts or showing preferential treatment to individual students or their families to avoid perceptions of favoritism as well as influencing admission, grading, and student treatment." Our investigation found Masullo gave numerous gifts to Student 1, including two pairs of shoes, a book Masullo obtained on a

---

[24] A teacher should never embrace or kiss a student on the cheek in the manner that Student 1 reported Masullo did. Regardless of consent—which was not present here and regardless of whether a student is over the age of eighteen, the type of touch Masullo engaged in is wholly unacceptable in a teacher-student relationship.

[25] Our investigation did not find any evidence Masullo touched Student 1, or any other student, in a way that met the definition of "sexual contact" in Tennessee. Tennessee law defines "sexual contact" as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." The term "intimate parts" includes "semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being." *See* Tenn. Code Ann. §§ 39-13-505; 40-35-112. "Sexual contact" is an element of most "sexual offenses" enumerated in Title 39 (Criminal Offenses), Chapter 13 (Offenses Against Person), Part 5 (Sexual Offenses) of the Tennessee Code.

trip to France, several t-shirts and a jean jacket. Our investigation also found Masullo gave out of place or unexpected gifts to other students in the Class of 2024 and prior class years.

5.    The Handbook (p. 53) states "one of our fundamental responsibilities [of USN employees] is to model the behavior that we hope to inspire in our students." Our investigation found Masullo failed to model behavior that any USN administrator, faculty member, or parent would believe was acceptable. Some of these actions included leaving numerous notes to Student 1 expressing affection and/or containing hand drawn hearts, and leaving notes in her locker or other, less observable locations.

6.    The Handbook (p. 56) states USN employees "should develop and sustain relationships with colleagues that benefit their students and further their own professional growth. (from NAIS Guidelines)." Masullo developed a persona within the English department that violated this requirement. Our investigation found Masullo actively sought to turn students in the 2024 class year and prior years against other members of the English Department who he disliked, for his own personal or professional gain.

Within two weeks of Student 1's Disclosure, USN (via its own employees and the work of its Former Outside Counsel) had gathered evidence to substantiate violations of all but the final policy set out above. For example, in a meeting with Former Outside Counsel on May 14, 2024, Masullo admitted that he hugged and kissed Student 1 on April 27, 2024 in a manner consistent with what Student 1 had disclosed. Masullo also admitted that he held Student 1's hand, while also holding his wife's hand, at the Bob Dylan concert they attended together. By that point, senior School leadership also had the opportunity to view objectively inappropriate one-on-one communications between Student 1 and Masullo. In our view, this direct evidence of significant and substantial violations of USN's existing policies could have served as a basis for the Director to terminate Masullo's employment for-cause at that time.[26]

We did not find any evidence that anyone at the School was aware of the full extent of Masullo's conduct. While individual employees described some of Masullo's behavior as odd or unusual, no one we spoke to was aware of anything approximating the objectively improper conduct in Student 1's Disclosure, including one-on-one texts, secret

---

[26] This report is not intended to serve as a legal analysis of claims and defenses Masullo may have had in the event of his termination. Many of these policies are suggestive rather than required (*i.e.*, USN employees "*should* develop and sustain relationships with colleagues that benefit their students and further their own professional growth" or may have been violated by other employees (one-on-one personal electronic communication with students). As such, termination for a violation of any one of these policies may have had increased legal risk. Here, however, Masullo's violation of the School's policies with regard to Student 1 were so flagrant and pervasive, and his conduct so objectively inappropriate, we believe USN had little practical risk in terminating Masullo upon confirming the nature and extent of his conduct.

notes, secret gifts, and private interactions. This appeared to be calculated, as Masullo allowed colleagues to see what he wanted them to see. Without Student 1's Disclosure, it is entirely possible Masullo's improper conduct would not have been discovered.

Finally, we believe that it is important to note that regardless of any label assigned to Masullo's conduct, or his stated intent, his actions were objectively improper and should have resulted in his prompt termination. Said another way, there is no explanation that Masullo could have offered to justify his actions. This is important for two reasons. First, USN had the right kind of policies in place. While the Handbook likely requires improvement, it contains policies that generally prohibit the type of conduct that Masullo engaged in with regard to Student 1 and other students. Masullo's violations of those policies rightfully formed the basis for his termination. Second, his actions need not fit the definition of "grooming" (discussed below) or any other label to be objectively wrong and worthy of reporting. Students and employees should not feel like they need to assign a label to specific conduct or determine intent to feel comfortable reporting the type of conduct Masullo engaged in.

### i. Masullo's conduct was consistent with "grooming" behavior.

We note for the purposes of this section there is no legal definition of "grooming" under any applicable state or federal statute. While it can be harmful to those subjected to it, grooming or grooming-like behavior is not in-and-of itself illegal. Nor can it create civil or criminal liability unless the specific conduct itself satisfies the elements of a particular statute or cause of action. Here, for the purposes of assessing Masullo's conduct, we have chosen to rely on the guidance offered by RAINN,[27] which defines grooming and the associated "warning signs" for this type of conduct as:

> A set of manipulative behaviors that the abuser uses to gain access to a potential victim, coerce them to agree to the abuse, and reduce the risk of being caught. While these tactics are used most often against younger kids, teens and vulnerable adults are also at risk.

> Grooming can take place online or in-person. It is usually employed by a family member or someone else in the victim's circle of trust, such as a coach, teacher, youth group leader or others who naturally have some interaction with the victim.

---

[27] RAINN stands for Rape, Abuse & Incest National Network. It is the nation's largest anti-sexual violence organization. It created and operates the National Sexual Assault Hotline in partnership with more than 1,000 local sexual assault service providers across the country and operates the Safe Helpline for the Department of Defense. RAINN also carries out programs to prevent sexual violence, help survivors, and ensure that perpetrators are brought to justice. *See* https://rainn.org/about-rainn, generally.

Though grooming can take many different forms, it often follows a similar pattern.

- Victim selection: Abusers often observe possible victims and select them based on ease of access to them or their perceived vulnerability.

- Gaining access and isolating the victim: Abusers will attempt to physically or emotionally separate a victim from those protecting them and often seek out positions in which they have contact with minors.

- Trust development and keeping secrets: Abusers attempt to gain trust of a potential victim through gifts, attention, sharing "secrets" and other means to make them feel that they have a caring relationship and to train them to keep the relationship secret.

- Desensitization to touch and discussion of sexual topics: Abusers will often start to touch a victim in ways that appear harmless, such as hugging, wrestling and tickling, and later escalate to increasingly more sexual contact, such as massages or showering together. Abusers may also show the victim pornography or discuss sexual topics with them, to introduce the idea of sexual contact.

- Attempt by abusers to make their behavior seem natural, to avoid raising suspicions. For teens, who may be closer in age to the abuser, it can be particularly hard to recognize tactics used in grooming. Be alert for signs that your teen has a relationship with an adult that includes secrecy, undue influence or control, or pushes personal boundaries.

*See* https://rainn.org/news/grooming-know-warning-signs.

From the facts that information we reviewed in our investigation, Masullo's actions fit the RAINN "warning signs" of grooming described above. These include:

1. Masullo's heightened focus on Student 1 and other students in prior class years who had perceived or known family difficulties.

2. Actions that caused separation of Student 1 and other students from their family members and other teachers, particularly those in the English Department.

3. Actions that caused Student 1 and other students to develop trust and create secrets with Masullo, including: (a) asking students on the Columbus trip, including Student 1, not to tell anyone they were left on the side of the road while Masullo retrieved gas or pulled over by the police in Columbus; (b) creating a hidden "time capsule" with students from that trip; (c) passing and writing secret notes to Student 1; (d) giving unusual or unexpected gifts to Student 1, other students in the 2024 class year, and students in prior class years; and (e) telling multiple students—including students in the 2024 class year—that they had unusual or unique talent, or were seemingly the best students he had ever taught.

4. Actions that appeared calculated to desensitize Student 1 to touch, including repeated hand holding, at least one full-frontal embrace, and kisses on the forehead and cheek.

5. Cultivating a persona at USN that many witnesses described as quirky or part of a perceived academic rigor, which resulted in those around Masullo believing he was "harmless" or that certain actions like calling students "love" or "dear" were just generational or simply a part of his esoteric persona.

Based on our investigation, we believe that Masullo's conduct toward Student 1 appeared to be motivated by, or in pursuit of, some form of personal gratification. Masullo declined to be interviewed as part of this investigation, but he was interviewed as part of the prior investigation. We do not find the responses he provided in that prior interview credible in light of the totality of information available to us. Masullo repeatedly took steps to conceal his behavior. He gave Student 1 numerous notes with hand-drawn messages, that often included hearts. When others were present, he would hide notes under other notes or in books for her to find. He would slide notes into Student 1's locker, where presumably only she would see them. The manner in which Masullo conveyed these notes appeared calculated to create secrets. Finally, when removed from the Mock Trial Trip, Masullo seemed to know his removal had something to do with Student 1 even though no one mentioned her by name. These actions and statements suggest Masullo was well aware that his behavior was improper.

## 2. Finding No. 2: The School's initial response was generally appropriate.

USN should be credited for the actions taken in the first forty-eight hours after Student 1's Disclosure. Every witness we spoke with who was involved in Student 1's Disclosure said they believed her, and we are unaware of anyone at USN doubting Student 1's account. The faculty and administrators who heard Student 1's Disclosure, and the administrators who listened as she repeated it, all acted with her best interest in mind. They all said, to one degree or another, they quickly recognized the gravity of the situation, with regard to not only what Student 1 said Masullo had done, but also what it

would mean to remove a teacher with Masullo's tenure and stature at USN. None of the witnesses that we spoke to doubted that Masullo would ultimately lose his job. Put another way, those involved in Student 1's Disclosure took her seriously and understood the likely outcome of what she had disclosed.

Additionally, the faculty and administrators with whom Student 1 met on the day of her Disclosure looped in the right people to assist, including the AHS, the Director of Counseling, the Director of Communications, the CFO, and the Human Resources Director. The Director informed the Board President that same day. USN's leaders also recognized the need for legal counsel and reached out to the School's Former Outside Counsel. Members of this initial leadership group also contacted Student 1's parents and met with Student 1, her parents, the AHS, and one of the trusted faculty members she chose to approach first with her Disclosure.

Once a larger group of senior School leadership became involved, we found evidence they immediately started drafting a working plan of response.[28] Those involved told us this plan, which was drafted by the AHS, was informed by how the School had responded to prior incidents of concern. We believe this plan was well considered and consistent with best practices.[29] It showed consideration of the team of senior School leadership to be included in responding to Student 1's Disclosure, how to quickly remove Masullo from contact with students, the need to abide by mandatory reporting obligations, whether to reach out to past students of Masullo, how to support affected faculty members, and how to communicate with Alumni 1.

Our investigation also found that although though there is no formal process for reporting teacher misconduct, Student 1 was supported by trusted USN faculty and staff members. Student 1 initially approached Teacher 1, Teacher 2, and Administrator 1 with hypothetical questions about what would happen if she reported inappropriate behavior by a teacher. Those individuals listened to Student 1 and explained what they understood would happen. They encouraged her to make a disclosure based on the hypotheticals she described but did not press her to do so. They also proactively informed the AHS and Director of Counseling of Student 1's hypotheticals. At least one of these individuals stated they suspected Student 1's hypothetical inquiries were about Masullo and that after speaking with Student 1 they believed a more formal disclosure was forthcoming.

---

[28] The AHS's notes outlining this plan are attached as **Exhibit 6**.

[29] *See, e.g.* Recommendations for Independent School Leaders from the Independent School Task Force on Educator Sexual Misconduct *available at* https://www.nais.org/getmedia/f27450cf-6737-4c6b-ab49-3c1762112b69/Prevention-and-Response-Task-Force-Report-2018.pdf; A Checklist for Crisis Planning *available at* https://sais.org/resource/a-checklist-for-crisis-planning-preparation/. We note that the NAIS Recommendations for Independent School Leaders from the Independent School Task Force on Educator Sexual Misconduct are a useful guide for independent schools faced with a serious allegation of teacher misconduct, regardless of whether the alleged misconduct ultimately is substantiated or how it is characterized or defined.

Teacher 1, Teacher 2, and Administrator 1 also formed an effective, albeit informal, care team[30] (Student 1's "Care Team") to support Student 1 through the process of her Disclosure and the ensuing investigation. At least one of these individuals was present with Student 1 for all of her interactions with the investigation and senior School administration. Student 1 indicated these individuals served as trusted confidants during a period when most people in the School community, including other faculty, were unaware of the full extent of Masullo's misconduct.

### 3. Finding No. 3: USN's overall response exhibited an overreliance on outside advisors, suffered from a lack of coordination, and prioritized process over people.

#### A. The School's response suffered from a lack of planning and internal coordination and communication.

The School's response in the first few days following Student 1's Disclosure largely followed best practices. In the following week, however, the role of the core group of senior School leadership who had responded to Student 1's Disclosure changed. While some of this group remained involved to varying degrees, critical information was not shared with them, and their perspectives and advice were not considered as it had been in the past. Witnesses told us that instead, critical decisions about how the School would respond were made by the Director and the School's outside advisors. As this occurred, the School's response began to falter. The lack of coordination invited speculation and rumors, increased internal tensions and frustration among those aware of Student 1's Disclosure, and made navigating the situation harder for Student 1 and other involved students. For example:

1.  The Director informed us he had wanted to step back from the initial investigation conducted by Former Outside Counsel to avoid any appearance of undue influence or impropriety. However, none of the senior School leadership or the Board President were aware of this decision, nor did we find any evidence that this decision was communicated to senior School leadership, members of Student 1's informal Care Team, or Student 1 herself. We also noted there was no other senior School leader assigned to manage the activities of Former Outside Counsel, and the Director continued to be the main point of contact for them through the conclusion of their investigation.

---

[30] While multiple witnesses reported a familiarity with Student 1's "Care Team," USN lacks a formal process for forming these teams or relaying expectations associated with them. We believe this lack of a formal process and the fact that Student 1's informal Care Team members were called upon to offer support at a level that fell outside or exceeded their professional expertise was an additional stressor for the faculty members on that the Care Team. This added stress exposed existing fault lines between them and senior School administration and created new ones.

2.      Senior High School Leadership did not work with Former Outside Counsel to conduct student interviews in a manner that minimized class disruption and visibility to other students. Witnesses told us Student 1 and other involved students were removed from the same class and interviews were conducted in a room that required those students to walk through a public section of the library while visibly emotional. At least one member of Student 1's Care Team, without prompting, tried to clear this area to minimize contact between student witnesses and other students.

3.      Similarly, there was no coordination between senior School leadership and the School's Former Outside Counsel about the location and timing of Masullo's interview, which was conducted at a building adjacent to School grounds. Several students saw Masullo before his interview, which increased speculation among the student body as a whole and the agitation of Student 1 and other involved students.

4.      Throughout the School's response to Student 1's Disclosure, the <u>Director failed to utilize existing School resources to communicate with the community</u>. Within hours of Student 1's Disclosure, the Director of Communications had drafted a media holding statement for the Director to review and share. While in draft format, the statement clearly relayed that 1) an alleged inappropriate relationship between a faculty member and a student had been brought to school administrators, 2) the faculty member had immediately been placed on leave, 3) the student and family were being supported, 4) the matter had been reported to authorities, 5) legal counsel had been contacted, and 6) an outside firm had been brought in to conduct an independent investigation. The communication was written for key USN constituencies, including students, families, faculty, staff and USN alumni. The School never utilized this holding statement, even after Student 1's July 1, 2024 Social Media Post. The School's first public statement did not come until July 12, 2024, seventy-one days after Student 1's initial Disclosure and 11 days after her Social Media Post.[31]

5.      Witnesses involved in Student 1's initial Disclosure and the School's response believed the Director and/or the AHS would handle any required reporting because that is how it had been done in the past. The Director indicated the School's Former Outside Counsel was tasked with determining if there was a mandatory reporting obligation. Yet no one other than the Director appeared to be aware of this fact, resulting in

---

[31] We found that the School's outside public relations advisors did not appear to be concerned about Student 1's social media post in light of Student 1's follower count. We are aware, however, that the post was widely shared within the Nashville private school community, and members of this B&T investigations team became aware of it as early as July 2.

members of the senior School leadership and Student 1's Care Team believing a report had been made, and being concerned and frustrated upon learning one had not. Importantly, because Student 1 was over the age of 18 at all relevant points, the School had no required reporting obligation to the Department of Children's Services.[32] Based on our investigation, we believe that Former Outside Counsel determined this relatively early in their investigation, but that information was not effectively communicated to all USN employees involved in Student 1's Disclosure, all of whom would have been mandatory reporters if a reporting obligation existed.

6.   The general lack of clear and effective communication among the Director, Former Outside Counsel, and the USN employees involved in Student 1's Disclosure resulted in members of Student 1's Care Team becoming increasingly frustrated by their isolation from the School's response. Their frustration contributed to a climate of derision and suspicion that negatively impacted the School's ability, as a whole, to respond to the aftermath of Student 1's Disclosure and July 1 Social Media Post.[33]

Based on our investigation, we believe the lack of internal coordination that resulted in these were a result of the Director's decision not to rely on other members of

---

[32] We did not learn of other conduct by Masullo that would have triggered a mandatory reporting obligation regarding Student 1 or any other students or alumni of USN.

[33] In particular, on or after September 9, 2024, Administrator 1 distributed a letter to the Board and an unspecified distribution list criticizing the School's leadership and its response to Student 1's Disclosure. While this letter largely recycled factual information contained in the August Letter, it also set out Administrator 1's personal perspective on the events at issue, the impact they had on him, and the impact he believes they had on others. There is no question the events following Student 1's Disclosure had a profound impact on the members of her Care Team, including Administrator 1, and that Administrator 1 believed the Board needed to hear his perspective. Nonetheless, we believe Administrator 1's decision to send his letter was ill advised. First, Administrator 1 occupied a leadership role within the School. Multiple witnesses informed us that based on his stature, the comments in his letter heightened tensions within the School. Second, multiple witnesses described a widely held belief within the community that Administrator 1 was upset at not being selected as the head of High School the year before. Many of those witnesses questioned whether the letter was written, at least in part, with that subtext in mind. Third, the letter itself discloses legal advice, which Administrator 1 knew or should have known was potentially privileged and should not have been disclosed. More importantly, it also discloses communications with, and the full names of, current and former USN students which should not have been disclosed without permission from those students, their families, and the School. We do not believe that all of those students or their families wanted to have their names disclosed in such a public manner. Fourth, while we are unaware of who originally received the letter, we believe Administrator 1 expected, or reasonably should have been expected, the letter would end up in the public sphere, further magnifying the ongoing schism in the community, increasing the publicly searchable record of the names of individuals impacted by Masullo's conduct, and further compounding the adverse effects on USN that Administrator 1 complained about. While we do not believe that Administrator 1's frustration with the School's response was misplaced, his decision to send the letter exhibited a lack of professionalism given the situation and Administrator 1's position within the School.

senior School leadership that had previously been involved in the School's response to other incidents of concern. Instead, critical information about how the School was responding to Student 1's Disclosure and the results of Former Outside Counsel's investigation was siloed between the Director, Former Outside Counsel, and, to a lesser extent, the Board President. The decision not to share information across a larger group of senior School leadership and those involved in Student 1's Disclosure does not follow best practices.[34] Ultimately it hamstrung the School's response, adversely impacted Student 1, and led to the crisis now affecting the School.

We believe this decision may have been driven, in part, by the Director's experience in his prior leadership roles. The two schools where the Director held leadership roles immediately prior to USN are both associated with larger research universities. The Director told us he was able to rely on the assistance of the general counsel and Title IX offices of those larger institutions for advice and counsel when a critical issue (akin to Student 1's Disclosure) arose. General counsel and Title IX offices of large research universities tend to be more familiar with the unique needs presented by academic institutions and schools like USN, and the challenges presented by investigating issues like Student 1's Disclosure. We believe this experience could have led to the Director's overreliance on the outside advisors engaged to investigate and assist the School after Student 1's Disclosure, and the Director's decision to delegate critical tasks in the School's response to these advisors. We also believe that this resulted in the Director not asking critical questions to ensure advice was tailored to USN and its community.

It appears to us USN as a whole possessed (and possesses) the necessary experience and institutional knowledge to ask these critical questions. For example, the Director of Communications has crisis communications expertise, but her input was largely ignored or overruled by outside advisors, and the School's internal and external communications suffered as a result. Similarly, the AHS, Administrator 1, Director of Counseling, and others have helped coordinate the School's response to consequential matters in the past, and that knowledge could have helped the School do a better job responding to Student 1's Disclosure. Ultimately, better coordination among the entire team of USN employees that originally responded to Student 1's Disclosure, her Care Team, the Director, and Former Outside Counsel would have alleviated many of problems that occurred with the School's response to Student 1's Disclosure.[35]

---

[34] *See, e.g.*, Recommendations for Independent School Leaders from the Independent School Task Force on Educator Sexual Misconduct, p. 23 *available at* https://www.nais.org/getmedia/f27450cf-6737-4c6b-ab49-3c1762112b69/Prevention-and-Response-Task-Force-Report-2018.pdf ("Protocols should be developed for consistent and timely coordination of information between and among response team members and the consistent and centralized documentation of relevant information.").

[35] A more coordinated approach would have resolved some, but not all, of the frustration exhibited by Student 1's Care Team. We believe that the outside advisors who were allowed to manage much of the School's response to Student 1's Disclosure, including Former Outside Counsel, approached Masullo's conduct more like an employment issue and came to view Student 1 as potentially adversarial to the

## B. The School's response focused on process over people.

We determined the initial response plan drafted by senior School leadership in the immediate wake of Student 1's Disclosure evidenced an understanding that Masullo's actions and his removal would have a significant impact. However, as this initial group of senior School leadership was largely supplanted by outside advisors, the School's response exhibited a more rigid adherence to process and less consideration of Student 1's status as a potential victim, and the impact that Masullo's actions and removal would have on the School community.

For example, both the AHS and Director stated that by the time Masullo had returned to Nashville, they did not believe he would return to USN. Indeed, the media holding statement written by the Director of Communications the day Student 1's Disclosure recognized this possibility and gave the Director the option to indicate as much in his statement: "While personnel matters are confidential, I can share that effective Day, Month Date, High School English Teacher Dean Masullo is no longer a USN employee." Despite this, the decision to terminate Masullo was delayed two months until that investigation had concluded. In our assessment, this was unnecessary. Once the essential facts of Student 1's account were confirmed, the Director – either in consultation with senior School leadership, the Board, Former Outside Counsel, or acting alone – could have, and likely should have, taken steps to terminate Masullo's employment. Instead, the Director, in consultation with outside advisors, appeared to focus more on the process of investigating Masullo's conduct instead of simply reaching the result that he and others in School leadership believed was inevitable and was, in fact, ultimately reached.

Similarly, when Student 1 asked which policies the investigation determined Masullo violated and whether his conduct constituted grooming, the Director, and eventually the Board, chose to not share that information. While facts related to employment decisions are generally maintained in confidence to reduce risk and avoid public scrutiny, there was no legal obligation preventing the School from discussing the reasons why Masullo was terminated or the specific policies he violated. Had the School

---

School, well before she engaged counsel. That approach, in our view, failed to recognize that Student 1's position with respect to USN. First, Student 1 was 18, she was a victim of Masullo's inappropriate conduct, and had no experience dealing with attorneys. Second, putting aside Student 1's status as a victim, students of independent schools, and their parents, are more akin to a longstanding customer of a business. Managing the response to adverse actions by an employee (here Masullo) against a longstanding customer (here Student 1 and her family) is different and requires a lighter touch and willingness to directly respond to the customer's (student's) needs and concerns. Failure to do so can result in reputational harm if a customer/student chooses to comment publicly or share their frustration with others in the community. Businesses often lack passionate constituencies, and can rely on the media cycle to shift attention. The same is not true for schools like USN. Students and parents are often highly engaged, memories are long, and points of contention can remain front and center for months and years. We believe the School's outside advisors did not adequately understand these dynamics and failed to take them into account.

shared this information with Student 1 and others closely involved in her Disclosure, we believe it is unlikely the School would find itself in the situation it is in today.

### C. The School's response ignored the widespread and persistent impacts of Masullo's actions and resulting termination.

Masullo taught at USN for fifteen years. For many, he was a well-liked and respected teacher they looked up to. He served as the faculty advisor to USN's GSA for years, and he forged close friendships with other faculty. Professionally, he was an integral, if at times divisive, part of the English Department. His abrupt removal two weeks before the end of the 2024 school year was bound to have ripple effects – something the draft response plan created by senior School leadership seemed to anticipate. Despite this knowledge, the School's response failed to fully consider or acknowledge these effects. This failure – particularly as the School's investigation and response wore on – contributed to the shock and upset suffered by multiple constituencies. Those particularly affected by the School's missteps include: Student 1, closely involved school faculty and administrators, other faculty, Masullo's other current and former students, and parents of students and alumni.[36]

  i.  **Student 1:** Student 1 was a victim of inappropriate conduct by a teacher at USN. While our investigation found that conduct did not trigger mandatory reporting obligations or constitute sexual assault, it was nonetheless traumatic to Student 1 and affected her deeply. The Director's decision to allow Former Outside Counsel to manage much of the School's official interaction and communication with Student 1 led her to feel as if the School, as a whole, was not supporting her and resulted in communication breakdowns which further traumatized Student 1. For example, as late as July 1, 2024, Student 1 was unaware of whether Masullo would return the following year and be allowed to teach her friends and her sisters, all of whom were still at USN. These were reasonable concerns under the circumstances.[37]

---

[36] It is likely that there are additional constituencies within the broader USN community who were also impacted by Masullo's actions and the School's initial response. We have reported what we have learned from those witnesses we spoke with.

[37] Our investigation determined that Student 1 expressed these concerns in meetings with the School's Former Outside Counsel. While members of her Care Team were present in these meetings, they were not in a position to address these concerns or give her information on behalf of the School. While Former Outside Counsel may have conveyed during a meeting on June 20, 2024 that Masullo would be terminated, the information was not delivered by a senior School administrator, or in a manner that recognized Student 1's position with respect to the School. As a result, it was apparently not internalized by Student 1 or Administrator 1, who was also present for this meeting.

ii. **Closely Involved School Faculty and Administrators:** We have been told that USN traditionally uses an informal "care team"[38] approach to assist students in a variety of difficult situations, from reporting problematic conduct on the part of another student or teacher to dealing with difficult events in their personal lives. Student 1's Care Team was composed of three faculty members to whom she made her initial Disclosure of Masullo's conduct. Each of these faculty members stated the events surrounding Student 1's Disclosure took an emotional toll on them. One was close friends with Masullo and his family. Following Student 1's Disclosure, he immediately cut all ties with Masullo. Others expressed profound regret they had not been able to spot Masullo's inappropriate conduct. In addition, some of these same teachers, and others in the English Department, had to develop a plan for managing Masullo's classes and advisees in his absence. They soon learned Masullo had only graded a few assignments for the semester, and that many of his students had received no feedback on their writing. These faculty members' workload more than doubled in the final weeks of the school year as they graded outstanding assignments, completed the remaining assessments for Masullo's classes (and their own), and ensured that all students had their grades entered before the end of the semester. Based on our investigation, neither the Director nor the Board seem to fully understand or appreciate the ways in which the faculty members who served on Student 1's Care Team were adversely impacted, or the additional uncompensated work that they and other USN faculty and administrators took on to minimize the adverse impact on Masullo's students.

iii. **Other Faculty:** We found that after Masullo was placed on leave, there was not a well-considered communication plan with faculty and statements delivered to them could have been delivered in a clearer and more timely manner.[39] Simply finding out about Student 1's Disclosure was a shock to many. While individual employees were aware of Masullo's occasionally

---

[38] While we believe that the informal Care Team approach fosters disclosure – as it did here – our interviews suggested USN has failed to appreciate the emotional toll that this approach can take on teachers and faculty members who are not trained to deal with these types of crises and can find themselves participating in such a care team simply because a student trusted them and chose to disclose something to them.

[39] The High School held a regularly scheduled faculty meeting on May 8, 2024, six days after the Disclosure. At that time, the AHS was away from Nashville on pre-scheduled travel. Several witnesses confirmed that senior School administrators strongly recommended that the Director speak to the High School faculty about Masullo's leave of absence on the day after the Disclosure (May 3) or on May 8. He declined both invitations, leaving Administrator 1 to deliver that news to the faculty on May 8. We found that the failure of senior School leaders to quickly and clearly address the High School faculty exacerbated tensions between senior School leadership and High School faculty, likely did little to tamp down rumors and speculation, and placed Administrator 1 into a perceived leadership role in responding this crisis that should have been filled by the AHS or the Director.

unusual and irregular demeanor, none of them were aware of the full scope of his clearly inappropriate behavior. More than one USN employee expressed profound regret about not being able to see the full picture of Masullo's inappropriate actions earlier or protect Student 1. We found no evidence the School's response or communication plan accounted for this expected result of his abrupt removal.

iv.     **Masullo's Other Current and Former Students:** We spoke with former students who had Masullo as a teacher, some of whom thought highly of him and others who were exposed to similar behaviors as Student 1. Most of them had strong feelings following Student 1's Disclosure. Those who thought highly of Masullo questioned his motives and their closeness with him as a teacher during their time at USN. Some of those exposed to similar behaviors were distressed at hearing about Masullo's conduct with Student 1. As discussed below, we did not find evidence the School's response or communication plan prior to our engagement accounted for these expected and reasonable concerns of former students.

v.      **Parents of Current Students and Parents of Alumni:** We spoke to parents of current USN students and parents of USN alumni who had children in Masullo's classes. Members of each group expressed concern that similar conduct may have occurred with their children. Many remained concerned about this point, since they were unaware of the results of the School's initial investigation, or the actual extent of Masullo's conduct. We did not find evidence the School's response or communication plan prior to our engagement accounted for these expected and reasonable concerns.

In sum, we believe the School and the Board largely failed to appreciate the emotional and psychological effects that Masullo's actions and removal from the School community has had on these various constituencies. This was in part driven by the fact the School's response to Student 1's Disclosure, at least until her Social Media Post, was framed as an employment issue. This perspective failed to appreciate that Masullo's actions—both with respect to Student 1 and other current and former students—were exploitive and emotionally damaging.

> D.     **The manner in which the School responded to Student 1's Disclosure has adversely impacted the likelihood of students reporting similar conduct in the future.**

Current School students who we spoke with told us that given what occurred with Student 1's Disclosure, they were less likely to report similar conduct. Teachers who served on Student 1's Care Team and others also told us they may be more hesitant to serve in a similar role in the future. We believe this is a normal reaction given the School's mishandling of Student 1's Disclosure. It should also be concerning to the School. We

have found no evidence to suggest that this potential chilling effect has been accounted for in the School's response or communication plan to date.

**4. Finding No. 4: Communications throughout the process were not timely, clear, or accurate, which eroded trust and confidence in the School and its leadership.**

The School's failure to communicate effectively, and in many cases at all, with its various constituencies after Student 1's Disclosure on May 2, 2024 was the most recurrent theme to emerge during our investigation. Specifically, we found:

1. More than two months elapsed between the date of Student 1's Disclosure and the first official communication from the School about Student 1's Disclosure.

2. The Director did not directly address USN faculty until August 23, 2024, after the August Letter.

3. The School was aware of the implications of Masullo's conduct, but it did not take adequate steps to see if other current or former students may have been impacted by Masullo, or to allow stakeholders to share relevant information about the incident with the School.

4. The School could have prevented Student 1's Disclosure from devolving into a crisis if it had been more transparent with her and responsive to her reasonable requests for information.

5. The School's delayed public acknowledgment of Student 1's Disclosure eroded the community's trust and confidence in the Board, the School, and its leaders.

While independent schools take different approaches to what information should be shared in a crisis, limiting external and internal communications or refusing to respond to community concerns in a situation directly implicating student safety is not a viable option.

**A. Student 1**

Student 1 told us at least one administrator and Former Outside Counsel promised to keep her updated about the investigation and its progress after her Disclosure. While the School's Former Outside Counsel and certain faculty members individually communicated with Student 1, the updates were informal and generally concerned the progress of the investigation. We find that the Director should have been more proactive in ensuring the School was clearly and effectively communicating with Student 1 regarding the School's response to her Disclosure. But the Director outsourced virtually all of the School's communications with Student 1 about the progress and results of the School's investigation to Former Outside Counsel. In the weeks following her Disclosure,

the Director's and School's detachment from the investigation led Student 1 to feel progressively uncomfortable and unprotected. The Director also made the choice to run all other communications concerning Masullo and Student 1's Disclosure through the School's former outside advisors, and at least one administrator stated the Director instructed him to clear all communications concerning Student 1's Disclosure with Former Outside Counsel before responding. While this approach might be necessary and appropriate in some situations, it was not the right course of action here.

Prior to Student 1's Social Media Post the Director only met with her twice. The first time was an eight-minute meeting on May 7, 2024 when Student 1 stopped by the Director's office to express her discomfort that classmates were writing get-well notes to Masullo because they believed his absence was health related. During this meeting the Director told Student 1 "there was a process and [Masullo] would not return until that process was complete."

The second meeting occurred on May 23, 2024, at Student 1's request. During the meeting, the Director largely adhered to talking points prepared by the School's former outside advisors, which included telling Student 1 he was sorry she had to go through this ordeal and thanking her for being brave and coming forward. Student 1 and others present at that meeting reported feeling frustrated by the Director's apparent rigid adherence to the talking points and the Director and Former Outside Counsel's unwillingness to clearly explain the "independence" of the investigation or their assessment of Masullo's conduct. Student 1 again left this meeting unsure whether Masullo would return to teach her sisters or friends the following year or how the investigation was being conducted. This meeting set the tone for the relationship between the Director and Student 1, which steadily deteriorated over time.

We determined that in the weeks leading up to Student 1's July 1 Social Media Post she was not adequately informed about Masullo's employment status, did not know whether he would return to USN, and was concerned he would be allowed to teach her friends or younger sisters who were still students at the School. During our investigation, it also became clear that Student 1 believed the School's investigation would be concluded by the end of June, and the results would be communicated to her at that time. No one overseeing the School's response, including the Director, appeared to apprehend that (1) Student 1 did not know critical information, such as whether Masullo would return to USN, (2) the importance she placed on receiving answers to questions she had posed at the conclusion of the School's investigation, or (3) how the lack of clear communication was impacting her mental health. When the School failed to provide the information she expected, she informed one of the faculty members on her Care Team that she was considering "going public." Another faculty member informed Former Outside Counsel and the Director about this possibility. Neither the Director, nor the School's outside advisors, took steps to proactively address Student 1's concerns before July 1.

In addition to her understandable concern that Masullo would return to USN to teach her friends and younger sisters, Student 1 also asked repeatedly what USN polices Masullo had violated and what label could be assigned to his conduct (*i.e.*, whether it constituted grooming). Our investigation determined these concerns and requests for information were relayed to the Director and Former Outside Counsel well before Student 1's July 1 Social Media Post. At any time, the School and Director could have chosen to provide the information Student 1 was requesting and to meaningfully respond to the concerns she had expressed, without violating any legal or contractual prohibition we are aware of. Student 1 informed us that if she had been provided this information, she would not have published her Social Media Post. In our assessment, had the School chosen to substantively respond to what we believe were Student 1's reasonable requests for information under the circumstances, it is likely Student 1 would have been satisfied and able to focus on other aspects of her healing process. It is also likely the School would have prevented the events that culminated in this Report.

The decision not to share this information with Student 1 is even more inexplicable given the information the School provided to Masullo when he was terminated. When the Director and the AHS met with Masullo via videoconference on July 3, 2024, they listed the policies Masullo violated and identified specific conduct underpinning those violations. While it is often the case that employees are informed of the reason for their termination, in this situation Student 1 should have also been provided this information. We acknowledge that maintaining confidentiality in routine employment matters is often advisable. But it is not always the most effective approach, especially where there is more than one victim of the employee's actions. Confidentiality also becomes less important when there is broad awareness of the actions that have led to an employment decision. Student 1 (and other students) were well aware of what Masullo had done. The School's lack of transparency further alienated Student 1 and other constituencies, including most of the faculty and parents interviewed during our investigation, and fed the belief the School was attempting to cover up what occurred. Although we do not believe the Director's decision not to share this information with Student 1 was calculated to harm or offend her, there was little reason not to share it, especially given that it had been conveyed to Masullo.

On July 5, 2024, Former Outside Counsel met with Student 1 to inform her that Masullo had been terminated and the investigation had concluded. The Director did not attend this meeting. Once again, Student 1 asked for specific details about which policies Masullo violated, and what Masullo was told about the reason for his termination. Former Outside Counsel declined to answer, again citing the confidentiality of personnel matters.

After her Social Media Post and meeting with Former Outside Counsel on July 5, Student 1 emailed the Director and requested a second meeting. That meeting occurred on July 10, 2024. The Director, AHS, Alumni 1, Alumni 1's parent, Student 1, Student 1's parents, and Student 1's lawyer participated in this meeting. Witnesses present for the

meeting described it as "not good" and tense. They told us the Director appeared overly reliant on prepared talking points and was unwilling to answer questions about the investigation directly, which served to deepen the distrust between the School and Student 1 and her family, which ultimately culminated in the decision for her to have her attorney prepare and send the August Letter, outlining the details of Masullo's conduct and criticizing the School's response.

Through our investigation, we determined that the School had several chances during and after the initial investigation to address Student 1's concerns, validate her Disclosure, and help her process and understand what Masullo had done. The factual findings of the initial investigation of Masullo's conduct were largely consistent with those outlined in this Report. If the School had made those findings available to Student 1 and the USN community at large and explained the steps it was taking to learn from the Disclosure and prevent similar misconduct in the future, the School could likely have avoided the ensuing fallout from the August Letter.

## B.    The USN Community

The School's communications with the wider USN community also did not comport with best practices. Although the School's decision to immediately remove Masullo from the Mock Trial Trip was correct, several communication errors occurred, resulting in the spread of misinformation in the USN community about why Masullo was abruptly removed. The AHS' statement that Masullo had to return to Nashville for an unspecified "family" issue was problematic in several respects. First, the mock trial team had high visibility and connectivity within the USN and broader private school social networks. As a result, this narrative spread quickly, and students, faculty, and parents began to express sympathy for Masullo's supposed family emergency. This had the unintended, but very real, consequence of further alienating Student 1, who was forced to listen to fellow students expressing sympathy for Masullo, while knowing the real reason he had been placed on leave. Faculty and other students aware of Student 1's Disclosure felt angry, sad, and frustrated by the rumors and the School's failure to communicate why Masullo had been placed on leave, or at least correct the misapprehension that it was because of a "family" issue. When the truth became clear, it further damaged the AHS' and the School's credibility.

Our investigation determined the AHS and CFO may have believed the adverse effects of this miscommunication would be mitigated because they planned to return to Nashville in time to meet with the High School faculty and inform them that Masullo had been placed on leave. But the AHS and CFO's flight was delayed and the Director declined to conduct this meeting in their absence. As a result, none of the faculty were aware Masullo had been placed on leave and the AHS's statements to the mock trial team led to rumors that Masullo or a member of his family was ill. By Monday, these rumors had spread across the High School community. Ultimately, these statements to the mock

trial team and the failure to timely communicate with the High School faculty about Masullo's leave were consequential and, in our view, avoidable.

The School also considered and rejected other options for communications with the USN community that could have slowed or stopped the spread of misinformation in the early stages of the School's response. For example, in the first days following Student 1's Disclosure, the School's Director of Communications drafted a holding statement to release to the USN Community, acknowledging that a faculty member had been placed on leave and stating that additional information would be provided in the future. In conjunction with a public statement, the School also considered creating and publicizing a hotline to determine if others had been adversely impacted by Masullo's conduct. Witnesses who participated in these early discussions thought a community-wide statement about Masullo's removal and a hotline were both advisable under the circumstances, and they shared those opinions with the Director. Ultimately, the Director decided against implementing either based on the advice of the School's outside advisors.

Student 1's July 1 Social Media Post prompted further discussion on whether the School should publicly respond. Here again, the Director, acting on the advice of the School's outside advisors, opted against doing so because Masullo had not yet signed his severance agreement. This decision ignored the larger implications and potential reputational damage of Student 1's Social Media Post. On July 1, the Director advised the Board via email that he was aware of the Social Media Post but did not intend to respond publicly. In arriving at that decision, the Director chose to follow the advice of the School's outside advisors rather than that of senior School leadership, including the Director of Communications. The Director scheduled a Zoom meeting to update the Board the next day. The Board did not take any action to override the Director's decision to not offer any public statement. Ultimately, the decision not to address Student 1's Social Media Post resulted in further rumors within the community, fostered the belief the School was trying to coverup what occurred, and undermined confidence in School leadership.

The School's first public response did not occur until July 12, 2024. This was also the School's first official community-wide communication about Masullo's removal, and came more than two months after Student 1's original Disclosure. Even then, the communication was only prompted by a reporter reaching out to the School, resulting in the School's former outside advisors preparing a statement for the Director to email to a subsection of the USN Community, including faculty, staff, K-12 families, High School Students, and recently graduated seniors entitled "Investigation into Student Complaint" on July 12, 2024. While this email stated Masullo had been terminated for "violat[ing] school policies," it did not explain what policies he had violated, the nature of Student 1's "allegations" or "complaint," or address whether other students may have been affected. The failure to provide clear and accurate information about what occurred only resulted in more questions, especially since what the communication did disclose implicated student safety.

Despite the questions that resulted from this communication, the School did not offer any further comments or explanation to the USN community until after the August Letter. The School's decision to communicate with the USN community in a reactionary manner does not adhere to best practices in crisis communications. Based on our investigation, we believe the former outside advisors and others closely associated with drafting and authorizing these communications failed to perceive how poorly they were received and the additional questions and speculation they invited.

On August 22, 2024, Student 1's lawyer sent the August Letter. The next morning, August 23, 2024, the Director emailed and met with USN faculty. Faculty were upset by the meeting and the lack of answers from the Director. Despite the known reach of the August Letter, there was no communication from the Director or anyone else associated with the School to the larger School community.

On September 10, 2024, the Board President sent a lengthy email to the community. Despite attempting the address community concerns head on, the email failed to clearly and accurately describe the School's response. For example, the email stated that "Immediately upon learning of this incident in May 2024, USN took action to prioritize the safety of the USN community according to established policies." While our investigation confirmed the School prioritized student safety by immediately removing Masullo, we did not find the School had any set policy to follow in these types of situations, did not adhere to established best practices for independent schools, and did not follow the way the School had responded to prior incidents of concern.

The email also continued to focus on confidentiality, stating "Administrators have prioritized the confidentiality of the student" and explaining the School "has not been able to comment on or clarify the facts due to the confidentiality of all who participated in this investigation." But this made little sense given the circumstances. Student 1 had publicly identified herself on social media, her attorney had sent a sixteen-page letter describing what occurred, and there were no confidentiality obligations in the School's severance agreement with Masullo. This continued focus on confidentiality when there was already so much information circulating publicly fed the belief among witnesses that the School was trying to hide or cover up information.

Sometime between September 10 and 13, the Board retained its Current Outside Counsel and new public relations and crisis communications advisors. On September 13, 2024, the Board changed course and announced that Current Outside Counsel shared the August Letter with the local district attorney, and was commissioning a new independent investigation and task force to "examine our policies and response practices." The letter also describe how the Board believed the August Letter contained "new information" and "new accusations of sexual contact" that "were not communicated during the initial investigation." While we believe these statements were well intended, and focused on certain descriptions of Masullo's conduct contained in the August Letter, they were not well received by those aware of Student 1's Disclosure and other members of the

community. Witnesses expressed concern the Board was either grossly uniformed, or was avoiding confronting its own failure. Ultimately the suggestion that the Board head learned "new information" caused confusion, engendered mistrust, and detracted from the larger context of the communication.

Our scope does not include an ongoing assessment of all continuing communications related to Student 1's Disclosure. We note, however that the Board's Ad Hoc Committee has taken the lead in communicating with the USN community, which is traditionally the Director's responsibility. The Ad Hoc Committee's assumption of that operational function could signal a loss of confidence in the Director and/or a governance issue. The Fall 2024 semester presented opportunities, including parent social nights, athletic events, and student assemblies, for the Director to actively engage with stakeholders and try to build relational capital and goodwill with the community. Witnesses that we spoke with – faculty, parents, students and alumni – generally expressed concern the Director made little to no effort to take advantage of these opportunities. Ultimately, the Board's decision to assume control over the School's communications in this instance may be justified, given the findings in this Report and the current climate.

### C.    Parents

The School's communications with parents in the immediate aftermath of Student 1's Disclosure was generally limited to the parents of students in Masullo's English classes, Student 1, and Student 1's friends. Here again, the School's failure to inform or communicate with parents of high school students about a matter potentially implicating the safety of their children was ill advised and failed to follow best practices.

### i.    Parents of Student 1

The School did communicate more often with Student 1's parents than it did with other parents, but those communications were sporadic and, at times, reactive. Senior High School leadership met with Student 1's parents the same day Student 1 disclosed Masullo's misconduct, provided a high-level overview of Student 1's Disclosure, and informed them that administrators were going to personally remove Masullo from the Mock Trial Trip. Student 1's parent emailed the AHS on May 4, 2024, requesting a call.  It is unclear whether the AHS and Student 1's parent spoke that weekend.  Regardless, nearly two weeks went by without any further communication from the School to Student 1's parents. On May 16, 2024, Student 1's parents emailed the Director and AHS, raised various concerns, and asked for an update. The AHS responded the next day, provided an update, and offered to put them in touch with former outside counsel.  The AHS proactively updated Student 1 and her parents on the progress of the investigation on May 22 and 23, 2024.

Student 1's Care Team scheduled a Zoom call with Student 1 and her parents on May 23, 2024. Student 1's family took an extended vacation in early June, and the AHS emailed Student 1's parents a brief update on June 19, 2024, advising that Former Outside Counsel was "closing in on their report and findings." Weeks passed with no further updates or communication from the School. On July 3, 2024, Student 1's parent emailed the Director and AHS outlining his expectations and advising them of a "growing feeling that USN is failing in its responsibilities to support our family as we continue to deal with the fallout from Dr. Masullo's abuse of our daughter." Student 1's parent was present during the July 5, 2024 meeting with Former Outside Counsel, but neither the Director, nor the AHS participated in that meeting. The Director met with Student 1 and her parent and others on July 10, 2024. As previously explained, that meeting further exacerbated the distrust between Student 1, her family, and the School. We believe the School's execution of a coordinated response and communication plan for all affected parties, including Student 1's parents, would have offered these parties the care and support they expected and needed from the School.

### ii.    Other Parents

Senior High School leadership and English Department quickly put together a plan to cover Masullo's classes and complete all grading required for the Spring semester after Masullo's suspension. The AHS sent emails to the high school faculty members and parents of Masullo's advisees on May 7, 2024, informing the group that Masullo was "away" and not expected to return that semester. Although the email did alert parents of Masullo's absence, it should have, but did not, contain information sufficient to alert parents as to the nature and extent to Masullo's conduct – information that potentially implicated the safety of all students within Masullo's orbit. The emails from Teacher 4 and Administrator 1 to these parents on May 8, 2024, were appropriately focused on the academic plan for Masullo's students. But these emails were the last "official" communication from the School the parents in this group received about Masullo for more than two months.

There was no communication provided to parents of high school students who were not enrolled in one of Masullo's classes or close friends with Student 1 until the Director's July 12, 2024 email. The failure to address these parents was not well considered. Parents are naturally focused and deeply concerned about the health and safety of their children. Failing to communicate in a clear and transparent manner ultimately allowed rumors to spread about why Masullo was placed on leave did not allow parents to determine whether their children may have been affected, and caused members of the community to believe the School was hiding something.

### D.    Faculty

The School also did not effectively communicate with its faculty about the Disclosure or Masullo's removal, either. In the days immediately following the

Disclosure, the Director had more than one chance to speak to the High School faculty about the Disclosure and Masullo's leave of absence. The Director's first opportunity came on Friday, May 3, 2024. When the AHS's return flight was delayed, the CFO called the Director and asked him to meet with the High School faculty that afternoon to inform them Masullo was being placed on leave. The Director declined, stating he was not comfortable attending a meeting of the High School faculty to inform them of Masullo's removal because he had not previously attended a High School division meeting. This failure to provide the High School faculty with clear and accurate information about Masullo's removal and leave left them uninformed and unable to confront rumors as they spread over the weekend and into the following week.

The Director's second opportunity to address the High School faculty came at the monthly High School faculty meeting scheduled for May 8, 2024. Witnesses reported that on at least two occasions, members of the High School Leadership team asked the Director to attend this meeting and address the fact Masullo had been placed on leave. The Director declined each time.[40] Because the AHS was out of town, Administrator 1 was left to deliver this message.

The High School faculty, except for those on Student 1's Care Team, received no communications or updates from the Director, the AHS, or anyone else in leadership between the May 8, 2024 faculty meeting and the Director's July 12, 2024 email. This resulted in further speculation about Masullo's removal and alienation of faculty who felt like they were being left in the dark. It also resulted in operational issues. For example, even though Teacher 4 understood that Masullo would likely be terminated, the High School was unable to publicly post or interview for the position until July 2024.

The failure to communicate openly with High School faculty continued into the new academic year. At the start of the new school year, on August 7, 2024, Former Outside Counsel conducted a training on teacher-student interactions. It was apparent to those in attendance the training topic likely stemmed from Masullo's termination, and one of the scenarios discussed mirrored some of his conduct. However, the Director did not address Masullo's separation during the training, or at any other point during the in-service training period.

The Director did not directly address Masullo's termination or Student 1's Disclosure with the High School faculty until Student 1 and her attorney sent the August Letter (discussed below). In the weeks after that, the Director and Board's communications with faculty were reactionary, unclear, and disjointed. On August 23, 2024, the morning after the August Letter was widely distributed to the School

---

[40] The Director informed us he chose not to attend because he did not want to create the impression that he was manipulating or directing the investigation in any way. Members of the High School Leadership team who asked the Director to attend informed us that the Director's explanation for declining was because he did not attend division meetings it would be odd for him to attend this one in this instance.

community, the Director emailed USN faculty, indicating he was aware of the letter and would be in the auditorium for a brief check in at 7:45 AM. According to faculty members who attended that assembly, the Director acknowledged the August Letter and confirmed the School would respond. But some of the Director's statements confused faculty members and angered others, including his assertion (without further elaboration) that there were "inaccuracies" in the August Letter and his refusal to state whether the School had reported Masullo to any governmental or licensing agency.

In our view, the failure to communicate clearly and openly with faculty was a mistake. The School's faculty serve an important function, interacting with students on a daily basis. They are best positioned to communicate factually accurate information and address and prevent rumors. The failure to convey critical information to them can also result in alienation, which faculty members we interviewed confirmed happened here.

### 5. Finding No. 5: Student 1's Disclosure exposed and magnified governance flaws

The Incident exposed and magnified flaws in the Board's governance, which resulted in: (1) ineffective and delayed consolidation and presentation of critical information at the Board level and (2) the community's loss of trust and confidence in the School and Board's crisis decision-making abilities.

The Board is the guardian of the School's mission and is responsible for "all policy concerning the governance, operation and financial viability of the School."[41] There is no shortage of guidance available for independent schools. Both SAIS and NAIS offer helpful governance and operational resources to their members.[42] We found no evidence the School's leadership, including the Board, consulted available resources for guidance in connection with the Disclosure.

### A. The Board of Trustees did not fully appreciate or appropriately plan for the special challenges presented by the former Head of

---

[41] *See* University School of Nashville Bylaws, Article 1.1.

[42] There are ample resources that offer guidance to independent schools and identify the best practices in the areas discussed at length in this report, including governance and leadership, school leadership, and school safety and security. *See, e.g,* https://www.nais.org/learn/principles-of-good-practice/; https://www.nais.org/membership/nais-resources-by-role/#head_of_school; https://www.nais.org/membership/nais-resources-by-role/#trustee; https://www.nais.org/learn/knowledge-center/governance-and-leadership/; https://www.nais.org/learn/knowledge-center/operations-and-administration/; https://sais.org/resource/governance-resources/; https://sais.org/resource/school-safety-and-security/; https://safeandsoundschools.org/resource-library-abuse-and-neglect/; https://safeandsoundschools.org/resource-library-climate-culture-and-sel/;

**School's retirement in 2022 and the transition period and leadership turnover that followed.**

USN and its Board experienced significant turnover in key leadership and administrative positions in the two years leading up to the Disclosure. In 2022, USN welcomed a new Director when the former Head of School ("Former Director") retired after 22 years of service. Between 2023 and 2024, USN also hired a new Assistant Head of School for Academics, as well as New Academic Division Heads for the Lower School, Middle School and High School. The School's CFO unexpectedly retired in 2023, and a new CFO was hired in 2024. The School also hired a new HR Director in 2024. This turnover created a sizeable gap in institutional knowledge and experience in these key positions that exposed and magnified existing flaws in the Board's governance. The turnover at the CFO and Human Resources Director positions was especially challenging, given the prominent role these leaders played in managing School crises under the Former Director.

The Board itself experienced an atypical turnover in leadership between 2022-2024. Board presidents have historically served two-year terms, but the Board has had three different presidents in the past two years. Witnesses we spoke to uniformly told us the Former Director had amassed significant relational capital with key USN constituencies, including students, parents, faculty and board members. The Former Director and his leadership team had successfully managed prior incidents of concern, and generally only involved the Board if and when necessary. As a result, we believe the Board maintained the same level of confidence in the Director as it did the Former Director and was less involved in the crisis that ballooned from Student 1's Disclosure than it needed to be.

The Board duty to not only select the Director, but also to support the Director once s/he is installed. Although the School devoted substantial time and resources to introducing the new Director to the community in 2022, the Board did not create a specific succession plan for the Director or the School as it navigated this critical transition period. As the average tenure of independent school directors has fallen in recent years, succession planning "has moved to the forefront of exceptional governance" for independent schools.[43]

Based on our investigation, the Board could have done more to assist the new Director during the transition. Anecdotally, it appears that much of what the Board and the Director did was focused on his integration into the broader Nashville community, and less on USN's distinct constituencies. While the Board has more recently encouraged the Director to focus on building relationships with faculty, parents, and students, based on our review, at the time of the Disclosure, the Director generally lacked the type of

---

[43] *See* https://www.nais.org/magazine/independent-school/spring-2024/succession-planning-to-set-schools-up-for-long-term-success/.

relationships within the USN community that its various constituencies expected. As a result, at the time of Student 1's Disclosure, the Director had little relational capital within the USN community. We were struck that this lack of capital extended to USN employees the Director would be expected to work most closely with, including members of senior leadership. We believe that if the Board been more cognizant of the Director's lack of relational capital among School employees and the community at large, it may have acted more quickly to assist the Director and the School in responding to the Disclosure.

Succession planning often prompts boards to consider their composition and membership to determine whether the board possesses sufficient expertise to address problems that may impact the organization, or specialized expertise that can be used to assist the management of the organization they oversee. While decisions relating to the Board's current composition are outside the scope of our investigation, we did not locate any information to suggest the Board had considered the expertise possessed by its members and whether it was lacking in the years leading up to the Disclosure. In addition to these considerations, numerous witnesses expressed concern regarding the makeup of the USN Board. Some view the Board as too insular and feel there are too many parents and not enough outside voices and subject matter experts in crucial areas. Witnesses also commented on the lack of *economic* diversity in board members. Finally, some witnesses used words like "clubby," and "glorified PTA" to describe the Board. Right or wrong, these adjectives evidence a perception the Board lacks credibility and the USN community's trust.

### B. The Board was unprepared for this crisis.

Our investigation determined the Former Director had generally earned the trust of the Board and the community. This trust allowed him and his leadership team to handle sensitive matters (or aspects thereof) internally without substantively engaging the Board.

This experience may have enabled complacency on the part of the Board, causing it to overlook or delay critical governance-related tasks that it needed to more effectively and efficiently help the School navigate a crisis. The Board's bylaws were last updated in or around 2016. Although the Board formed an *ad hoc* committee roughly four years ago to update the bylaws, that task proved to be labor intensive, and the project stalled. As a result, the Board operates under a set of bylaws that, among other things, do not adequately allow the Board to act quickly and efficiently in a crisis. "Special Meetings" require five days' notice.[44] Although the Board's Executive Committee is empowered to act in case of emergency, the Board has used this power sparingly. Even if it did, a 10-member Executive Committee is likely too large to provide efficient and meaningful direction in the event of a crisis.[45]  Once the School's response to Student 1's Disclosure

---

[44] USN Bylaws, Art. 1.5.
[45] USN Bylaws, Art. 4.2.

spiraled into a crisis, the Board should have been able to immediately form a small committee of disinterested board members to address that crisis. It does not have that ability under the current bylaws. Indeed, we found the crisis reached a fever pitch during the one-week it took the Board to form the Ad Hoc Committee for School Safety.

The composition of the Ad Hoc Committee has also raised concerns. It includes the Board President and the Director as ex-officio members, both of whose actions in connection with the School's handling of Student 1's Disclosure have been questioned by the community. The Board's inability to constitute a committee of uninvolved board members has undermined the credibility of the Ad Hoc Committee, Board, School and its outside advisors (including us) in responding to the crisis. The vast majority of witnesses who we spoke to expressed doubts about the Ad Hoc Committee's neutrality and the Board's professed intent to be transparent about the results of this investigation. The automatic inclusion of the Board President and Director as ex-officio members of the Ad Hoc Committee and all other Board committees does not appropriately account for circumstances, like those presented here, in which their inclusion could pose a potential conflict of interest.[46] We understand the Ad Hoc Committee has been chaired by members who are not implicated in this investigation, and there have been significant meetings that have not included the Director. Nonetheless, the Director's automatic inclusion in the Ad Hoc Committee has opened the Board up to needless criticism and undermined its efforts to rebuild trust and transparency with the USN community.[47]

## C.  Board members do not appreciate their fiduciary obligations.

Each board member owes the School a number of fiduciary duties, including the duty of confidentiality.[48] Competent board governance requires board members to not only keep all board deliberations confidential, but also to accept and publicly support board decisions, even if they privately disagree with them. In our assessment, the Board failed in both respects after receiving the August Letter. The reasons for these failures are not altogether clear. Every year, Board members are required to electronically sign a Conflict of Interest Policy and Code of Business Conduct and Ethics Policy, both of which generally require members to maintain confidentiality of all information shared with them in connection with their Board service. Requiring these signatures shows the Board's commitment to good governance. But the Board has not rigorously enforced this

---

[46] USN Board of Trustees Bylaws, Art. 2.3 and 5.1.

[47] We stress that ***our investigation has been entirely independent***. We have not been directed by the Ad Hoc Committee, the Board, the Director, or the Board President. We have interviewed both the Director and the Board President as part of our investigation. Both were fully cooperative and neither attempted to influence the results. While we believe their inclusion on the Ad Hoc Committee has exposed it to unnecessary criticism, we have found no evidence their inclusion impacted the Ad Hoc Committee or the Board's response to Student 1's Disclosure in any way.

[48] *See, e.g.*, NAIS Principles of Good Practice for Independent School Trustees, https://www.nais.org/learn/principles-of-good-practice/independent-school-trustees/.

requirement. We understand that as of the date of this Report, not all Board members have signed these policies.

As reflected in the Code of Business Conduct and Ethics Policy, "the duty of confidentiality is material to the School's election of each Trustee and to the ability of Trustees to have frank and candid discussions in the Board room pertaining to the School's business, some of which may be sensitive, competitive, and highly confidential." Board members have also been repeatedly reminded of these fiduciary obligations by the Board President and the School's Current Outside Counsel. Despite this, confidential information discussed at Board meetings following Student 1's Disclosure, her Social Media Post and the August Letter, found its way into the public sphere. As such, we believe there are Board members who either do not fully appreciate their fiduciary duties or have failed to uphold them. This inability to maintain the confidentiality of sensitive information has eroded the community's confidence and trust in the Board and its ability to manage the current crisis.

## VI.  RECOMMENDATIONS

This Report highlights mistakes of individuals, but it also reveals opportunities for improvement in the School's current culture, governance, administration, policies and procedures with regard to student-teacher interaction, student disclosures, and crisis response, among others. To move forward the School must institute and adhere to best practices in these areas. To that end, we have prepared the following recommendations with three primary goals in mind: (1) to better equip the School and Board to prevent future misconduct like the kind that occurred here; (2) to better respond to future disclosures like Student 1's and better respond to crises, and (3) to help the community to move forward. These recommendations are not intended to be exhaustive, nor do they address every single issue we identified in our investigation. Rather, they are intended to help the School's administrators, faculty, staff, and Board improve how they govern and protect students.

As set forth in this Report, we believe there are ample publicly available resources – many through NAIS and SAIS – that the School can take advantage of in addressing these recommendations. We also believe the School as a whole possesses the necessary experience and expertise to address many, if not all, of these recommendations. We understand the School has already begun this process and the Board's Task Force is examining many of the same areas highlighted in this Report. When its work is complete, the Task Force may make different and/or additional recommendations aimed at improving the School's safety-related response, communications, and policies. Ultimately the Board has the responsibility to evaluate and decide whether and how to adopt any of these recommendations.

With these points in mind, we recommend the Board and the School undertake the following:

1. **BE TRANSPARENT WITH THE USN COMMUNITY.** One of the reasons the School finds itself in its current position is because it failed to be open and transparent with the USN Community about Student 1's Disclosure and Masullo's removal. We believe that this Report provides the most comprehensive description of facts surrounding Student 1's Disclosure and the School's response. To that end, we recommend the School and the Board consider making this Report, or a redacted version of it, available to the USN community. We believe that ensuring a common frame of reference will allow the community as a whole to discuss what needs to occur next and how USN can best move forward.

2. **ASSESS WHAT FAILURES OCCURRED.** We believe the School's response and its communications following Student 1's Disclosure suffered from significant failures. Both the Director and the Board need to decide what assessments in this Report they agree with. If they do agree that failures occurred, we believe they should accept responsibility for those failures and ensure they have apologized to the constituencies that have been affected, including Student 1, her parents, other students impacted by Masullo's conduct, parents of those affected students, faculty, and the broader USN community.

3. **ASSESS THE BOARD'S ROLE AND STRUCTURE.** We believe the Board suffered from certain governance and operational issues that impacted its ability to help the School swiftly and effectively respond to Student 1's Disclosure. As such, we recommend the Board, either on its own, or with the assistance of an experienced consultant, take steps to address these issues. In particular, we believe the Board should consider the following:

   a. Amending its bylaws to: (1) allow for a board meeting to occur with less than 5 days' notice; (2) remove the requirement that the Director and Board President serve as members of all sub-committees; and (3) establish an appropriate protocol for Board meetings.

   b. Institute additional training on the obligations of Board members, including their fiduciary obligations.

   c. Assess its structure and composition to determine: (i) whether the size the of the Board effectively serves the School's needs; (ii) whether the number of sub-committees effectively serve the School's needs and whether they create and undue administrative burden for the Board and the School as a whole; (iii) whether the Board's composition provides the requisite subject matter expertise to assist the School in all aspects of its operations, from a crisis of this type to day-to-day operational issues; and (iv) whether the Board's

composition reflects the wide social and economic diversity of the USN community as a whole.

    d. Assess the manner in which Board meetings are conducted to ensure they are efficient and allow the Board effectively address the issues before it.

4. **MODIFY THE SCHOOL'S REPORTING STRUCTURE.** The School must have a way for Students and other members of the USN community to report what they believe to be inappropriate conduct by teachers or other members of the School community. USN has a "bias reporting form," but it does not apply to the concerns Student 1 reported in her Disclosure. In particular, we recommend such a mechanism: (1) be broadly publicized and available to all members of the USN community; (2) cover any inappropriate conduct that could occur in the school setting; (3) allow for anonymous reports; (4) enable the submission of documentary evidence and information; and (5) deliver reports to a group of senior School administrators across all School divisions trained and able to respond to such reports. Vanderbilt's Project Safe reporting form may be a useful template. *See* https://vanderbilt.guardianconduct.com/incident-reporting/

5. **CONDUCT AN AUDIT OF THE EMPLOYEE HANDBOOK.** Masullo had inappropriate interactions with Student 1 and other students. While many of those actions violated USN's Handbook, the boundary lines and policies could have been more clearly drawn. As such, we recommend the School, either on its own, or with the assistance of an experienced consultant, audit and review its existing Handbook in an effort to provide clearer guidance around what conduct USN employees should, and should not, engage in. In particular, we recommend the Handbook:

    a. Prohibit one-on-one electronic communications between USN employees and students outside of USN-controlled systems;

    b. Prohibit employee use of personal laptops for work purposes;

    c. Prohibit covering or obscuring visibility into enclosed areas, including classrooms;

    d. Prohibit single-chaperone off-campus trips;

    e. Clearly and unequivocally state that all teacher-student interactions whether virtual or in person must be interruptible and observable;

> f. Be made available to parents and students so they can make themselves aware of what employee conduct is, and is not, allowed.

6. **CREATE A CRISIS RESPONSE PLAN.** The School failed to adhere to best practices with regard to crisis response and communications. Crises occur in even the best institutions. Well-run institutions are prepared to deal with them. We recommend the School and the Board, either on their own or with the assistance of an experienced consultant, create a crisis response plan to respond to various potential crises, including, at minimum, allegations of teacher misconduct, student misconduct, school safety concerns, natural disasters, cultural challenges, and any other reasonably foreseeable incidents of concern. Any plan should identify a core group of senior school administrators and Board members who can be convened to quickly respond to a crisis and consider and prepare for the type of communications to the USN community that may be necessary.

7. **CONDUCT MANDATORY TRAINING ON GROOMING AND GROOMING BEHAVIOR.** Masullo's actions fit recognized patterns of grooming behavior. Individuals who engage in grooming behavior often take steps to conceal their behavior from others, attempt to normalize it, or take steps to explain it away. Training that helps others recognize this behavior can help prevent it. School employees and parents who served as coaches told us they were familiar with the term "grooming" because of training offered by Safe Sport, which the School requires all coaches to complete. *See, e.g.* https://uscenterforsafesport.org/wp-content/uploads/2024/03/2024_HPCourse_Grooming_v9.pdf. We recommend the School offer similar training that addresses grooming and grooming behaviors to all faculty and staff, and consider whether and how such training should be made available to students and parents as well.

8. **ADDRESS ITS CULTURE OF COMPLIANCE.** After Student 1's Disclosure, members of the USN community saw odd or strange actions by Masullo in a different light. Had those actions been reported earlier, it may have changed the course of events with regard to Masullo and Student 1. In this regard, the School needs to address its culture of compliance. At a minimum, the School needs to foster a "see something, say something" approach to compliance with policies around student-teacher interactions. The School should ensure all members of the School community are encouraged (and given a vehicle) to report behavior that may run afoul of those policies, and provide reassurance it will recognize and not penalize honest mistakes.

9. **LISTEN TO THE CONCERNS OF THE COMMUNITY.** This report does not purport to capture all the concerns of the USN community as a whole.

Each person we spoke to offered their unique perspective. Those concerns ranged from specific issues surrounding Masullo's conduct, Student 1's Disclosure and the School's response to general concerns about School leadership and whether USN is a safe place for its students. The School needs to listen to the concerns of its community and work to achieve as much consensus and buy-in as possible in the way it chooses to move forward. In particular, we believe the listening sessions being conducted by the Board and the creation of the Task Force on Educator/Staff Appropriate Behavior and Misconduct Response, Communication, and Policy Review composed of members of the various constituencies of the USN community are good first steps.

10. **ADDRESS THE POTENTIAL CHILLING EFFECT ON FUTURE DISCLOSURES.** As the result of disclosing clearly inappropriate conduct by a faculty member, Student 1 and her close friends have been interviewed by two sets of lawyers, she has had to engage her own counsel, and the actions of members of her Care Team have been questioned. It would be reasonable for anyone considering making a similar disclosure – whether a student, alumni, parent or faculty member – to weigh these experiences in deciding whether to disclose. The School must address this potential chilling effect. While we believe the other recommendations included here will help address this concern, the School must be cognizant of this concern as it evaluates the need for, and begins to implement, changes.

## VII. <u>CONCLUSION</u>

Many of the events described in this report are troubling. Some of them were easily preventable, while others were harder to identify in the moment. In certain instances, the School failed its students and other members of its community. At the same time, USN faculty and administration went to extraordinary lengths to try to protect and support Student 1. Ultimately, in our view USN remains a vibrant academic institution with a strong history and community. We saw nothing that caused us to believe USN is not capable of learning from and addressing these mistakes, and emerging as a better place for its students, alumni, parents, teachers, and staff.

# EXHIBIT 1



# SIMS
# FUNK

**www.simsfunk.com**

**ROBERT PEAL**
rpeal@simsfunk.com
(629) 215-8917 - direct
(615) 649-8565 - fax

September 25, 2024

<u>VIA EMAIL</u>

Board of Trustees
University School of Nashville

      **RE:**    *Independent Comprehensive Investigation*

Dear Trustees:

Sims|Funk, on behalf of USN, has engaged Barnes & Thornburg ("B&T"), an Indianapolis based law firm with a newly opened office in Nashville, to conduct a comprehensive and independent investigation into all aspects of a complaint involving Dr. Dean Masullo and his conduct with regard to a student during the 2023-2024 academic year (the "Complaint"). The scope of this investigation was developed with input from the Board, community letters, B&T, and consultation with Alex Little, attorney for the Complainant.

B&T will examine the following:

**The facts and circumstances surrounding the Complaint:** The scope of the investigation will include all facts and circumstances surrounding the Complaint. This scope will include but is not limited to (1) an examination of all available evidence surrounding the Complaint, including witness statements, written and electronic communications, and any other electronic or documentary information that B&T is provided or is able to obtain; (2) an examination of whether any faculty or staff members were aware, or should have been aware of, the conduct described in the Complaint; (3) whether the conduct alleged in the Complaint or any other similar conduct as that alleged in the Complaint involved or impacted other students or members of the School community during Masullo's 15-year tenure on the USN faculty; and (4) making recommendations on the establishment of a more robust and well defined reporting structure to allow students or others to make reports (including anonymous reports, as more fully discussed below) of any facts or circumstances concerning the Complaint, or conduct similar to the conduct described in the Complaint.

**The School's handling of, and response to, the Complaint:** The investigation will include a review of the manner in which the School, its teachers, administrators, staff, and Board responded to the Complaint. The investigation will examine (1) when any of the circumstances described in the Complaint first became known to the School, including its teachers, administrators, staff, and Board; (2) a timeline of when the circumstances described in the Complaint became known to the

school, and what individuals at the School learned of them; (3) the actions taken, and by whom, in response to the circumstances described in the Complaint; (4) the basis for any actions that were taken and whether they had support in the School's policies and procedures, the advice of legal counsel, or best practices when dealing with circumstances like those described in the Complaint; (5) whether the response by the School followed any of the School's applicable policies and procedures or best practices for addressing complaints of this nature; (6) whether the actions of any faculty, administrators, or staff were in accordance with the School's policies and procedures or the best interests of the School's students and community, (7) the impact of the school's actions on the Complainant; and (8) any additional related avenues of inquiry suggested by B&T's fact finding efforts.

We have instructed B&T that its investigation should be comprehensive. Based on what we know now, we believe the scope set forth above will allow B&T to conduct an independent investigation that will allow the School to fully understand the conduct described in the Complaint, assess whether the conduct described impacted other current or former members of the School community, and assess the School's response to the Complaint. At the end of the investigation, B&T expects to provide the School with a report that includes the following:

1. A description of the findings as they relate to the conduct described in the Complaint.

2. A description of whether the conduct described in the Complaint, or similar conduct, impacted any other current or former members of the School's community.

3. Whether any members of the School community, in particular any faculty, administrators, or staff, were aware of the conduct described in the Complaint (or any similar conduct) before the student reported it and an assessment of whether any faculty, administrators, or staff should have been aware of the conduct described in the Complaint.

4. An assessment of whether any steps could have been taken to prevent any of the conduct described in the Complaint, including who could have prevented it and when.

5. An assessment of the School's response to the Complaint, including whether it followed the School's policies and procedures and best practices as recognized by the National Association of Independent Schools and other nationally recognized organizations.

6. A recommendation of what changes, if any, the School should make to its policies and practices going forward to address allegations of inappropriate relationships and/or sexual or other improper physical contact with students by any faculty, administrators, or staff and any other steps the School should take to ensure the safety of its students and larger community. In this regard, B&T will consider all applicable laws and regulations as well as applicable consensus standards for independent schools such as NAIS and SAIS.

We have explicitly instructed B&T that its investigation and report should be comprehensive and address all aspects of the conduct set forth in the Complaint, its potential scope and impact on the School and its students, and the School's response. Consistent with those instructions, B&T will

report whether it believes, based on professional assessment and experience, that it needs to investigate or report on other facts or circumstances not listed above in order to provide a full and comprehensive assessment of the Complaint and the School's response. B&T will also inform the School of any circumstances that may limit its ability to provide a comprehensive investigation, including the lack of cooperation of any witnesses or the unavailability of certain information. The School understands that B&T will not take actions that may adversely impact any ongoing criminal investigation, and such an investigation may limit or delay the ability to collect or assess certain information related to the Complaint.

Very truly yours,

Robert A. Peal

# EXHIBIT 2



You are my heart's content.

♡

# EXHIBIT 3

Thank you for allowing me
into your life, and for being

Such an important part of mine.

I love you.

# EXHIBIT 4



# EXHIBIT 5



# EXHIBIT 6

**Working Plan for us to Consider**

- Beth to connect with ███ re conversation with parents  <span style="color:red">Student 1</span>
- QW to connect with ████████████████████████████████████  <span style="color:red">CFO and HR Head re: former outside counsel</span>
- QW to consider how to notify DM of leave — will likely travel to Wilmington, DE to inform and have him return to Nashville.
    - Dean, we've been given some information that has prompted us to open an investigation that you're involved with. As a result, we have placed you on leave effective immediately.
    - I have booked a ticket for you to return to Nashville today. Please gather your things and head back to the hotel.
    - We will meet tomorrow morning to discuss. I'm not able to answer further questions at this point in time.
    - No retaliation. No contacting students or colleagues or community member
        - can we block contact from DM to ██ (email / phone number)<span style="color:red">Student 1</span>
        - What can we do during leave
            - Email turned off / blackboard suspended
- QW to form team (IW, JE, BE, PM, NJ, AR, JICT) and brief people.
- Consider mandated reporting obligations and commitment
- At what point do we reach out to past student and family to gather information
- QW to type notes from conversation
- Sub for balance of semester
- Who else may know
    - ████████████████████████████████████████  <span style="color:red">Students</span>
- Support for faculty who are in the loop
- Second order effect of faculty and students
- We can and should talk to ██ about this as well  <span style="color:red">Alumni 1</span>
    - Where is she at? What would she offer? Is there a reason she didn't report?
- Investigations

Questions
- What can we do within our purview during a leave (for investigation)


Suspended Leave — potentially unpaid
Reportable Duty