# EXHIBIT B

# MEMORANDUM

| | |
|---|---|
| To: | TODD MCKEE |
| FROM: | ERIC FRANKLIN AMARANTE |
| DATE: | SEPTEMBER 11, 2025 |
| RE: | AMANI REED AND THE BARNES & THORNBURG REPORT |

## QUESTION PRESENTED

You have asked me to review the *Independent Investigation Report* conducted by Barnes & Thornburg LLP, dated December 18, 2024, and attached to this memorandum as <u>Exhibit A</u> (the "**Report**") and provide a written opinion about whether the Report provides a factual basis to conclude that, within the contexts of the Tennessee Nonprofit Corporation Act and my understanding of the conventional, established roles and responsibilities of governing boards and executive employees of nonprofit corporations, Mr. Amani Reed and/or the Board of Trustees (the "**Board**") of the University School of Nashville (the "**School**") and its members failed to perform their respective roles or fulfill their duties.

## BRIEF ANSWER

As to Mr. Reed, it is my conclusion that the Report provides no factual basis to conclude that he failed to perform his role or his duty as school director. The Report discloses no illegal or inappropriate behavior by Mr. Reed within the context of the conventional role of a nonprofit officer or executive, and the Report provides no basis to conclude that Mr. Reed failed to fulfill his responsibilities. With respect to the Board, however, the Report highlights several actions or omissions that qualify as violations of fundamental nonprofit board responsibilities.

## QUALIFICATIONS

My name is Eric Franklin Amarante and I am a Professor at the University of Tennessee Winston College of Law.[1] I have taught courses on nonprofit law for 15 years[2] and have published several articles on nonprofit governance and regulation. A more complete description of my educational background and qualifications is set forth in my curriculum vitae, attached to this letter as <u>Exhibit B</u>.

## STATEMENT OF FACTS

The School is a nonprofit corporation formed under the laws of Tennessee. The Report addresses the facts and circumstances surrounding Dr. Dean Masullo's inappropriate conduct with a student (the "**Student**") and the ensuing investigation which ultimately resulted in Masullo's termination. Throughout the investigation, Mr. Reed served as director of the School (the "**School Director**"). The Report provides the following findings: (1) Masullo acted inappropriately with a student; (2) the School's initial response was appropriate; (3) the School's overall response "exhibited an overreliance on outside advisors, suffered

---

[1] I am acting in my individual capacity and not as a representative of the Winston College of Law. I reserve the right to modify or supplement the opinions expressed in this memorandum for any reason, including but not limited to review of new evidence or in response to any change in the law. My compensation is not dependent on the content of this memorandum or the outcome of any litigation.

[2] I have taught the following courses, each of which cover nonprofit law: Representing Enterprises, Community Economic Development Clinic, Transactional Law Clinic, and the Small Business and Nonprofit Legal Clinic.

from a lack of coordination, and prioritized process over people;"[3] (4) communication throughout the process was not timely, clear, or accurate; and (5) the School suffered from significant governance flaws.

Of these findings, only the third and fourth implicate Mr. Reed in any way; however, it is important to note that the fifth finding greatly constrained Mr. Reed's actions. The first finding concerns Masullo, the second finding reflects positively upon Mr. Reed, and the fifth finding concludes that the Board, not Mr. Reed, violated fiduciary duties. Although the third and fourth findings include some criticisms of Mr. Reed's actions, the criticisms ignore the conventional roles of nonprofit boards and executives.

## Discussion

### *The Conventional Roles of Nonprofit Boards and Executives*

In Tennessee, all nonprofit corporations are required to have a governing board and certain enumerated officers. In general, the board is charged with setting the nonprofit's overall vision and mission and protecting its assets, while officers and other executives are responsible for the nonprofit's day-to-day activities. Board members and officers each owe fiduciary duties to the nonprofit, which require acting in good faith, with loyalty to the nonprofit, and with appropriate care.

One particularly relevant board responsibility is to establish and maintain policies, which in turn govern the actions of the officers and executives. These responsibilities are well-settled in Tennessee law, and is, in fact, codified in the School's bylaws. According to the Report, Section 1.1 of the School's bylaws set forth the Board's responsibility to establish "all policy concerning the governance, operation and financial viability of the School," while the School Director is "responsible to the Board for the implementation of the policies adopted by the Board."[4] In other words, the Board is responsible for establishing policies and procedures to govern Mr. Reed's role as School Director. Mr. Reed's responsibility is to manage the daily operations of the School by following the Board's policies.

### *Mr. Reed Complied with the Legal Advice of the School's Attorneys*

While the investigation was ongoing, advice from outside legal counsel restricted Mr. Reed's ability to communicate. He did, however, provide as much information as he could, providing investigation updates to the Board, students, parents, and teachers whenever possible. Indeed, the Report finds much to praise concerning Mr. Reed's initial reaction to the Masullo situation. As soon as he learned of the Student's allegations, Mr. Reed immediately abandoned an all-day off-campus event and called the Board President as he drove back to the School. By midday, Mr. Reed convened a group to determine the best path forward and Masullo was placed on leave the following day. Mr. Reed also worked with an *ad hoc* care team to support the Student and approved payment of the Student's counseling.

Despite these actions, the Report reserves some critiques of Mr. Reed. For example, the Report suggests that the investigation could have been more private and less disruptive,[5] that communication generally

---

[3] *Independent Investigation Report*, Barnes & Thornburg LLP, December 18, 2024 (hereinafter, the "The B&T Report") at 33.
[4] *Id*. at 4-5.
[5] *Id*. at 34.

lacked coordination,[6] that Mr. Reed relied too much on outside advisors,[7] and that Mr. Reed "focused on process over people."[8]

But these criticisms are mere opinions emboldened by hindsight. The investigation was led by the School's former outside counsel ("**Counsel**"), and the facts of the investigation were kept confidential. The Report does not explicitly indicate the source of the decision to maintain confidentiality but instead notes that "facts related to employment decisions are generally maintained in confidence."[9] Although the Report asserts that "there was no legal obligation"[10] to keep the investigation confidential, maintaining confidence throughout such an investigation is a common approach.[11] This is because confidentiality protects the privacy of all individuals involved in the investigation, helps ensure the integrity of the investigation, and avoids damage to any employees who were falsely accused. Mr. Reed maintained confidentiality throughout the investigation, even if he did not always agree with the approach. For example, Mr. Reed wanted to explain Masullo's absence to students and faculty while the investigation was in process, but Counsel advised the School to describe it as a "leave of absence" and to say little more.[12]

Regardless of the wisdom of Counsel's advice, it does not make sense to fault Mr. Reed for following legal counsel from the School's lawyers. Whenever Mr. Reed was asked to divulge confidential information—for example, when the Student asked Mr. Reed if Masullo's actions constituted "sexual harassment"—Mr. Reed explained to the Student that confidentiality obligations prohibited him from going into detail.[13] In this light, the Report's admonition that Mr. Reed "put process over people," is just another way of saying that Mr. Reed did his job.

### *The Board Failed to Address Significant Governance Flaws*

According to the Report, the Board failed to fulfill its responsibilities in a number of ways. As set forth in the fifth finding, the Board failed to properly support Mr. Reed in his transition into his role as School Director,[14] had inadequate bylaws that made it difficult to act quickly,[15] failed to comply with the School's Conflict of Interest Policy and Code of Business Conduct and Ethics Policy,[16] and violated its duty to maintain confidentiality.[17]

In addition to these issues, the Board failed to take action that might have helped ease the Student's frustration. After Masullo's termination, the Student asked to address the entire Board. This request went unanswered. Although the Report suggests Mr. Reed's meetings would sometimes leave the victim dissatisfied, there is no indication that Mr. Reed ever avoided meeting with the Student whenever she

---

[6] The B&T Report at 34-36.
[7] *Id*. at 36.
[8] *Id*. at 37-38.
[9] *Id.* at 37.
[10] *Id*. at 37.
[11] *Id*. at 43 (The authors of the Report "acknowledge that maintaining confidentiality in routine employment matters is often advisable.").
[12] *Id*. at 18.
[13] *Id*. at 21-22.
[14] *Id*. at 50-51.
[15] *Id*. at 52.
[16] *Id*. at 53-54.
[17] *Id*. at 54.

asked. The Report found that the Board's failure resulted in the Student's attorney writing a letter that summarized what she wanted to say to the Board if it "had the decency and institutional courage to meet with her and listen to what she had to say."[18] This letter, which was widely circulated, exacerbated an already heated situation.

Finally, I will note that the Report contains repeated references to "best practices,"[19] citing the *Recommendations for Independent School Leaders* by the Independent School Task Force on Educator Sexual Misconduct (the "**Recommendations**"). More specifically, the Report cites the Recommendations to support its assertion that the School should have shared information about the investigation more broadly. The Report references the Recommendations to support some of the criticisms of Mr. Reed.

I do not take issue with the Recommendations and perhaps the School might have alleviated some of the communication issues identified in the Report if it had followed them. That said, it is the Board's responsibility to identify risks, stay up-to-date on best practices, and make appropriate changes to the School's policies. A nonprofit executive could certainly be involved in such a process, but Mr. Reed does not have the authority to unilaterally adopt and implement policies that have not been approved by the Board. This is, again, a fundamental principle of nonprofit corporate governance: the board of directors establish the policies and executives implement the policies.

## CONCLUSION

In sum, the Report reserves its most harsh criticisms for the Board and does not identify any instance in which Mr. Reed violated any legal duty or failed to fulfill any other responsibility as the School Director. Mr. Reed followed policies established by the Board and observed advice from Counsel. Although the Report exposes the Board's failure to competently fulfill its duties, there is nothing in the Report to suggest that Mr. Reed's actions as School Director were unlawful or inappropriate.

---

[18] The B&T Report at 25.
[19] See, e.g., *Id*. at 32.

**Exhibit A**

**The Report**

**Exhibit B**

**Eric Franklin Amarante's Curriculum Vitae**